**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------- x

ALLSTATE INSURANCE COMPANY, ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, AND ALLSTATE PROPERTY & CASUALTY INSURANCE COMPANY,

                                       PLAINTIFFS,

                         -against-

JAMES AVELLINI, M.D., ANATOLIY ABAKIN, D.C., AHMED AHMED, P.T. A/K/A AHMED ABASS, LUDMILA AVSHALUMOVA, L.AC., AMR SAMY ELBEGRMI, P.T., BRAD LACROIX, D.C., JAGA MEDICAL SERVICES, P.C., CORONA MEDICAL PLAZA P.C., ABA CHIROPRACTIC P.C., AHMED AHMED PT P.C., ELMONT REHAB PT, P.C. D/B/A WAVE CREST REHABILITATION PT., HIGH LEVEL CARE PHYSICAL THERAPY P.C., LOGIC CHIROPRACTIC, P.C., MILAS ACUPUNCTURE, P.C., MINDFUL CHIROPRACTIC P.C., STANDARD CARE P.T. P.C., UGP ACUPUNCTURE P.C., VSL ACUPUNCTURE P.C., JOHN DOES 1 THROUGH 20, AND ABC CORPORATIONS 1 THROUGH 20,

                                  DEFENDANTS.

CIVIL ACTION

21-CV-4951

COMPLAINT

(TRIAL BY JURY DEMANDED)

-------------------------------------------------------------------------- x

        Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company (collectively "Plaintiffs" or "Allstate") by their attorneys, Morrison Mahoney LLP, for their Complaint against James Avellini, M.D. ("Avellini"), Anatoliy Abakin, D.C. ("Abakin"), Ahmed Ahmed, P.T. a/k/a Ahmed Abass ("Ahmed"), Ludmila Avshalumova, L.Ac. ("Avshalumova"), Amr Samy Elbegrmi, P.T. ("Elbegrmi"), Brad Lacroix, D.C. ("Lacroix"), JAGA Medical Services, P.C. ("JAGA Medical Services"), Corona Medical Plaza P.C. ("Corona Medical Plaza"), ABA Chiropractic P.C. ("ABA Chiropractic"), Ahmed Ahmed PT P.C. ("Ahmed PT"), Elmont Rehab PT, P.C. d/b/a Wave Crest Rehabilitation PT ("Elmont Rehab PT"), High Level Care Physical Therapy P.C. ("High Level Care Physical Therapy), Logic Chiropractic, P.C. ("Logic Chiropractic"), Milas Acupuncture, P.C. ("Milas Acupuncture"), Mindful Chiropractic P.C.

("Mindful Chiropractic"), Standard Care P.T. P.C. ("Standard Care PT"), UGP Acupuncture P.C. ("UGP Acupuncture"), VSL Acupuncture P.C. ("VSL Acupuncture"), John Does 1 through 20 (the "John Doe Defendants") and ABC Corporations 1 through 20 (the "ABC Corporations") (collectively, "Defendants"), allege as follows:

## PRELIMINARY STATEMENT

1.      On information and belief, from in or about 2013 through the date of the filing of this Complaint, one or more of the John Doe Defendants (collectively the "Controllers") presided over one or more separate but related enterprises that systematically stole hundreds of thousands of dollars from automobile insurance companies, including Plaintiffs, through New York State's No-fault system via the submission of fraudulent claims for medical services submitted by JAGA Medical Services, Corona Medical Plaza, ABA Chiropractic, Ahmed PT, Elmont Rehab PT, High Level Care Physical Therapy, Logic Chiropractic, Milas Acupuncture, Mindful Chiropractic, Standard Care PT, UGP Acupuncture and VSL Acupuncture (hereinafter collectively referred to as the "Fraudulently Owned PCs"), each an entity formed and/or operated in violation of Article 15 of the New York Business Corporation Law (the "B.C.L."), Article 130 of the Education Law and the implementing regulations promulgated by the New York State Department of Financial Services (formerly known as the Department of Insurance) concerning the eligibility requirements of health care providers seeking reimbursement under the No-fault Law (as defined herein).

2.      The Controllers, none of whom are licensed and/or authorized to operate and/or own a medical professional corporation in the State of New York, orchestrated the fraud alleged herein, with the assistance, participation and agreement of Defendants Avellini, Abakin, Ahmed, Avshalumova, Elbegrmi, and/or Lacroix (hereinafter collectively referred to as the "Paper Owners"), who in exchange for ostensibly being paid to provide medical services,

allowed their names, signatures and licenses to be used to fraudulently bill insurance companies for services that were either never rendered or were medically unnecessary.

3.       On information and belief, in furtherance of the scheme to defraud alleged herein, one or more of the Controllers, using the names and licenses of the Paper Owners, established three separate medical mills that they utilized to fraudulently bill Allstate for bogus services, including but not limited to diagnostic testing, chiropractic, acupuncture and physical therapy services.

4.       Each of the medical mill clinics established by the Controllers consisted of, at a minimum, a medical doctor, chiropractor, acupuncturist and physical therapist, all of which would treat virtually every patient that presented at their location, irrespective of medical necessity.

5.       In furtherance of the scheme to defraud alleged herein, one or more of the Controllers established a multidisciplinary clinic at 104-08 Roosevelt Avenue, Corona, New York (the "Corona Clinic"), which, through Corona Medial Plaza, ABA Chiropractic, Elmont Rehab PT and UGP Acupuncture, (the "Corona Clinic Providers"), provided virtually all Claimants that presented at the Corona Clinic with diagnostic testing, chiropractic, acupuncture and physical therapy services, respectively, irrespective of medical necessity.

6.       Similarly, in furtherance of the scheme to defraud alleged herein, one or more of the Controllers established a multidisciplinary clinic at 107-04 Jamaica Avenue, Richmond Hill, NY (the "Richmond Hill Clinic") which, through JAGA Medical Services, Logic Chiropractic, VSL Acupuncture and High Level Care Physical Therapy (the "Richmond Hill Clinic Providers"), provided virtually all Claimants that presented at the Richmond Hill Clinic with  diagnostic testing, chiropractic, acupuncture and physical therapy services, respectively, irrespective of medical necessity.

7.      Additionally, in furtherance of the scheme to defraud alleged herein, one or more of the Controllers established a multidisciplinary clinic at 1900 B Ralph Avenue, Brooklyn, NY (the "Brooklyn Clinic") which, through JAGA Medical Services, Mindful Chiropractic, Standard Care PT and Ahmed PT, and Milas Acupuncture (the "Brooklyn Clinic Providers"), provided virtually all Claimants that presented at the Brooklyn Clinic with diagnostic testing, chiropractic, acupuncture and physical therapy services, respectively, irrespective of medical necessity.

8.      Each of the Defendant Paper Owners knowingly allowed fictitious bills to be submitted under their names in association with one or more of Fraudulently Owned PCs named herein, each of which is a fraudulently owned and improperly licensed medical professional corporation that was used to fraudulently bill insurance companies in general, and Allstate in particular, at the Corona Clinic, Richmond Hill Clinic and/or the Brooklyn Clinic (collectively the "Fraudulent Multidisciplinary Clinics").

9.      In *State Farm Mut. Auto. Ins. Co. v. Mallela*, 4 N.Y.3d 313, 827 N.E.2d 758, 794 N.Y.S.2d 700 (2005), the New York Court of Appeals held, in part, that (1) a professional corporation not licensed in accordance with applicable New York state law is not entitled to recover benefits under the No-fault Law and implementing regulations irrespective of the date of service, and (2) an insurer is entitled to recover payments made to such an entity on or after April 4, 2002, the effective date of the amended No-fault regulations.

10.     In carrying out their fraudulent scheme, one or more of the Controllers used the names of one or more of the Paper Owners to fraudulently incorporate and/or own professional service corporations in which they engaged in the unlicensed practice of health care services and held out the Fraudulently Owned PCs to be legitimate professional service corporations that were properly licensed in accordance with applicable New York State and local law when

4

in fact they were not.

11.     This action seeks to prevent the Defendants from continuing to illegally seek reimbursement of benefits under New York State's No-fault system through fraudulently owned professional corporations and/or pursuant to an unlawful referral scheme.

12.     In violation of Article 15 of the B.C.L. and the stringent eligibility and reimbursement requirements mandated under the New York State No-fault Law and implementing regulations, one or more of the Controllers have been and are the illegal owners of one or more of the Fraudulently Owned PCs, which are purportedly owned on paper as medical professional corporations by the Paper Owners.

13.     On information and belief, in violation of Article 15 of the B.C.L., one or more of the Controllers purchased or otherwise was permitted to use the name and license of the Paper Owners to fraudulently own, control and/or operate the Fraudulently Owned PCs.

14.     At all relevant times mentioned herein, one or more of the Controllers were the true beneficial owners of one or more of the Fraudulently Owned PCs, which they owned, controlled and operated.

15.     At all relevant times mentioned herein, the Fraudulently Owned PCs submitted and/or continue to submit bills for payment, and/or have sought and/or continue to seek collection on such bills from, No-fault insurers in general, and Allstate in particular, for healthcare services.

16.     At all relevant times mentioned herein, although pursuant to and in purported compliance with Section 1503 of the B.C.L., the Paper Owners were listed as the sole shareholders, officers and directors of their respective Fraudulently Owned PCs on the certificates of incorporation filed with the Department of State, when in fact, they were nominal owners who abdicated and/or ceded all or part of their ownership interest therein and control

to one or more of the Controllers who are not licensed to practice medicine or own medical professional corporations in the State of New York.

17. On information and belief, Defendant Avellini, who was the Paper Owner of a medical professional corporation at each of the three locations at which the Defendants perpetrated their scheme, has a long history of engaging in schemes to defraud such as that alleged herein by ceding ownership and control of medical professional corporations incorporated under his name to persons not licensed to practice medicine or own medical professional corporations in the State of New York.

18. By way of example and not limitation, in the matter of *Government Employees Insurance Co., et al. v. James Avellini, M.D., et al.*, (1:15-cv-04070-RDJ-MDG), the plaintiff-insurers alleged that Defendant Avellini participated in a scheme which defrauded them out of more than $1,240,00.00 by, among other things, ceding ownership of two medical professional corporations incorporated under his name (Central Broadway Medical, P.C. and Professional Medical Healthcare Services of New York, P.C.) to persons not licensed to practice medicine or own medical professional corporations in the State of New York.

19. Under the fraudulent scheme described herein, the Fraudulently Owned PCs billed for professional services purportedly provided to persons who allegedly sustained injuries covered under the No-fault Law in violation of Article 15 of the B.C.L., which governs the corporate practice of medicine in New York State and requires any corporation that provides medical services to do so as a professional corporation owned and controlled exclusively by licensed physicians. The practice of medicine by one who is not a physician, as well as the sale of a medical license by a physician, are felonies pursuant to Section 6512 of the New York Education Law.

20. On information and belief, in violation of Article 15 of the B.C.L., pursuant to

the illicit scheme described herein, the Paper Owners abdicated and/or were divested of any and all attributes of true ownership and control of the Fraudulently Owned PCs, which were diverted and/or ceded to one or more of the Controllers and/or one or more of the ABC Corporations, in which one or more of the Controllers also maintained a similar ownership and financial interest.

21.     The Controllers submitted claims through one or more of the Fraudulently Owned PCs for healthcare services purportedly rendered to persons who allegedly sustained injuries covered under the No-fault Law (hereinafter referred to as "Claimants"). Under that law, policyholders and others who sustain injuries in automobile accidents can obtain payments from the policyholders' automobile insurance companies for necessary medical care, including treatments, tests and medical equipment ordered by the Claimants' physicians.

22.     Under the No-fault Law, Claimants can only assign the right to payment of such benefits directly to doctors and other licensed healthcare providers, enabling them to bill insurance companies directly for their services. Defendants exploited the No-fault system by obtaining such assignments, and by billing insurers for healthcare services rendered by fraudulently owned professional corporations in violation of the No-fault Law.

23.     On information and belief, at all relevant times mentioned herein, the cash or other proceeds of Defendants' schemes were either funneled directly to the Controllers or to one or more of the ABC Corporations, through which such proceeds were then funneled to the Controllers.

24.     By using the name and license of the Paper Owners to fraudulently incorporate, own, operate and control the Fraudulently Owned PCs, the Controllers held out one or more of the Fraudulently Owned PCs to be legitimate professional corporations in compliance with core licensing requirements when, in fact, they were not.  In doing so, the Controllers

perpetrated a fraud upon the public and Plaintiffs, among others.

25.     By allowing their names and licenses to be used to fraudulently incorporate, and/or to vest in one or more of the Controllers ownership, control and operation of the Fraudulently Owned PCs, the Paper Owners held out their respective Fraudulently Owned PCs to be legitimate professional corporations in compliance with core licensing requirements when, in fact, they were not.  In doing so, the Paper Owners perpetrated a fraud upon the public and the Plaintiffs, among others.

26.     In contravention of the strong public policy concerns of the New York State Legislature in regulating the licensing of, and limiting the practice of medicine to, qualified professionals, the Controllers circumvented the laws of the State and have imperiled the welfare of the public by engaging in the wholesale purchase and/or misuse of the Paper Owners' professional license.

27.     On information and belief, the Fraudulently Owned PCs were created for the singular purpose of fraudulently billing insurance companies under the No-fault Law and sweeping the illicit profits gained therefrom to one or more of the Controllers, through substantial, regular payments made by the Fraudulently Owned PCs, to among others, the ABC Corporations, which were owned and operated by one or more of the Controllers and/or others unknown to Plaintiffs.

28.     Separate and apart from their illegal corporate structure, the Defendants participated in massive and substantively similar billing fraud operations at the Corona Clinic, Brooklyn Clinic and Richmond Hill Clinic, routinely submitting bills to insurers, in general, and Allstate in particular, for services that were never rendered, not of any diagnostic or treatment value and/or reflected a pattern of billing for services that were medically unnecessary.

29.     On information and belief, in addition to having a long history of ceding ownership and control of medical professional corporations incorporated under his name to persons not licensed to practice medicine or own medical professional corporations in the State of New York, Defendant Avellini similarly has a history of engaging is schemes to defraud in which he billed for services that were devoid of any diagnostic or treatment value and which reflect a pattern of billing for services that were medically unnecessary.

30.     By way of example and not limitation, in the matter of *State Farm Mutual Auto Insurance Company, et al. v. Corona Medical Plaza, P.C., et al.*, (1:17-cv-00258-FB-VMS), it was alleged that Defendant Avellini caused Corona Medical Plaza to submit fraudulent documents to the plaintiff-insurers in connection with claims for reimbursement, with medical reports reflecting illegitimate patient histories, examinations, findings, diagnoses, or treatment plans, as well a protocol of treatment without regard for medical necessity.

31.     In furtherance of their scheme to defraud, Defendants concocted a sophisticated fraudulent billing and medical documentation scheme that created the impression that Claimants had serious injuries and medical conditions that required, among other things, chiropractic services, physical therapy, acupuncture, and diagnostic testing (collectively referred to herein as "Fraudulent Services"), when in fact no such injuries and/or conditions existed.

32.     On information and belief, one or more of the Controllers, at each location, directly and/or indirectly through the Paper Owners, directed and/or steered occupants of insured motor vehicles and pedestrians purportedly entitled to benefits under the No-fault Law who purportedly receiving treatment at one of the Fraudulently Owned PCs to another of the Fraudulently Owned PCs for the Fraudulent Services as part of an illegal referral arrangement without regard to medical necessity.

33.     Irrespective of whether a Claimant was treated at the Corona Clinic, Richmond Hill Clinic or Brooklyn Clinic, a "patient's" initial consultation and follow-up visits created and maintained the illusion of serious injuries, a misrepresented fact that was used to justify further consultations, testing, treatment and referrals to other related providers at the same respective clinic. By the conclusion of their treatment many "patients" would receive virtually identical examinations and unwarranted referrals for, among other things, chiropractic services, physical therapy, acupuncture, as well as electrodiagnostic testing, range of motion testing, manual muscle testing and/or outcome assessment testing (electrodiagnostic testing, range of motion testing, manual muscle testing and/or outcome assessment testing are collectively referred to herein as the "Fraudulent Diagnostic Testing").

34.     On information and belief, the majority of Claimants (as defined herein) who were purportedly treated by more than one of the Fraudulently Owned PCs were referred by another of the Fraudulently Owned PCs, which provided all of the Fraudulently Owned PCs with a steady stream of Claimants to utilize to submit fraudulent billing to Plaintiffs.

35.     By way of example and not limitation, in a representative sample of 172 Claimants that were purportedly treated at a single Fraudulently Owned PC, at least 167 Claimants (approximately 95%) were concurrently treated by more than one Fraudulently Owned PC.  Moreover, 140 of the Claimants in the representative sample (approximately 80%) received treatment at all four Fraudulently Owned PCs at each location (the Corona Clinic, Brooklyn Clinic or Richmond Hill Clinic) where the Claimants were purportedly treated.

36.     On information and belief, the Fraudulently Owned PCs greatly profited from self-referrals for chiropractic services, physical therapy, acupuncture, electrodiagnostic testing, range of motion testing, manual muscle testing and/or outcome assessment testing, all of which the Fraudulently Owned PCs would bill for, regardless of whether the services were actually

rendered or medically necessary.

37.     In addition, in furtherance of the scheme to defraud alleged herein, as a matter of practice, procedure and protocol, Defendants JAGA Medical Services and Corona Medical Plaza billed Allstate for nerve conduction velocity ("NCV") tests and electromyograms ("EMG") that Defendant Avellini knew or should have known were performed, if at all, contrary to the prevailing standard of care and resulted in invalid data, findings and diagnoses that endangered the welfare of the Claimants, thereby putting them at risk of having undiagnosed medical conditions and diseases, and/or the wrong diagnosis and wrong treatment.

38.     By submitting fictitious bills and reports for NCV and EMG testing to Allstate, Defendants JAGA Medical Services and Corona Medical Plaza misrepresented the actual medical status of the Claimants and the services purportedly rendered, which were not provided as billed, if provided at all.

39.     Once one or more of the Fraudulently Owned PCs directed and/or steered their patient population to another of the Fraudulently Owned PCs, the Paper Owners, through their respective Fraudulently Owned PCs that they purported to own, billed No-fault insurers, in general, and Plaintiffs, in particular, for pain management services, physical therapy, acupuncture services, diagnostic tests and/or chiropractic care purportedly rendered to the Claimants.

40.     At all relevant times mentioned herein, the Defendants knew or should have known that the Claimants that were directed and/or caused to be directed and/or steered by the Fraudulently Owned PCs would be used to obtain payment from insurers in general, and Allstate in particular, in connection with fraudulent claims.

41.     Because the Claimants purportedly treated by the Fraudulently Owned PCs

were directed, referred and/or steered for services in furtherance of Defendants' scheme to defraud, any bills submitted to Plaintiffs for such services were fraudulent and, as such, never eligible for reimbursement.

42.     The No-fault Law is a statutory creation, in derogation of the common law, and must be strictly construed.  This lawsuit seeks, among other things, to enforce the plain language of the No-fault Law and implementing regulations, as well as its underlying public policy, which limits reimbursement of No-fault benefits to properly licensed professional corporations that provide medically necessary services. In doing so, Plaintiffs seek compensatory damages and declaratory judgment that Plaintiffs are not required to pay any No-fault claims from the Fraudulently Owned PCs that seek reimbursement for any medical services that resulted from the Fraudulently Owned PCs' fraudulent incorporation and/or control and/or ownership by laypersons or that resulted from an illegal referral scheme.

43.     Such claims continue to be the subject of No-fault collection actions and/or arbitrations to recover benefits, and thus constitute a continuing harm to Plaintiffs.

44.     By way of example and not limitation, annexed hereto as Exhibit "1" is a spreadsheet listing the No-fault claims on which Plaintiffs made payments to the Fraudulently Owned PCs and to which they are not entitled because of their fraudulent corporate structure and because they resulted from an unlawful referral scheme. By way of further example and not limitation, annexed hereto as Exhibit "2" is a spreadsheet listing the No-fault claims that form the basis of Plaintiffs' request for declaratory relief. Said spreadsheets are grouped by PC, claim number, date of service and the amount pending.

45.     Every aspect of Defendants' fraudulent scheme was motivated by money and greed, without regard to the grave harm inflicted on the public at large by the Fraudulently

Owned PCs, which held themselves out as being legitimate health care providers when, in fact, they were not.

46.     The practices alleged herein were conducted willfully, with the sole object of converting money, in utter disregard of their impact on the premium-paying public and in flagrant disregard of the rules and laws governing provision of services under the No-fault Law.

47.     The fraudulent billing activity described herein not only is an imminent and ongoing threat to consumers' health, but it drains the limited health care resources of this Country, resources which are already under strain to meet legitimate healthcare needs. The New York State Department of Financial Services and insurance committees in both the New York State Senate and Assembly each estimate that No-fault insurance fraud is costing New York State consumers in excess of one billion dollars a year.

48.     The duration, scope and nature of all Defendants' illegal conduct brings this case well within the realm of criminal conduct to which the Racketeering Influenced and Corrupt Organization Act ("RICO") applies. Defendants did not engage in sporadic acts of fraud—although that would be troubling enough—they adopted a fraudulent blueprint as their business plan and used it to participate in a systematic pattern of racketeering activity. Every facet of Defendants' operations, from generating fraudulent supporting medical documents to record keeping to billing, was carried out for the purpose of committing fraud.

## NATURE OF THE ACTION

49.     This action is brought pursuant to:

> i)      The United States Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, 1962(c), 1962(d) and 1964(c);
>
> ii)     New York state common law; and
>
> iii)    The Federal Declaratory Judgment Act; 28 U.S.C. §§ 2201, 2202.

## NATURE OF RELIEF SOUGHT

50.     Plaintiffs seek treble damages that they sustained as a result of the Defendants' schemes and artifices to defraud, and the Defendants' acts of mail fraud (pursuant to 18 U.S.C. § 1341), in connection with their use of the facilities of the No-fault system and its assignment of benefits mechanism to fraudulently obtain payments from Plaintiffs for medical services they allegedly rendered to individuals covered by Plaintiffs under New York State's No-fault Law.

51.     Plaintiffs seek compensatory damages to recover all payments made to the Fraudulently Owned PCs during the time periods alleged herein as a result of Defendants fraudulently obtaining payments from Plaintiffs for purported medical services rendered by fraudulently incorporated professional corporations, that were medically unnecessary and of no diagnostic or treatment value, and/or that were provided pursuant to an illegal referral scheme, to individuals covered by Plaintiffs under New York State's No-fault Law.

52.     Plaintiffs further seek recovery of the No-fault claim payments made under the independent theory of unjust enrichment.

53.     Plaintiffs also seek a judgment declaring that Plaintiffs are under no obligation to pay any of the Fraudulently Owned PCs' No-fault claims because they are not licensed in

accordance with applicable New York state law and therefore are not entitled to recover benefits under the No-fault Law and implementing regulations, and a judgment declaring that Allstate is under no obligation to pay any of the Defendants' No-fault claims arising from any examination, testing or treatment of Claimants because of Defendants' fraudulent and deceptive scheme to induce such payments as alleged herein.

54.     As a result of Defendants' actions alleged herein, Plaintiffs were defrauded of an amount in excess of $1,277,889.48, the exact amount to be determined at trial, in payments which Defendants received for billing Plaintiffs for purported medical services provided by fraudulently owned professional corporations, and which were medically unnecessary, of no diagnostic or treatment value, and/or provided pursuant to an illegal referral scheme.

## THE PARTIES

### A.     Plaintiffs

55.     Plaintiff Allstate Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

56.     Plaintiff Allstate Fire and Casualty Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

57.     Plaintiff Allstate Indemnity Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

58.     Plaintiff Allstate Property and Casualty Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

59.     Plaintiffs are duly organized and licensed to engage in the writing of automobile insurance policies in the State of New York and provide automobile insurance coverage to their policyholders under and in accordance with New York state law.

**B.      The Licensed Healthcare Professional Defendants**

60.     Defendant James Avellini is a citizen of New Jersey and was licensed to practice medicine in the State of New York on or about October 30, 1981 under license number 148049, and is listed with the Departments of State and Education as the sole owner of JAGA Medical Services, P.C. and Corona Medical Plaza P.C. In furtherance of the scheme to defraud alleged herein, Defendant Avellini transacted business within New York State and/or contracted to provide services within New York State.

61.     On information and belief, to facilitate the fraudulent incorporation and/or illegal corporate structure of Corona Medical Plaza and JAGA Medical Services, Defendant Avellini sold his name and/or the use of his license for a fee and/or other compensation to one or more of the Controllers, and provided the essential means for one or more of the Controllers to fraudulently incorporate and/or operate Corona Medical Plaza and JAGA Medical Services, and bill for purported medical services through Corona Medical Plaza and JAGA Medical Services in violation of applicable New York state law.

62.     In addition to selling his name and/or the use of his license for a fee and/or other compensation, in furtherance of the scheme to defraud alleged herein, Defendant Avellini billed Plaintiffs for services that were not medically necessary and/or of no diagnostic or treatment value.

63.     Defendant Anatoliy Abakin, D.C. is a natural person residing in the State of New York and has practiced as a chiropractor in the State of New York under license number 010303, issued by the New York State Education Department on or about December 24, 2001.

16

Defendant Abakin is listed with the Departments of State and Education as the sole owner of ABA Chiropractic and Logic Chiropractic.

64.     On information and belief, to facilitate the fraudulent incorporation and/or illegal corporate structure of ABA Chiropractic and Logic Chiropractic, Defendant Abakin sold his name and/or the use of his license for a fee and/or other compensation to one or more of the Controllers, and provided the essential means for one or more of the Controllers to fraudulently incorporate and/or operate ABA Chiropractic and Logic Chiropractic, and bill for purported medical services through ABA Chiropractic and Logic Chiropractic in violation of applicable New York state law.

65.     In addition to selling his name and/or the use of his license for a fee and/or other compensation, in furtherance of the scheme to defraud alleged herein, Defendant Abakin billed Plaintiffs for services that were not medically necessary and/or of no diagnostic or treatment value.

66.     Defendant Ahmed Ahmed, P.T., a/k/a Ahmed Abass is a natural person residing in the State of New Jersey and has practiced as a physical therapist in the State of New York under license number 018065, issued by the New York State Education Department on or about April 15, 1998.  Defendant Ahmed is listed with the Departments of State and Education as the sole owner of Ahmed PT, Elmont Rehab PT and High Level Care Physical Therapy. In furtherance of the scheme to defraud alleged herein, Defendant Ahmed transacted business within New York State and/or contracted to provide services within New York State.

67.     On information and belief, to facilitate the fraudulent incorporation and/or illegal corporate structure of Ahmed PT, Elmont Rehab PT, and High Level Care Physical Therapy, Defendant Ahmed sold his name and/or the use of his license for a fee and/or other compensation to one or more of the Controllers, and provided the essential means for one or

more of the Controllers to fraudulently incorporate and/or operate Ahmed PT, Elmont Rehab PT, and High Level Care Physical Therapy, and bill for purported medical services through Ahmed PT, Elmont Rehab PT, and High Level Care Physical Therapy in violation of applicable New York state law.

68.    In addition to selling his name and/or the use of his license for a fee and/or other compensation, in furtherance of the scheme to defraud alleged herein, Defendant Ahmed billed Plaintiffs for services that were not medically necessary and/or of no diagnostic or treatment value.

69.    Defendant Ludmila Avshalumova, L.Ac. is a natural person residing in the State of New York and has practiced acupuncture in the State of New York under license number 002911, issued by the New York State Education Department on or about January 6, 2005. Defendant Avshalumova is listed with the Departments of State and Education as the sole owner Defendants Milas Acupuncture, UGP Acupuncture and VSL Acupuncture.

70.    On information and belief, to facilitate the fraudulent incorporation and/or illegal corporate structure of Milas Acupuncture, UGP Acupuncture and VSL Acupuncture, Defendant Avshalumova sold her name and/or the use of her license for a fee and/or other compensation to one or more of the Controllers, and provided the essential means for one or more of the Controllers to fraudulently incorporate and/or operate Milas Acupuncture, UGP Acupuncture and VSL Acupuncture, and bill for purported medical services through Milas Acupuncture, UGP Acupuncture and VSL Acupuncture in violation of applicable New York state law.

71.    In addition to selling her name and/or the use of her license for a fee and/or other compensation, in furtherance of the scheme to defraud alleged herein, Defendant Avshalumova billed Plaintiffs for services that were not medically necessary and/or of no

18

diagnostic or treatment value.

72.     Defendant Amr Samy Elbegrmi, P.T., is a natural person residing in the State of New Jersey and has practiced as a physical therapist in the State of New York under license number 039715, issued by the New York State Education Department on or about November 19, 2015.  Defendant Elbegrmi is listed with the Departments of State and Education as the sole owner of Standard Care PT.  In furtherance of the scheme to defraud alleged herein, Defendant Elbegrmi transacted business within New York State and/or contracted to provide services within New York State.

73.     On information and belief, to facilitate the fraudulent incorporation and/or illegal corporate structure of Standard Care PT, Defendant Elbegrmi sold his name and/or the use of his license for a fee and/or other compensation to one or more of the Controllers, and provided the essential means for one or more of the Controllers to fraudulently incorporate and/or operate Standard Care PT, and bill for purported medical services through Standard Care PT in violation of applicable New York state law.

74.     In addition to selling his name and/or the use of his license for a fee and/or other compensation, in furtherance of the scheme to defraud alleged herein, Defendant Elbegrmi billed Plaintiffs for services that were not medically necessary and/or of no diagnostic or treatment value.

75.     Defendant Brad Lacroix, D.C. is a natural person residing in the State of New York and has practiced as a chiropractor in the State of New York under license number 012121, issued by the New York State Education Department on or about December 15, 2011.  Defendant Lacroix is listed with the Departments of State and Education as the sole owner of Mindful Chiropractic.

76.     On information and belief, to facilitate the fraudulent incorporation and/or

illegal corporate structure of Mindful Chiropractic, Defendant Lacroix sold his name and/or the use of his license for a fee and/or other compensation to one or more of the Controllers, and provided the essential means for one or more of the Controllers to fraudulently incorporate and/or operate Mindful Chiropractic, and bill for purported medical services through Mindful Chiropractic in violation of applicable New York state law.

77.     In addition to selling his name and/or the use of his license for a fee and/or other compensation, in furtherance of the scheme to defraud alleged herein, Defendant Lacroix billed Plaintiffs for services that were not medically necessary and/or of no diagnostic or treatment value.

## C.     **The Fraudulently Owned PC Defendants**

78.     Defendant JAGA Medical Services, P.C. was incorporated on or about September 30, 2009, and purports to be a professional corporation authorized to do business in the State of New York, with its principal place of business located in New York. Defendant Avellini is the nominal paper owner of Defendant JAGA Medical Services, P.C., and, on information and belief, received an agreed upon salary and/or other compensation for doing so from the John Doe Defendants and/or one or more of the ABC Corporations in exchange for allowing his name and license to be used on corporate filings made with the New York State Departments of State and Education on behalf of Defendant JAGA Medical Services, P.C.

79.     Defendant Corona Medical Plaza P.C. was incorporated on or about September 6, 2013, and purports to be a professional corporation authorized to do business in the State of New York, with its principal place of business located in New York. Defendant Avellini is the nominal paper owner of Defendant Corona Medical Plaza, and, on information and belief, received an agreed upon salary and/or other compensation for doing so from the John Doe Defendants and/or one or more of the ABC Corporations in exchange for allowing his name

and license to be used on corporate filings made with the New York State Departments of State and Education on behalf of Defendant Corona Medical Plaza.

80.     Defendant ABA Chiropractic P.C. was incorporated on or about December 19, 2007, and purports to be a professional corporation authorized to do business in the State of New York, with its principal place of business located in New York. Defendant Abakin is the nominal paper owner of Defendant ABA Chiropractic P.C. and, on information and belief, received an agreed upon salary and/or other compensation for doing so from the John Doe Defendants and/or one or more of the ABC Corporations in exchange for allowing his name and license to be used on corporate filings made with the New York State Departments of State and Education on behalf of Defendant ABA Chiropractic P.C.

81.     Defendant Ahmed Ahmed PT P.C. was incorporated on or about March 5, 2018, and purports to be a professional corporation authorized to do business in the State of New York, with its principal place of business located in New York. Defendant Ahmed is the nominal paper owner of Defendant Ahmed Ahmed PT P.C. and, on information and belief, received an agreed upon salary and/or other compensation for doing so from the John Doe Defendants and/or one or more of the ABC Corporations in exchange for allowing his name and license to be used on corporate filings made with the New York State Departments of State and Education on behalf of Defendant Ahmed Ahmed PT P.C.

82.     Defendant Elmont Rehab PT, P.C. was incorporated on or about March 11, 2010, and purports to be a professional corporation authorized to do business in the State of New York, with its principal place of business located in New York. Defendant Ahmed is the nominal paper owner of Defendant Elmont Rehab PT, P.C. and, on information and belief, received an agreed upon salary and/or other compensation for doing so from the John Doe Defendants and/or one or more of the ABC Corporations in exchange for allowing his name

and license to be used on corporate filings made with the New York State Departments of State and Education on behalf of Defendant Elmont Rehab PT, P.C.

83.     Defendant High Level Care Physical Therapy P.C. was incorporated on or about April 11, 2014, and purports to be a professional corporation authorized to do business in the State of New York, with its principal place of business located in New York. Defendant Ahmed is the nominal paper owner of Defendant High Level Care Physical Therapy P.C. and, on information and belief, received an agreed upon salary and/or other compensation for doing so from the John Doe Defendants and/or one or more of the ABC Corporations in exchange for allowing his name and license to be used on corporate filings made with the New York State Departments of State and Education on behalf of Defendant High Level Care Physical Therapy P.C.

84.     Defendant Logic Chiropractic, P.C. was incorporated on or about August 26, 2010, and purports to be a professional corporation authorized to do business in the State of New York, with its principal place of business located in New York. Defendant Abakin is the nominal paper owner of Defendant Logic Chiropractic, P.C. and, on information and belief, received an agreed upon salary and/or other compensation for doing so from the John Doe Defendants and/or one or more of the ABC Corporations in exchange for allowing his name and license to be used on corporate filings made with the New York State Departments of State and Education on behalf of Defendant Logic Chiropractic, P.C.

85.     Defendant Milas Acupuncture, P.C. was incorporated on or about June 16, 2017, and purports to be a professional corporation authorized to do business in the State of New York, with its principal place of business located in New York. Defendant Avshalumova is the nominal paper owner of Defendant Milas Acupuncture, P.C. and, on information and belief, received an agreed upon salary and/or other compensation from the John Doe Defendants

and/or one or more of the ABC Corporations in exchange for allowing her name and license to be used on corporate filings made with the New York State Departments of State and Education on behalf of Defendant Milas Acupuncture, P.C.

86.     Defendant Mindful Chiropractic P.C. was incorporated on or about September 18, 2017, and purports to be a professional corporation authorized to do business in the State of New York, with its principal place of business located in New York. Defendant Lacroix is the nominal paper owner of Defendant Mindful Chiropractic P.C. and, on information and belief, received an agreed upon salary and/or other compensation for doing so from the John Doe Defendants and/or one or more of the ABC Corporations in exchange for allowing his name and license to be used on corporate filings made with the New York State Departments of State and Education on behalf of Defendant Mindful Chiropractic P.C.

87.     Defendant Standard Care P.T. P.C. was incorporated on or about July 3, 2017, and purports to be a professional corporation authorized to do business in the State of New York, with its principal place of business located in New York. Defendant Elbegrmi is the nominal paper owner of Defendant Standard Care P.T. P.C. and, on information and belief, received an agreed upon salary and/or other compensation for doing so from the John Doe Defendants and/or one or more of the ABC Corporations in exchange for allowing his name and license to be used on corporate filings made with the New York State Departments of State and Education on behalf of Defendant Standard Care P.T. P.C.

88.     Defendant UGP Acupuncture P.C. was incorporated on or about December 5, 2012, and purports to be a professional corporation authorized to do business in the State of New York, with its principal place of business located in New York. Defendant Avshalumova is the nominal paper owner of Defendant UGP Acupuncture P.C. and, on information and belief, received an agreed upon salary and/or other compensation for doing so from the John

Doe Defendants and/or one or more of the ABC Corporations in exchange for allowing her name and license to be used on corporate filings made with the New York State Departments of State and Education on behalf of Defendant UGP Acupuncture P.C.

89.     Defendant VSL Acupuncture P.C. was incorporated on or about June 6, 2013, and purports to be a professional corporation authorized to do business in the State of New York, with its principal place of business located in New York. Defendant Avshalumova is the nominal paper owner of Defendant VSL Acupuncture P.C. and, on information and belief, received an agreed upon salary and/or other compensation for doing so from the John Doe Defendants and/or one or more of the ABC Corporations in exchange for allowing her name and license to be used on corporate filings made with the New York State Departments of State and Education on behalf of Defendant VSL Acupuncture P.C.

**D.     The John Doe Defendants**

90.     Defendants John Does 1 through 20 are individuals who conspired, participated, conducted and assisted in the fraudulent and unlawful conduct alleged herein. These individuals will be added as defendants when their names and the extent of their participation become known through discovery.

**E.     The ABC Corporation Defendants**

91.     The Defendant ABC Corporations 1 through 20 are additional companies that are unknown to Plaintiffs and are owned, controlled and operated by one or more of the Controllers, and which entered into ostensible agreements and other contracts with one or more of the Fraudulently Owned PCs and/or were used to funnel money to one or more of the Controllers.

92.     On information and belief, the ABC Corporations also are the alter egos of one or more of the Controllers and conspired and assisted in the fraudulent and unlawful conduct

alleged herein. These corporations will be added as Defendants when their names and the extent of their participation become known through discovery.

## JURISDICTION AND VENUE

93.     The jurisdiction of the Court arises under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*; 28 U.S.C. §§ 1331; and principles of pendent jurisdiction.

94.     The Court has supplemental jurisdiction over the claims arising under state law pursuant to 28 U.S.C. § 1367(a) and under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

95.     Venue lies in this District Court under the provisions of 28 U.S.C. § 1391, as the Eastern District of New York is the district where one or more of the Defendants reside and because this is the district where a substantial amount of the activities forming the basis of the Complaint occurred.

## FACTUAL BACKGROUND AND ALLEGATIONS
## APPLICABLE TO ALL CAUSES OF ACTION

96.     Plaintiffs underwrite automobile insurance in New York State and participate as insurers in New York State's No-fault program.

97.     Under the Comprehensive Motor Vehicle Insurance Reparations Act of New York State, Ins. Law (popularly known as the "No-fault Law") §§ 5101, *et seq.*, Plaintiffs are required to pay, *inter alia*, for health service expenses that are reasonably incurred as a result of injuries suffered by Claimants that arise from the use or operation of such motor vehicles in the State of New York.

98.     On information and belief, each of the Fraudulently Owned PCs are ostensibly healthcare providers that bill for treatments to, among others, individuals covered under the

No-fault Law. In exchange for their services, the Fraudulently Owned PCs accept assignments of benefits from Claimants and submit claims for payment to No-fault insurance carriers, in general, and to Plaintiffs, in particular.

99. Under the No-fault Law and implementing regulations, a provider of healthcare services is not eligible for reimbursement under Section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

## A.    **Control / Ownership of Professional Corporations**

100. Pursuant to Section 1504(a) of the B.C.L. and regulations promulgated by the New York State Department of Health, professional service corporations may only render professional services through individuals authorized by law to render such professional services.

101. Section 1504(c) of the B.C.L. requires, among other things, that:

> each report, diagnosis, prognosis, and prescription made or issued by a corporation practicing medicine, . . . physiotherapy or chiropractic shall bear the signature of one or more physicians, . . . physiotherapists, or chiropractors, respectively, who are in responsible charge of such report, diagnosis, prognosis, or prescription.

102. Section 1507 of the B.C.L. prohibits a shareholder of a professional service corporation from issuing shares, entering into an agreement, granting proxies or transferring control to individuals who are not authorized by law to practice the profession for which the professional corporation is authorized to practice, and it further provides that "[a]ll shares issued, agreements made or proxies granted in violation of this section shall be void."  B.C.L. § 1507(a).

103.    Similarly, under section 1508 of the B.C.L., no individual may be a director or officer of a professional service corporation unless that individual is authorized by law to practice in the same profession that the corporation is authorized to practice.

104.    Section 1503(b) of the B.C.L. requires that the certificates of incorporation for an entity seeking to practice as a professional service corporation state the profession to be practiced by such corporation and the names and resident addresses of all individuals who are to be the original shareholders, directors and officers of such corporation.

105.    The restrictions contained in Article 15 of the B.C.L. were meant to "ensure that a professional service corporation renders professional services only through qualified members of the professions and are *in fact controlled only by qualified members*." New York Legislative Annual 1970, p. 129 (emphasis added).  Restrictions in Section 1507 of the B.C.L. in particular were designed to "insure that a professional service corporation [such as the Fraudulently Owned PCs here] *could not be* controlled by a layperson." New York State Legislative Annual 1971, p. 130 (emphasis added). These are not mere technical requirements, but are part of an important and long-established regulatory scheme specifically designed by the Legislature to protect Claimants' health and safety and to insure the ethical and competent practice of the profession of medicine.  *See People v. Cole*, 219 N.Y. 98 (1916) (purpose of licensing provisions governing practice of medicine is to protect the public).  Indeed, Section 6512 of the Education Law makes it a Class E felony to "fraudulently sell. . . any. . . license . . . purporting to authorize the practice of a profession." Moreover, the New York State Department of Health has determined that violating these important provisions constitutes "professional misconduct" that can result in the revocation of a physician's medical license. The statutory scheme "prohibits a licensed physician from allowing a non-licensed person to form a service corporation, to be a shareholder of a professional service corporation, *or to*

*control a professional service corporation*."  Sept. 5, 2000 DOH Opinion (emphasis added).

106.    The implementing No-fault regulation promulgated by the Superintendent of Financial Services states, in relevant part, that "a provider of health care services is not eligible for reimbursement under section 5102(a)(l) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York…."  11 NYCRR 65-3.16(a)(12).

107.    Furthermore, Section 6530(18) of New York's Education Law prohibits "[d]irectly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or in connection with the performance of professional services…" N.Y. Educ. Law § 6530(18), (19); *see also* 8 N.Y.C.R.R. § 29.1(b)(3), (4).

108.    The payment by a healthcare practitioner or PC to another party for the referral of a patient is a practice prohibited by New York state law.

**B.**     **Backdrop and the Fraudulently Owned PCs' Submission of Fraudulent Bills**

109.    In purported compliance with the No-fault Law and 11 NYCRR 65, *et seq*., the Fraudulently Owned PCs submitted proof of their claims to Plaintiffs, using the claim form prescribed by the New York State Department of Insurance (known as a "Verification of Treatment by Attending Physician or Other Provider of Health Service" or "NF-3").

110.    Pursuant to Section 403 of the New York Insurance Law, the claim forms submitted to Plaintiffs by the Fraudulently Owned PCs contained the following warning at the foot of the page:

> "Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a

crime."

111.    To process and verify claims submitted by the Fraudulently Owned PCs, Plaintiffs required, and the Fraudulently Owned PCs submitted, to the extent applicable, narrative reports and other medical records relative to the alleged medical care and treatment rendered to Claimants, for which the Fraudulently Owned PCs were seeking payment from Plaintiffs.

112.    Pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiffs are generally required to process claims for which a PC has standing to submit within 30 days of receipt of proof of claim.

113.    To fulfill their obligation to promptly process claims, Plaintiffs justifiably relied upon the bills and documentation submitted by Defendants in support of their claims, and paid Defendants based on the representations and information that Defendants mailed to Plaintiffs.

114.    The Controllers are not licensed to practice medicine or own medical professional corporations in the State of New York, who purchased and/or otherwise were permitted to use the name and license of one or more of the Paper Owners to fraudulently own, control and operate one or more of the Fraudulently Owned PCs in violation of applicable New York state law, including Article 15 of the B.C.L., which prohibits ownership of a medical professional corporation by someone who is not licensed in medicine.

115.    The Controllers used the Fraudulently Owned PCs, medical practices ostensibly owned by the Paper Owners, to bill No-fault insurance carriers for healthcare services that were provided by fraudulently owned professional corporations and/or professional corporations owned, controlled and operated in violation of New York state law, and by virtue thereof, were not and are not entitled to reimbursement of No-fault benefits.

116.    On information and belief, in violation of Article 15 of the B.C.L. and Article

130 of the Education Law, the Paper Owners had no or limited control and/or ownership interest in the Fraudulently Owned PCs that they purportedly owned, the proceeds of which were diverted by and to the Controllers and/or one or more of the ABC Corporations.

117.    On information and belief, pursuant to the scheme to defraud alleged herein, the Paper Owners were divested of and/or voluntarily ceded part or all true ownership and control in the Fraudulent Owned PCs.

118.    By selling and/or permitting the use of their names and licenses, the Paper Owners knowingly provided the essential means by which the Controllers, non-physicians, were able to own and control that in which they are prohibited by law from maintaining a financial interest, *to wit:* medical professional corporations that must be owned exclusively by a professional licensed in medicine or like professionals acting within the scope of the professional corporations' authorized practice.

119.    On information and belief, in violation of the B.C.L. and Education Law the Paper Owners maintained little or no control over how the Fraudulently Owned PCs were operated and managed.

120.    To ensure that ownership and control of the Fraudulently Owned PCs remained with the Controllers, the Fraudulently Owned PCs' true owners, one or more of the Controllers caused the Fraudulently Owned PCs to enter into one or more agreements with one or more of the ABC Corporations, which one or more of the Controllers also controlled and owned.

121.    The Controllers used one or more of the ABC Corporations as the vehicle(s) to control the Fraudulently Owned PCs' operations and to funnel fraudulently obtained insurance payments to themselves.

122.    The Fraudulently Owned PCs were required to pay rent and/or other fees that ensured that the Paper Owners had little or no real ownership interest in the Fraudulently

Owned PCs, and the proceeds derived therefrom were diverted to the Controllers, the Fraudulently Owned PCs' true owners.

123.    Under the scheme to defraud alleged herein, the Controllers used the name and licenses of the Paper Owners to enable the Fraudulently Owned PCs to bill for healthcare services throughout the metropolitan area of New York City.

124.    At all relevant times mentioned herein, the Fraudulently Owned PCs were medical offices in name only. In fact, the Fraudulently Owned PCs served as alter egos for the Controllers and did not adhere to a separate and distinct function that would entitle them to be recognized as legitimate corporate entities. For all practical and legal purposes, the Fraudulently Owned PCs were created and used for the sole purpose of defrauding insurers into paying No-fault claims to fraudulently owned professional corporations and/or professional corporations that were not licensed in accordance with applicable New York state law.

125.    The Controllers, through their control, ownership and operation of the Fraudulently Owned PCs, became the centerpieces of schemes to fraudulently bill No-fault insurance carriers for services which were rendered by fraudulently owned and operated professional corporations.

126.    The Fraudulently Owned PCs, the Paper Owners and the Controllers were part of well-organized illegal enterprises that engaged in systematic and fraudulent practices that distinguished them from legitimate healthcare providers.  For instance, the components of each enterprise followed practices that were part of a racketeering scheme dictated by one or more of the Controllers:

- Unlike legitimate providers, the Fraudulently Owned PCs submitted bills to insurers in general, and Allstate in particular, that represented

that the Fraudulently Owned PCs were professional corporations owned solely by a medical doctor when, in fact, they were not;

- Unlike legitimate providers, the Fraudulently Owned PCs made false and misleading statements and/or provided false information regarding who owned, controlled and operated the Fraudulently Owned PCs;

- Unlike legitimate providers, the Fraudulently Owned PCs made false and misleading statements and/or provided false information intended to mislead Plaintiffs into believing that the Fraudulently Owned PCs were being operated by the Paper Owners, whose names were listed on the certificates of incorporation, when, in fact, they were was not;

- Unlike legitimate providers, the Fraudulently Owned PCs made false and misleading statements and/or provided false information intended to circumvent Article 15 of the B.C.L., which prohibits ownership by individuals not licensed to practice the profession for which a professional corporation was incorporated;

- Unlike legitimate providers, the Fraudulently Owned PCs concealed the fact that the Fraudulently Owned PCs were engaged in the illegal corporate practice of medicine in contravention of New York state law, and that they were billing for physician services through Fraudulently Owned PCs;

- Unlike legitimate providers, the Fraudulently Owned PCs misrepresented the existence or severity of any injuries that Claimants may have had and the course of any treatments;

- Unlike legitimate providers, the Fraudulently Owned PCs routinely submitted claims for Fraudulent Services that were medically unnecessary and/or performed in a sub-standard manner from which no useful medical information could be derived, and submitted false medical reports in support of those services;

- Unlike legitimate providers, the Fraudulently Owned PCs submitted claims for Fraudulent Services pursuant to a fraudulent protocol of treatment established by the Controllers;

- Unlike legitimate providers, rather than perform a valid test according to prevailing standards of medical care as they must, or refer to a legitimate practitioner, the Fraudulently Owned PCs performed invalid, medically unnecessary and bogus diagnostic tests that willfully misrepresented medical facts and potentially endangered the Claimants; and

- Unlike legitimate providers, the Fraudulently Owned PCs  submitted bills, using the prescribed "NF-3" forms entitled "Verification of Treatment by Attending Physician or Other Provider of Health Services" wherein Defendants knowingly, with intent to deceive Allstate and induce payment as a result thereof, and falsely misrepresented the

services reflected therein, when in fact the services were of no diagnostic or treatment value.

127.    By way of example and not limitation, on information and belief, in furtherance

of the scheme to defraud alleged herein, the Controllers:

- Recruited the Paper Owners to serve as the nominal owners of the Fraudulently Owned PCs, divesting them of attributes of ownership in those medical professional corporations;

- Managed the day-to-day operations of the locations where the Fraudulently Owned PCs operated, including but not limited to hiring staff to work in the physical locations;

- Determined the physical space from which the Fraudulently Owned PCs would (and did) purportedly maintain their operations;

- Maintained control over and/or caused those acting under their direction and control to maintain the books and records of the Fraudulently Owned PCs;

- Maintained control and/or supervision over the Fraudulently Owned PCs' finances, including the charges for and economic benefit from the services purportedly provided by the Fraudulently Owned PCs;

- Established and oversaw a fraudulent treatment protocol that each of the Fraudulently Owned PCs provided to claimants that was medically unnecessary and/or of no diagnostic or treatment value;

- Prepared or caused to be prepared fraudulent bills and/or medical reports and sent them to Plaintiffs;

- Participated, or caused those acting under their direction to participate, in the preparation and mailing of bogus claims, knowing that they contained materially false and misleading information; and

- Ensured that the profits from the criminal enterprise were funneled to themselves and others unknown to Plaintiffs.

128.    By way of example and not limitation, in furtherance of the scheme to defraud

alleged herein, the Paper Owners:

- Sold their names and license for use by one or more of the Controllers;

- Provided the essential means through which one or more of the Controllers were able to own the Fraudulently Owned PCs in contravention of New York state law;

- Ceded ownership and control of the Fraudulently Owned PCs;

- Abdicated any and all attributes of ownership and control of the Fraudulently Owned PCs to one or more of the Controllers;

- Maintained no control over how Fraudulently Owned PCs were operated and managed;

- Allowed their names and license to be used to pursue fraudulent claims on behalf of the Fraudulently Owned PCs—fraudulently incorporated professional corporations that were unlawfully formed and operated by one or more of the Controllers;

- Allowed and facilitated the generation of fictitious medical records and bills that were submitted to Allstate under their names in association with the Fraudulently Owned PCs;

- Signed HCFA, NF-3 Forms and/or narrative reports, which falsely represented that they, or someone at their direction, actually rendered the health services for which the Fraudulently Owned PCs submitted bills, when in fact the services were medically unnecessary and/or of no diagnostic or treatment value; and

- Ordered Fraudulent Services for Claimants that were materially misrepresented, medically unnecessary and/or of no diagnostic or treatment value.

129.    At all relevant times mentioned herein, the Paper Owners knew or should have known that the Fraudulent Services for which the Fraudulently Owned PCs billed Plaintiffs was not performed as billed, was fabricated, was of no diagnostic value and/or was provided pursuant to a pre-determined fraudulent protocol, irrespective of medical necessity.

130.    At all relevant times mentioned herein, the Controllers, through the Fraudulently Owned PCs, directly or through others acting under and pursuant to their directions, instructions and control, submitted or caused to be submitted fraudulent bills for the Fraudulent Services, in furtherance of the scheme to defraud alleged herein, to obtain payment in connection with fraudulent claims.

131.    As a result of the Defendants' fraudulent billing scheme, Allstate has paid Defendants in excess of $1,277,889.48 in fraudulent and unnecessary medical services.

**MECHANICS OF THE SCHEME TO DEFRAUD**

132.    The Controllers conducted their business, affairs and operations through

34

various entities, known and unknown to Plaintiffs.

133.    Though the Controllers attempted to conceal their ownership of the Fraudulently Owned PCs, they did, in fact, use each of the Paper Owners as the nominal paper owners of their respective Fraudulently Owned PCs over which they exercised control.

134.    One or more of the Controllers, using the names and licenses of the Paper Owners, established Fraudulent Multidisciplinary Clinics at three different locations that they utilized to fraudulently bill Allstate for bogus services, including but not limited to diagnostic testing, chiropractic, acupuncture and physical therapy services, irrespective of medical necessity.

135.    The Corona Clinic was established at 104-08 Roosevelt Avenue, Corona, New York and provided, among other things, bogus diagnostic testing, chiropractic, acupuncture and physical therapy services through Fraudulently Owned PCs Corona Medical Plaza, ABA Chiropractic, Elmont Rehab PT and UGP Acupuncture, to virtually all Claimants, irrespective of medical necessity.

136.    The Richmond Hill Clinic was established at 107-04 Jamaica Avenue, Richmond Hill, NY, and provided, among other things, bogus diagnostic testing, chiropractic, acupuncture and physical therapy services through Fraudulently Owned PCs JAGA Medical Services, Logic Chiropractic, VSL Acupuncture and High Level Care Physical Therapy to virtually all Claimants, irrespective of medical necessity.

137.    The Brooklyn Clinic was established at 1900 B Ralph Avenue, Brooklyn, NY, and provided, among other things, bogus diagnostic testing, chiropractic, acupuncture and physical therapy services through  Fraudulently Owned PCs JAGA Medical Services, Mindful Chiropractic, Standard Care PT, Ahmed PT, and Milas Acupuncture, to virtually all Claimants, irrespective of medical necessity.

138.    During the time period relevant to this Complaint, the Controllers hid their ownership of the Fraudulently Owned PCs in order to falsely lead No-fault insurance carriers, in general, and the Plaintiffs, in particular, to believe that the Fraudulently Owned PCs were lawfully incorporated and legitimate professional corporations when, in fact, they were not.

139.    On information and belief, while the Paper Owners were listed as the record owners of the Fraudulently Owned PCs on their Certificates of Incorporation, the Paper Owners ceded, to one or more of the Controllers, ownership and control over the day-to-day operation and management of their respective Fraudulently Owned PCs, including treatment and billing protocols.

140.    Defendants also concealed the fact that one or more of the Controllers were the illegal beneficial owners of one or more of the Fraudulently Owned PCs in order to circumvent the B.C.L., which prohibits individuals who are not licensed to practice medicine from owning professional corporations in the medical field.  Specifically, Section 1507 of the B.C.L. permits the ownership of a professional corporation by only those "individuals who are authorized by law to practice in this state [New York] a profession which such corporation is authorized to practice…"

141.    By concealing the fact that one or more of the Controllers were the true beneficial owners of one or more the Fraudulently Owned PCs, Defendants circumvented the restrictions contained in Article 15 of the B.C.L., which are designed to "ensure that a professional service corporation renders professional services only through qualified members of the professions and are *in fact controlled only by qualified members*."  New York Legislative Annual 1970, p. 129 (emphasis added).

142.    One or more of the Controllers controlled and operated virtually every aspect of the Fraudulently Owned PCs' business directly, or indirectly through one or more of the

ABC Corporations, which they created for the purpose of concealing that one or more of the Controllers were the true owners of one or more of the Fraudulently Owned PCs.

143.    One or more of the Controllers determined the terms and/or unilaterally established the manner and means through which they, and/or one or more of the ABC Corporations, would unlawfully control and dictate the operations of the Fraudulently Owned PC's daily operations.

144.    On information and belief, the monies the Fraudulently Owned PCs paid to one or more of the Controllers and/or one or more of the ABC Corporations were pursuant to various sham agreements that purported to be for services provided by the Controllers and/or their ABC Corporations, when in fact such payments were designed and intended to siphon payments by insurers in general and Allstate in particular to the Controllers in violation of New York state law.

145.    On information and belief, one or more of the Controllers, not the Paper Owners, provided the start-up costs, capital contribution and/or investment capital to operate the Fraudulently Owned PCs.

146.    On information and belief, the compensation the Paper Owners received was determined and subject to the sole discretion of one or more of the Controllers.

147.     On information and belief, the Paper Owners' compensation, as determined by one or more of the Controllers, was not dependent upon the revenue that was generated, or expenses incurred, by the Fraudulently Owned PCs, but rather upon the needs of one or more of the Controllers, demonstrating the Paper Owners did not have ownership and/or control over the profits of the medical practices they purportedly owned.

148.    The sole purpose of the relationship between the Fraudulently Owned PCs, one or more of the Controllers, and/or one or more of the ABC Corporations was, after

37

compensating the Paper Owners, to funnel the money from the Fraudulently Owned PCs to one or more of the Controllers or entities controlled by one or more of the Controllers, including but not limited to one or more of the ABC Corporations.

149.    Through their illegal ownership and control, operation and management of the Fraudulently Owned PCs, one or more of the Controllers were able to engage in pervasive billing schemes at three separate locations premised entirely on their ability to pass substantial monies through fraudulently owned professional corporations.

150.    At the Fraudulent Multidisciplinary Clinics, one or more of the Controllers operated the clinics in essentially the same way: at each location, the Controllers illegally owned and operated professional corporations that provided the Fraudulent Services, and caused those providers to bill Allstate for services which were provided, if at all, pursuant to a fraudulent protocol irrespective of medical necessity.

151.    Virtually all patients that were purportedly treated at the Fraudulent Multidisciplinary Clinics received health care services pursuant to a pre-determined protocol that was dictated by one or more of the Controllers and executed by the Paper Owners in furtherance of the scheme to defraud alleged herein in order to fraudulently bill insurers in general, and Allstate in particular, for unnecessary testing and treatment.

152.    One or more of the Controllers controlled all aspects of operation and management of the Fraudulently Owned PCs, from the hiring and firing of employees, to the implementation of a treatment protocol, to the determinations of how services would be billed to insurers, to how the profits of the Fraudulently Owned PCs would be distributed.

153.    Notwithstanding that the Fraudulent Multidisciplinary Clinics operated at different locations during different time periods, and purported to be separately owned clinics, they all shared one or more commonalities that evidence a centralized scheme to defraud

established by one or more of the Controllers. By way of example and not limitation:

- Despite purportedly being separate entities that operated at three different locations, Corona Medical Plaza, ABA Chiropractic, Elmont Rehab PT, JAGA Medical Services, Mindful Chiropractic, Logic Chiropractic and High-Level Care Physical Therapy all utilized five-digit patient identifier numbers printed, in identical font, on the bottom left corner of bills submitted to Allstate which were identical for all providers that treated out of a particular Fraudulent Multidisciplinary Clinic;

- Despite purportedly being separate entities that operated at three different locations, Corona Medical Plaza, ABA Chiropractic, Elmont Rehab PT, JAGA Medical Services, Mindful Chiropractic, Logic Chiropractic and High-Level Care Physical Therapy all utilized invoice numbers printed on the top right corner of bills submitted to Allstate; and

- Despite purportedly being separate entities that operated at three different locations, Standard Care PT, Milas Acupuncture, VSL Acupuncture and UGP Acupuncture all utilize the same NF-3 Template, which includes, among other things, the multiple identical fonts on the same sections of the form.

154. Virtually every Claimant that presented at any of the Fraudulent Multidisciplinary Clinics, irrespective of location, purportedly sustained soft-tissue injuries that would automatically trigger a treatment protocol designed to fraudulently bill for medical evaluations, diagnostic tests, chiropractic treatment, acupuncture treatment, and physical therapy, irrespective of medical necessity. By way of example and not limitation, the Fraudulently Owned PCs operating at the Multidisciplinary Clinics followed the following predetermined fraudulent protocol:

- Corona Medical Plaza and JAGA Medical Services fraudulently billed Allstate for initial evaluations and Re-evaluations pursuant to Current Procedure Terminology (CPT) Codes which contained the highest reimbursement rates, despite the fact that the services reflected in such codes were never provided, in order to justify referrals for further, unnecessary diagnostic tests, acupuncture, physical therapy and chiropractic services;

- Elmont Rehab PT, High Level Care Physical Therapy, Standard Care PT and Ahmed PT provided virtually identical physical therapy treatment regardless of whether a Claimant's condition was improving as a result of the alleges services that were being performed;

- ABA Chiropractic, Logic Chiropractic, and Mindful Chiropractic diagnosed virtually every Claimant with sprains and strains in the cervical, thoracic, and lumbar regions of the back, and based on these diagnoses, routinely recommended that each Claimant undergo the same treatments, including adjustments to the vertebral motion segments, trigger point therapy, neuromuscular reeducation exercise, mechanical traction, electrical stimulation, and hot packs, three to four days per week for the first four to six weeks, starting immediately, with a re-evaluation performed every four to six weeks;

- UGP Acupuncture, VSL Acupuncture, and Milas Acupuncture routinely performed nearly the identical treatment on every Claimant, without taking into account any particular Claimant's medical history, physical examination, diagnosis, treatment plan or progress throughout the course of treatment;

- Irrespective of location, on the day of a Claimant's initial visit to any of the Fraudulent Multidisciplinary Clinics, they were instructed to execute Assignment of Benefit ("AOB") forms for each Fraudulently Owned PC operating out of that location, whether or not such Claimants were scheduled to be treated at those providers;

- At least 70% of all Claimants that were purportedly treated at the Fraudulent Multidisciplinary Clinics were treated by every Fraudulently Owned PC which operated out of that location, irrespective of medical necessity, and at least 90% of all Claimants that were purportedly treated at the Fraudulent Multidisciplinary Clinics were treated by more than one  Fraudulently Owned PC which operated out of that location;

- None of the Paper Owners of the Fraudulently Owned PCs performed any marketing or undertook any efforts to obtain a patient base for the professional corporations they purported owned;

- The Controllers were solely responsible for all marketing activities, paying kickbacks and entering into financial arrangements to obtain a patient population where claimants were referred to the

Fraudulently Owned PCs in exchange for illicit payments;

- The Controllers exercised full authority and control over generating a patient base through which the Fraudulently Owned PCs could submit bills to insurers in general, and Allstate in particular;

- The purported sublease agreement entered into by Corona Medical Plaza and ABA Chiropractic at the Corona Clinic is completely identical in terms, substance and form, including to the purported sublease entered into between JAGA Medical Services and High Level Care Physical Therapy at the Richmond Hill Clinic;

- The purported sublease agreement entered into by JAGA Medical Services and Mindful Chiropractic at the Brooklyn Clinic has the same term of length, monthly rent due and signature block as the purported sublease agreements entered into by Corona Medical Plaza and  ABA Chiropractic at the Corona Clinic, and JAGA Medical Services and High Level Care Physical Therapy at the Richmond Hill Clinic; and

- Notwithstanding that the clinics purported to be separate medical practices, several shared common and/or sequentially numbered phone and fax numbers; including  but not limited to: (a) Corona Medical Plaza, ABA Chiropractic, Elmont Rehab PT share the same sequential phone and fax number numbers; (b) JAGA Medical Services, Mindful Chiropractic, and Milas Acupuncture share the same fax number; (c) JAGA Medical Services, Logic Chiropractic, High Level Care Physical Therapy, and VSL Acupuncture share the same fax number; and (d) JAGA Medical Services and High Level Care Physical Therapy share the same phone number.

<u>**OVERVIEW OF THE SCHEME TO DEFRAUD**</u>

1.   <u>**THE JAGA MEDICAL SERVICES JAMAICA AVENUE LOCATION**</u>

155.   The scheme to defraud alleged herein started in or about July 2010, when JAGA Medical Services was opened by Avellini at 107-09 Jamaica Avenue, Richmond Hill, NY at the direction and control of one or more of the Controllers and/or Abakin.

156.   While JAGA Medical Services was initially incorporated to provide aesthetics training and treatment in laser and aesthetics, one or more of the Controllers, by and/or through Abakin, recruited Avellini to sell his name and license to them so that one or more of the

Controllers could use JAGA Medical Services to fraudulently bill Allstate for medical services purportedly provided to automobile accident victims without regard to medical necessity.

157.    Prior to JAGA Medical Services being incorporated, Avellini's medical background was in general/urological surgery, and he had no experience in physical pain management, including treating individuals who were suffering from soft tissue injuries, such as those injuries purportedly suffered by Claimants.

158.    Avellini has no experience or training in physical pain and medicine, specifically as it relates to the treatment of injuries suffered by individuals in automobile accidents.

159.    On information and belief, because one or more of the Controllers and/or Avellini never intended for JAGA Medical Services to provide legitimate medical services to Claimants, it was irrelevant to the Controllers and/or Avellini that Avellini had no experience treating individuals who were suffering from soft tissue injuries.

160.    Demonstrative of the fact that JAGA Medical Services was used a vehicle through which one or more of the Controllers could commit fraud, JAGA Medical Services did not, and never has had, its own storefront or standalone practice.

161.    One or more of the Controllers provided Avellini, and JAGA Medical Services, with a fully equipped office space in which to purportedly treat Claimants at the 107-09 Jamaica Avenue location.

162.    Avellini did not purchase any of the equipment which JAGA Medical Services used at the 107-09 Jamaica Avenue location.

163.    Avellini did not meaningfully contribute or invest any personal money to capitalize JAGA Medical Services at the 107-09 Jamaica Avenue location.

164.     One or more of the Controllers fraudulently owned, operated and or/controlled JAGA Medical Services at the 107-09 Jamaica Avenue location, and utilized JAGA Medical Services to bill insurers for services which were provided, if at all, irrespective of medical necessity.

165.     On information and belief, the provision of fraudulent services by JAGA Medical Services at the 107-09 Jamaica Avenue location was to maximize profits to be diverted to one or more of the Controllers, irrespective of medical necessity.

166.     In or about November 2009, Avellini misrepresented that he was a board certified physician and/or board certified cosmetic surgeon and was sanctioned by the Office of Professional Misconduct in August of 2011 and suspended by the New York State Workers' Compensation Board in October 2012.

167.     Avellini did not have any input in decisions affecting where and when services would be provided and/or stop being provided at a given location.

168.     By way of example and not limitation, In or about 2012, at the direction of the Controllers and by or through Abakin, and without any input from him, Avellini was informed that the 107-09 Jamaica Avenue location of JAGA Medical Services was being closed.

169.     In or about 2013, one or more of the Controllers, by or through Abakin, recruited Avellini to open Corona Medical Plaza, a new medical practice to be operated at 104-08 Roosevelt Avenue, Corona, New York.

**2.      THE CORONA CLINIC SCHEME TO DEFRAUD**

170.     At an examination under oath in *In the Matter Corona Medical Plaza, P.C. and Allstate Insurance Company* on January 13, 2020, Defendant Avellini testified that in or about 2013, Abakin asked him if he would be willing to open Corona Medical Plaza at 104-08 Roosevelt Avenue, Corona, New York.

171.    On information and belief, similar to JAGA Medical Services, Avellini agreed to become the nominal, paper owner of Corona Medical Plaza, with it being incorporated, by and through the Controllers with Avellini falsely listed as its record owner, on or about September 30, 2009.

172.    On information and belief, the opening of Corona Medical Plaza was in furtherance of  the scheme to defraud orchestrated by one or more of the Controllers through which they would own, operate and control Corona Medical Plaza, as well as ancillary providers which would operate out of the same location and fraudulently bill Allstate for chiropractic, physical therapy acupuncture, and diagnostic testing services.

173.    On information and belief,  in addition to recruiting Defendant Avellini to sell his name and license so that they could illegally own and control Corona Medical Plaza, one or more of the Controllers, also recruited Defendants Abakin, Ahmed, and Avshalumova to sell their names and licenses to one or more of the Controllers to allow them  to  illegally own and operate ABA Chiropractic, Elmont Rehab PT and UGP Acupuncture (the "Corona Clinic Providers"), respectively, out of 104-08 Roosevelt Avenue, Corona, New York (the "Corona Clinic").

**A.      Fraudulent Ownership of the Corona Clinic Providers**

174.    On information and belief, one or more of the Controllers managed the day-to-day operations of the Corona Clinic Providers, including but not limited to hiring staff to work in the physical locations and purchasing the equipment that was used at the Corona Clinic.

175.    On information and belief, the Paper Owners operating out of the Corona Clinic ceded operation and/or control of their respective professional corporations to one or more of the Controllers.

176.   By way of example and not limitation, consistent *with* the fact that he was not the true owner of Corona Medical Plaza, at the examination under oath in *In the Matter Corona Medical Plaza, P.C.*, Defendant Avellini testified that he (i)  does not have keys to the location, nor does he know who has the keys; (ii) does not know the telephone number; (iii) did not purchase any of the equipment; (iv) did not contribute or invest any capital to the practice other than a small cash outlay; (v); does not know the name of a single medical provider that referred Claimants to him; (vi) has no knowledge regarding the equipment used to purportedly perform Manual Muscle Testing, Computerized Range of Motion Testing or Electrodiagnostic Testing; (vii) has no knowledge regarding the qualifications of the technicians who performed diagnostic services on behalf of Corona Medical Plaza and did nothing to ensure that they possessed the requisite training or experience to perform the testing; (viii) has no knowledge regarding the medical necessity for Electrodiagnostic Testing; and (ix) has no knowledge regarding the CPT codes used for billing Manual Muscle Testing, Computerized Range of Motion Testing or Electrodiagnostic Testing.

177.   On information and belief, separate and apart from being fraudulently incorporated, once the Corona Clinic Providers were established, one or more of the Controllers, with the knowledge and acquiescence of the Paper Owners that operated from the Corona Clinic, caused the Corona Clinic Providers to make unnecessary referrals of Claimants who were being treated by a different Corona Clinic Provider that one or more of the Controllers also owned, operated and/or controlled.

178.   On information and belief, at all times relevant herein, the New York State Public Health Law, §  P.B.H. 238 *et seq*.,  prohibited a practitioner, such as the Paper Owners, from making a referral of patients to a health care provider for the furnishing of health or health related items or services where such practitioner has a financial relationship with such health

care provider unless such patients are informed of such interest in writing and it is posted in the practitioner's office.

179.   On information and belief, at all times relevant herein, the Paper Owners that operated from the Corona Clinic knew or should have known that the fee and/or other compensation that they received from one or more of the Controllers for the use of their names and licenses was dependent, in part, on their referral of Claimants to other Corona Clinic Providers, irrespective of medical necessity.

180.   A provider that makes a prohibited referral, in violation of New York law is subject to civil and criminal penalties (*see* Public Health Law §§ 12, 12–b; *see generally* Public Health Law § 238–a).

181.   On information and belief, the majority, if not all Claimants who were purportedly treated at a Corona Clinic Provider, was referred to it by another Corona Clinic Provider.

182.   By way of example and not limitation, in a representative sample of 83 Claimants that purportedly treated at the Corona Clinic, 80 Claimants (97.5%) were purportedly treated by more than one Corona Clinic Provider, and 72 Claimants (90%) were purportedly treated by every Corona Clinic Provider.

183.   On information and belief, the scheme to defraud devised by one or more of the Controllers ensured that each Corona Clinic Provider had a constant stream of Claimants which could be used to submit fraudulent billing to Allstate.

184.   On information and belief, because the scheme to defraud alleged herein ensured that the Corona Clinic Providers had a constant stream of Claimants which could be used to submit fraudulent billing to Allstate, the Corona Clinic Providers did not engage in any marketing activities or have any substantive patient base other than those patients referred from

other Corona Clinic Providers.

185.    On information and belief, in order to facilitate the billing fraud alleged herein, one or more of the Controllers established a common billing apparatus designed to ensure that they maintained complete control over the coordination of billing submitted to Allstate in connection with claims for reimbursement submitted by the Corona Clinic Providers.

186.    By way of example and not limitation, despite purportedly being separate and independent professional corporations, one or more of the Corona Clinic Providers routinely has the same five (5) digit unique patient identifier number printed on the bottom left corner of bills submitted to Allstate.

187.    On information and belief, as a matter of pattern, practice and protocol, each Claimant that was "treated" at the Corona Clinic was assigned a unique patient identifier number so that one or more of the Controllers, or others acting at their direction, could track the amount of No-fault billing submitted in connection with any individual Claimant.

188.    On information and belief, the Paper Owners that operated out of the Corona Clinic ceded all substantive billing functions of the Corona Clinic Providers to one or more of the Controllers and maintained no control over how those functions were conducted.

**B.    The Fraudulent Treatment Protocol at the Corona Clinic**

189.    In furtherance of the scheme to defraud, individuals who were purportedly involved in automobile accidents in New York and purportedly sustained soft-tissue injuries would present to the Corona Clinic, which would automatically trigger a treatment protocol designed to fraudulently bill insurance companies, in general, and Allstate, in particular, for *inter alia,* medical evaluations, diagnostic tests, chiropractic treatment, acupuncture treatment, and physical therapy, irrespective of medical necessity.

190.     On information and belief, as a matter of pattern, practice and protocol, on the date of a Claimant's initial visit to the Corona Clinic, such Claimant was instructed to execute Assignment of Benefit ("AOB") forms for each practice operating out of the clinic, including but not limited to Corona Medical Plaza, ABA Chiropractic, Elmont Rehab PT, and UGP Acupuncture, irrespective of whether or not such Claimant required treatment at such practices.

191.     On information and belief, to the extent any Claimant was examined at all at the providers operating out of the Corona Clinic, they were each diagnosed with conditions that varied little from Claimant to Claimant, allowing for the same predetermined protocol of treatment for each Claimant. By way of example and not limitation, (i) Corona Medical Plaza routinely diagnosed Claimants with non-specific neck and back pain, (ii) ABA Chiropractic routinely diagnosed Claimants with sprains and strains in the cervical, thoracic, and lumbar regions of the back, and (iii) UGP Acupuncture regularly diagnosed Claimants with non-specific neck pain, lower back pain, and joint pain in the shoulder region.

192.     On information and belief, legitimate treatment plans for patients with non-specific neck and back pain, such as those purportedly treated at the Corona Clinic, may be limited to rest, over-the-counter pain medications, and application of heat or cold packs, or involve no treatment at all.  Notwithstanding the foregoing, Claimants purportedly treated at the Corona Clinic were routinely assessed the same general diagnoses and subjected to the same pre-determined treatment protocol irrespective of medical necessity, including but not limited to physical therapy purportedly provided by Elmont Rehab PT, chiropractic services purportedly provided by ABA Chiropractic, and billing for chiropractic treatment, and/or acupuncture services purportedly provided UGP Acupuncture billing.

193.     On information and belief, consistent with the fact that Claimants that treated at the Corona Clinic were subjected to the same pre-determined treatment protocol irrespective

of medical necessity, approximately 97.5% of such Claimants were purportedly treated by more than one Corona Clinic Provider, and approximately 90% were purportedly treated by every Corona Clinic Provider.  A spreadsheet identifying a representative sample of Claimants that were treated by more than one Corona Clinic Provider is annexed hereto as Exhibit "3."

194.    On information and belief, the protocol of treatment by each of the providers operating out of the Corona Clinic involved virtually the same services purportedly performed for every Claimant on nearly every visit and continued irrespective of any documented changes in the Claimant's condition.

### i.    Corona Medical Plaza's Fraudulent Examinations, Diagnoses, and Treatment

195.    On information and belief, at all times relevant herein and in order to justify fraudulent billing, Defendant Avellini, through Corona Medical Plaza, diagnosed virtually all, if not all Claimants, that were purportedly treated at Corona Medical Plaza with pre-determined diagnoses of non-specific neck and back pain, and referred each Claimant for physical therapy and various diagnostic tests including cervical and lumbar spine MRIs.

196.    On information and belief, notwithstanding that Corona Medical Plaza virtually always diagnosed Claimants at their initial evaluations with non-specific neck and back pain in order to justify unnecessary further testing and treatment at the Corona Clinic, Corona Medical Plaza, as a matter of pattern, practice and protocol, fraudulently billed Allstate for initial evaluations pursuant to CPT Codes which contained the highest reimbursement rates, despite the fact that the services reflected in such codes were never provided.

197.    By way of example and not limitation, Corona Medical Plaza routinely, if not always, billed Allstate for initial evaluations pursuant to: CPT Code 99205, which requires an approximate 60 minute face-to-face examination that involves a comprehensive history, a

comprehensive exam, and high complexity medical decision-making; CPT Code 99204, which requires an approximate 45 minute face-to-face examination that involves a comprehensive history, a comprehensive exam, and moderate complexity medical decision-making; or CPT Code 99243, which requires an approximate 40 minute face-to-face examination that involves a detailed history, a detailed exam, and low complexity medical decision-making.

198. On information and belief, notwithstanding that the length and complexity of an initial examination should vary depending on the unique circumstances of each Claimant, Corona Medical Plaza routinely selected the foregoing new patient evaluation CPT Codes solely because they had the highest reimbursement rates.

199. On information and belief, Corona Medical Plaza's initial evaluation reports routinely failed to reflect a level of examination which would substantiate the expensive CPT Codes that were billed; instead such reports were merely form documents with check boxes or circled fields, containing limited extemporaneous comments and a pattern of similar purported patient complaints and medical histories that were documented for no other reason than to justify further unnecessary treatment and/or testing at the Corona Clinic. By way of example and not limitation:

- Unlike what would be expected from a representative sample of legitimate initial examinations of individuals involved in automobile accidents, in a review of initial examination reports of Claimants purportedly treated at Corona Medical Plaza, the descriptions of the Claimant's complaints in each Initial Report submitted by Corona Medical Plaza virtually always included non-specific neck and back pain;

- Unlike what would be expected from a representative sample of legitimate initial examinations of individuals involved in automobile accidents, in a review of initial examination reports of Claimants purportedly treated at Corona Medical, the section of the initial reports submitted containing a check list of activities Claimants should avoid to

prevent aggravation of the patient's condition was virtually always left blank;

- Unlike what would be expected from a representative sample of legitimate initial examinations of individuals involved in automobile accidents, in a review of initial examination reports of Claimants purportedly treated at Corona Medical Plaza, each Claimant was purportedly provided identical responses concerning their ability to perform each of a set list of activities of daily living, "limited 2ry [*sic*] to pain", indicated with a single pen-stroke down that response column, or the section was left blank;

- Unlike what would be expected from a representative sample of legitimate initial examinations of individuals involved in automobile accidents, nearly every Claimant was referred for MRIs of both the lumbar and cervical regions of the spine on the first date of service; and

- Unlike what would be expected from a representative sample of legitimate initial examinations of individuals involved in automobile accidents, Corona Medical Plaza billed for the performance of outcome assessment testing on nearly every Claimant on the same date of service as the initial examination.

A representative sample of initial examinations is annexed hereto as Exhibit "4."

200. On information and belief, Avellini, through Corona Medical Plaza, submitted fraudulent bills to Allstate, for the initial examinations, supported by template initial report forms which, on information and belief, recorded incomplete and/or fabricated Claimant complaints and medical histories to support pre-determined diagnoses, to justify the billing for initial examinations and outcome assessment testing irrespective of medical necessity, and to justify referrals for diagnostic tests, acupuncture, physical therapy and chiropractic services with the intent to defraud Allstate.

201. In addition to the fraudulent initial evaluations, Corona Medical Plaza routinely billed Allstate for periodic re-evaluations, which like Corona Medical Plaza's initial examinations, involved, at most, cursory exams of Claimants to support the continuation of

billing for medically unnecessary services purportedly provided to Claimants at the Corona Clinic.

202.    In that regard, irrespective of whether a particular Claimant's condition was documented to have improved, remained the same, or worsened, nearly every Re-Evaluation Report identified one or more conditions—neck pain, back pain, shoulder pain, or knee pain—requiring further treatment, and scheduled Claimants to return to Corona Medical Plaza for another re-evaluation.  A representative sample of re-evaluation reports is annexed hereto as Exhibit "5."

203.    On information and belief, as with Corona Medical Plaza's fraudulent initial examinations, Corona Medical Plaza similarly failed to tailor its re-evaluations to the unique circumstances of each patient in order to justify the billing it submitted to Allstate.

204.    By way of example and not limitation, Corona Medical Plaza billed Allstate for nearly every reevaluation under CPT code 99214, a level 4 office visit, the second most expensive code for an evaluation of an existing patient, in which the provider typically spends 25 minutes of a face-to-face time with the patient, and which involves two out of three of the following: detailed history, detailed examination, and medical decision making of moderate complexity.  A representative sample of claims is annexed hereto as Exhibit "6."

205.    On information and belief, based on the wide range of demographics of Claimants that purportedly treated Corona Medical Plaza, and the variation in the types of accidents, it is unlikely, if not impossible, that nearly every Claimant re-evaluation met the same criteria for the re-evaluation.

206.    In addition, in furtherance of the scheme to defraud, Corona Medical Plaza billed Allstate separately for an additional round of Outcome Assessment testing on the same

dates of service as nearly every Claimant's first re-evaluation, and in nearly two thirds of all Claimant re-evaluations. A representative sample of claims is annexed hereto as Exhibit "7."

### ii. Elmont Rehab PT's Fraudulent Treatment

207. On information and belief, as part of the scheme to defraud alleged herein, Ahmed, through Elmont Rehab PT, as a matter of pattern, practice and protocol, routinely billed Allstate for services purportedly provided to Claimants based on a pre-determined treatment protocol regardless of medical necessity, and irrespective of whether each Claimant presented with a prescription for such services as required by the No-fault Law.

208. By way of example and not limitation, demonstrative of the pervasive fraudulent protocol of treatment that occurred at the Corona Clinic irrespective of medical necessity, the majority of Claimants that were purportedly provided physical therapy services at Elmont Rehab PT pursuant to a documented referral from Defendant Avellini were provided such services days prior to having been seen or treated by Defendant Avellini. A representative sample of claims is annexed hereto as Exhibit "8."

209. On information and belief, Elmont Rehab PT identified Defendant Avellini/Corona Medical Plaza as the referring provider because it knew that as part of the fraudulent protocol of treatment established at the Corona Clinic, Defendant Avellini/Corona Medical Plaza would be referring virtually all Claimants for physical therapy services irrespective of medical necessity.

210. Moreover, Elmont Rehab PT's billing submissions rarely included a written referral from Defendant Avellini or Corona Medical Plaza, regardless of whether Corona Medical Plaza's initial evaluation or re-evaluation reports identified physical therapy in a Claimant's treatment plan.

211.    Rather, on information and belief, Elmont Rehab PT followed a pre-determined treatment plan for each Claimant  who was purportedly treated at the Corona Clinic, absent any input or review by Avellini or Corona Medical Plaza, with each Claimant being recommended physical therapy treatments three to four times a week to continue for a duration of eight to twelve weeks.

212.    On information and belief, Elmont Rehab PT billed Allstate for almost identical treatment purportedly provided to virtually every Claimant irrespective of any change in the Claimant's condition. By way of example and not limitation, in connection with a Claimant's first day of purported treatment, Elmont Rehab PT billed Allstate for a physical therapy evaluation using CPT Code 97001 based on a conclusion that each Claimant suffered from injuries as a result of an automobile accident and should begin a treatment plan.   A representative sample of claims is annexed hereto as Exhibit "9."

213.    On information and belief, in connection with every subsequent visit following an initial evaluation, Elmont Rehab PT billed Allstate for the same protocol of treatments, irrespective of necessity, consisting of hot packs billed under CPT Code 97010, and electrical stimulation, billed under CPT Code 97014, alone or in combination with therapeutic massage billed under CPT Code 97124, or therapeutic exercises billed under CPT Code 97110. A representative sample of claims is annexed hereto as Exhibit "10."

214.    Demonstrative of the fact that Elmont Rehab PT billed Allstate pursuant to a pre-determined treatment protocol irrespective of medical necessity, Elmont Rehab PT routinely failed to execute its own recommended treatments, and instead billed for the same three to four modalities purportedly performed on each Claimant. For example, while Elmont Rehab PT's initial examination reports frequently recorded numerous recommended services,

including but not limited to ADL training, gait training, neuromuscular reeducation, and various ultrasound treatments, Elmont Rehab PT rarely, if ever, provided those services.

215.    Instead, daily progress reports, which purported to document the physical therapy services provided to each Claimant on each date of service and record the physical therapist's assessment of each Claimant's condition, virtually always documented the predetermined treatment protocol followed by Elmont Rehab PT—hot packs and electrical stimulation either alone or in conjunction with therapeutic exercises or therapeutic massage—while documenting, at best, cursory descriptions of each Claimant's condition—either not assessing the Claimant's response to treatment or claiming that the Claimant was responding well to treatment, but continued to suffer pain, and that the Claimant's treatment plan should continue—regardless of whether the Claimant's condition was improving as a result of the services performed.

216.    In addition, Elmont Rehab PT's reports failed to document any attempt to coordinate care across the multiple disciplines that were purportedly provided to each Claimant, often on the same day.

### iii.    ABA Chiropractic's Fraudulent Examinations, Diagnoses, and Treatment

### a.    The Fraudulent Initial Exams and Diagnoses

217.    In addition to services billed for by Corona Medical Plaza and Elmont Rehab PT, Defendant Abakin, through ABA Chiropractic, billed Allstate for chiropractic services purportedly performed on Claimants, pursuant to a fraudulent pre-determined treatment protocol irrespective of medical necessity.

218.    In furtherance of the scheme to defraud alleged herein, ABA Chiropractic diagnosed virtually every Claimant with sprains and strains in the cervical, thoracic, and lumbar

regions of the back, and based on these diagnoses, recommended that each Claimant undergo the same treatments, including adjustments to the vertebral motion segments, trigger point therapy, neuromuscular reeducation exercise, mechanical traction, electrical stimulation, and hot packs, three to four days per week for the first four to six weeks starting immediately with a re-evaluation performed every four to six weeks.

219.    In connection with ABA Chiropractic's fraudulent protocol of treatment, ABA Chiropractic completed, for each Claimant, a "Chiropractic Initial Evaluation Report" ("Initial Chiro Report") which seldom varied from patient to patient.  For example, virtually every Initial Chiro Report reflected that Claimants reported:  (a) complaints of pain in three regions of the spine in most cases; (b) tenderness, pain, and subluxations in multiple regions of the spine; (c) limited cervical and lumbar ranges of motion accompanied by pain; and (d) purported positive responses to multiple orthopedic tests including the Straight Leg Raise, Kemp's test, Cervical Foraminal Compression, Soto Hall, Shoulder Depression, and Bakody's Sign. A representative sample of initial examinations are annexed hereto as Exhibit "11."

220.    On information and belief, in order to justify a fraudulent protocol of treatment, ABA Chiropractic diagnosed nearly all Claimants with sprains and strains in the cervical, thoracic, and lumbar regions of the back.  *Id.* Exhibit "11."

221.    Moreover, the treatment plans set forth in the Initial Chiro Reports, rather than demonstrating a credible exercise of professional judgment tailored to individual Claimants, consisted of a pre-printed paragraph on all forms with the following language:

> The patient will be seen 1 [ ] 2 [ ] 3 [ ] 4 [ ] times p/week for the first 4-6 weeks starting immediately. Re-evaluation will be performed every 4-6 weeks and proper treatment plan modifications will be done. The short term goal of this plan is to decrease pain and increase range of motion through chiropractic treatment and home exercise program. Chiropractic Treatment will include: adjustments to the vertebral motion segments,

> Trigger point therapy, Neuromuscular reeducation exercise, Mechanical traction, Electrical stimulation, Hot pack, Other:_____.

*Id.* at Exhibit "11"

222. For each Claimant, ABA Chiropractic virtually always marked off or circled the boxes for treatment three and four times a week; did not circle or cross off any of the listed treatments; and left blank the limited space on the form to recommend treatments not listed in the form, such that ABA Chiropractic's treatment plans were uniform, and not individualized to the needs of each Claimant. *Id.* at Exhibit "11."

223. ABA Chiropractic's Initial Chiro Reports also contained the following pre-printed boilerplate opinion and long-term prognosis, irrespective of each Claimant's physical condition:

> It is my opinion that as a result of the traumatic injuries sustained by Mr/Ms _____ on __/__/__ there were extremes of stretching and a likely tearing of the supporting joint structures (discs, tendons, joint capsules, and ligaments of the spine) with concomitant pathokinesiology (Vertebral Subluxation Complex).
>
> The Vertebral Subluxation Complex and myofascial compensatory hypertonicity will affect normal joint mechanics, produce adverse reaction of related nerves and can be responsible for causing pain and abnormal range of motion which can persist for month or even years. The Chiropractic Adjustment is the most proficient manner on which to treat Vertebral Subluxation Complex to regain and/or retain the normal functional motion of the spine.
>
> It is my professional opinion that this patient should begin and/or continue the treatment program described above in order to achieve both symptomatic and optimal functional improvement in his/her overall condition.

*Id.* at Exhibit "11."

### b. The Fraudulent Chiropractic Treatment and Billing Protocol

224.     Based upon the Initial Chiro Reports by ABA Chiropractic, ABA Chiropractic billed Allstate for services purportedly provided to each Claimant, several times a week, that were nearly identical for each Claimant on every date of service, irrespective of any improvement or worsening of the Claimant's condition.

225.     In that regard, while ABA Chiropractic recommended the same six services for each Claimant on each Initial Chiro Report, —"adjustments to the vertebral motion segments, Trigger point therapy, Neuromuscular reeducation exercise, Mechanical traction, Electrical stimulation, Hot pack"—ABA Chiropractic almost always billed Allstate just for Chiropractic manipulative treatment for each Claimant date of service, but rarely if ever, billed for mechanical traction, trigger point therapy, electrical stimulation or hot packs. A representative sample of claims is annexed hereto as Exhibit "12."

226.     On information and belief, Abakin, through ABA Chiropractic submitted bills and supposedly supporting documentation for chiropractic services purportedly performed on each Claimant to conceal that Abakin, through ABA Chiropractic systematically billed Allstate for identical or near identical combinations of services purportedly performed on each Claimant according to a pre-determined treatment protocol irrespective of medical necessity.

### i. UGP Acupuncture's Fraudulent Examinations, Diagnoses, and Treatment

227.     On information and belief, in furtherance of the scheme to defraud alleged herein, Avshalumova, through UGP Acupuncture, billed Allstate for acupuncture services pursuant to a fraudulent pre-determined treatment protocol irrespective of medical necessity on virtually all, if not all, Claimants who were purportedly treated at the Corona Clinic during all times relevant to the Complaint.

228.   On information and belief, Avshalumova, through UGP Acupuncture, reportedly performed acupuncture on the same days that Claimants purportedly received medical services from one or more additional providers at the Corona Clinic.

229.   On information and belief, acupuncture services are premised upon the theory that each individual has a unique life energy ("Qi") which flows along paths called meridians and impact an individual's mental and physical health. There are twelve main meridians ("the Meridians") in the human body through which Qi flows. When that Qi becomes disrupted or imbalanced for any reason (such as trauma), needles can be inserted, or pressure can be applied to very specific points ("Acupuncture Points") along the Meridians to remove the disruption or imbalance and restore the patient's Qi. There are three main steps in an acupuncture treatment regimen.

230.   On information and belief, the first step in any legitimate acupuncture regimen is an examination of the patient, which includes an examination of the appearance of the patient's tongue's color, shape, and texture, and measurements of the rate, rhythm, and strength of the patient's pulse. Competently performing these components of the physical examination is necessary to accurately diagnose the patient and thereby determine an acupuncture treatment plan designed to benefit the patient by restoring their unique Qi.

231.   On information and belief, the second step in any legitimate acupuncture regimen is the development of a specific acupuncture treatment plan, which requires the insertion of needles into particular Acupuncture Points along the Meridians, including local points at the injury sites, proximal Acupuncture Points (i.e., near the affected areas of the involved Meridian) and distal Acupuncture Points (i.e., distant from the affected areas of the involved Meridian).

232.    On information and belief, the third step in any legitimate acupuncture regimen is the implementation of the acupuncture treatment plan.  The acupuncturist inserts generally 10 but more typically 20 or more acupuncture needles, for a minimum of approximately twenty minutes into each of the selected Acupuncture Points, with the number and location of the Acupuncture Points varying based upon the individualized circumstances presented by each patient, and each patient's therapeutic response to each acupuncture treatment.

233.    On information and belief, the greater the severity a patient's condition is, the greater frequency that patient is treated and at a greater number of Acupuncture Points.  As patients improve, treatment frequency and the number of points used should decrease.

234.    On information and belief, a meaningful assessment of each patient is required before a licensed acupunctured begins treatment to ascertain the patient's condition and determine whether acupuncture treatment is necessary and will benefit the patient.

235.    On information and belief, legitimate acupuncture protocols permit up to four treatment sessions during the first two weeks of treatment. Following the first two weeks of treatment, the frequency of sessions typically decreases, providing time to assess how long the patient remains pain free between treatments and/or how long the therapeutic effect of such treatments can be maintained between treatments.

236.    On information and belief, as treatments progress, an acupuncturist evaluates whether and when treatments are no longer beneficial and/or necessary for each patient.

237.    On information and belief, any legitimate acupuncture regimen requires meaningful documentation of the: (1) patient's medical history; (2) physical examination; (c) diagnosis; (d) treatment plan; (e) results of each treatment session; and (f) the patient's progress throughout the course of treatment.

238.    On information and belief, legitimate acupuncture regimens require the continuous assessment of the patients' condition and energy flow as well as the therapeutic effect of previous treatments. Acupuncture treatment plans, like most treatments, are fluid and should evolve over time. Therefore, over the course of legitimate acupuncture treatment plans, the acupuncturist makes adjustments to improve the therapeutic effectiveness of each treatment and eventually return the patient to maximum health by restoring his or her unique Qi.

239.    On information and belief, because UGP Acupuncture's purported services were provided pursuant to an illegal protocol of treatment irrespective of medical necessity, UGP Acupuncture's evaluation and treatment of Claimants did not bear any of the hallmarks of a legitimate acupuncture regimen.

240.    On information and belief, rather than providing acupuncture services within the prevailing standard of care, and in furtherance of their scheme to defraud, to the extent any Claimant received purported acupuncture treatment at all at UGP Acupuncture, such treatment was performed on every Claimant the same way, without taking into account any particular Claimant's medical history, physical examination, diagnosis, treatment plan or progress throughout the course of treatment.

241.    On information and belief, consistent with providing purported acupuncture treatments pursuant to a pre-determined treatment protocol, Avshalumova, through UGP Acupuncture, submitted initial examination reports and treatment notes to Allstate, which, with few exceptions, revealed the following pattern in UGP Acupuncture's purported evaluation and treatment of each Claimant:

- Unlike what would be expected from a representative sample of legitimate initial acupuncture evaluations of individuals involved in automobile accidents, a review of initial reports of Claimants purportedly treated at UGP Acupuncture identified identical meridian

points used for each Claimant irrespective of the Claimant's complaints
or physical condition recorded on the same initial examination report.

- The prognosis on the initial examination report for every Claimant was
  "guarded."

A representative sample of initial examinations are annexed hereto as Exhibit "13."

242.    While Claimants at the Corona Clinic received chiropractic, acupuncture, and
physical therapy treatments from multiple professionals on the same dates of service over the
same periods of time, on information and belief, neither Avshalumova nor any other employee
of UGP Acupuncture communicated with the other providers rendering services on each
Claimant in an attempt to coordinate their treatment.

243.    On information and belief, in furtherance of their scheme to defraud,
Avshalumova, through UGP Acupuncture, systematically submitted bills and reports for
identical or nearly identical combinations of acupuncture services purportedly performed on
each Claimant who was purportedly treated at the Corona Clinic, to Allstate, according to a
pre-determined billing protocol irrespective of medical necessity.

## 3.   THE RICHMOND HILL CLINIC SCHEME TO DEFRAUD

244.    At an examination under oath on November 18, 2019 and December 9, 2019 in
*In the Matter JAGA Medical Services, P.C. and Allstate Insurance Compan*y, Defendant
Avellini testified that Defendant Ahmed asked him if he would  open a  JAGA Medical Services
location at 107-04 Jamaica Avenue, Richmond Hill, NY.

245.    On information and belief, the re-opening of JAGA Medical Services at 107-04
Jamaica Avenue, Richmond Hill, NY was part of a scheme to defraud orchestrated by one or
more of the Controllers through which they would, as with the Corona Clinic, own, operate
and control JAGA Medical Services at 107-04 Jamaica Avenue, Richmond Hill, NY, as well as

ancillary providers which would operate out of the same location and fraudulently bill Allstate for chiropractic, physical therapy, acupuncture and diagnostic testing services.

246.   On information and belief, in furtherance of the scheme to defraud, in addition to recruiting Defendant Avellini to sell his name and license so that they could illegally own and control JAGA Medical Services at 107-04 Jamaica Avenue, Richmond Hill, NY, one or more of the Controllers also recruited Defendants Abakin, Avshalumova, and Ahmed to sell their names and licenses to one or more of the Controllers so that they could illegally own and operate Logic Chiropractic, VSL Acupuncture and High Level Care Physical Therapy (the "Richmond Hill Clinic Providers"), respectively, out of 107-04 Jamaica Avenue, Richmond Hill, New York (the "Richmond Hill Clinic").

**A.  Fraudulent Ownership of the Richmond Hill Clinic Providers**

247.   On information and belief, one or more of the Controllers operated and managed the day-to-day operations of the Richmond Hill Clinic Providers, including but not limited to hiring staff to work in the physical locations and purchasing the equipment that was used at the Richmond Hill Clinic.

248.   On information and belief, the Paper Owners operating out of the Richmond Hill Clinic ceded ownership, control and/or operation of their respective professional corporations to one or more of the Controllers.

249.   By way of example and not limitation, consistent with the fact that he was not the true owner of JAGA Medical Services at the Richmond Hill Clinic, at the examination under oath in *In the Matter JAGA Medical Services, P.C. and Allstate Insurance Company*, Defendant Avellini testified that: (i) in exchange for "lease" payments, he was provided a fully equipped office space in which to see Claimants; (ii) he did not purchase any of the equipment which JAGA Medical Services used; (iii) there is no signage or other designation outside of

107-04 Jamaica Avenue indicating that JAGA Medical Services operates out of that location; (iv) he does not have keys to the location; (v) he does not know the telephone number; (vi) he has no knowledge regarding the equipment used to purportedly perform diagnostic testing; (vii) he has no knowledge of the names of technicians who purportedly performed Manual Muscle Testing or Outcome Assessment Testing; (viii) he has no knowledge regarding the medical necessity for Electrodiagnostic Testing; and (viii) he has no knowledge regarding the CPT codes used for billing Manual Muscle Testing, Computerized Range of Motion Testing, or Electrodiagnostic Testing.

250.    On information and belief, once the Richmond Hill Clinic Providers were established, one or more of the Controllers, with the acquiescence of the Paper Owners, caused the Richmond Hill Clinic Providers to make unnecessary referrals of Claimants who were being treated by a different Richmond Hill Clinic Provider that one or more of the Controllers also owned, operated and/or controlled.

251.    On information and belief, at all times relevant herein, the Paper Owners that operated from the Richmond Hill Clinic knew or should have known that the fee and/or other compensation that they received from one or more of the Controllers for the use of their names and licenses was dependent, in part, on their referral of Claimants to other Richmond Hill Clinic Providers, irrespective of medical necessity.

252.    On information and belief, once the Richmond Hill Clinic Providers were established, one or more of the Controllers caused the Richmond Hill Clinic Providers to make unnecessary referrals of Claimants who were being treated by a different Richmond Hill Clinic Provider that one or more of the Controllers also owned, operated and/or controlled.

253.    On information and belief, the majority, if not all the Claimants who were purportedly treated at a Richmond Hill Clinic Provider was referred to it by another Richmond

Hill Clinic Provider.

254.     On information and belief, the scheme to defraud devised by one or more of the Controllers ensured that each Richmond Hill Clinic Provider had a constant stream of Claimants which could be used to submit fraudulent billing to Allstate.

255.     By way of example and not limitation, in a representative sample of 41 Claimants that purportedly treated at the Richmond Hill Clinic, 40 Claimants (97.5%) were purportedly treated by more than one Richmond Hill Clinic Provider, and 30 Claimants (73%) were purportedly treated by every Richmond Hill Clinic Provider.

256.     On information and belief, because the scheme to defraud alleged herein ensured that the Richmond Hill Clinic Providers had a constant stream of Claimants which could be used to submit fraudulent billing to Allstate, the Richmond Hill Clinic Providers did not engage in any marketing activities or have any substantive patient base other than those patients referred from other Richmond Hill Clinic Providers.

257.     On information and belief, in order to facilitate the billing fraud alleged herein, one or more of the Controllers established a common billing apparatus designed to ensure that they maintained complete control over the coordination of billing submitted to Allstate in connection with claims for reimbursement submitted by the Richmond Hill Clinic Providers.

258.     By way of example and not limitation, despite purportedly being separate and independent professional corporations, one or more of the Richmond Clinic Providers routinely has the same five (5) digit unique patient identifier number printed on the bottom left corner of bills submitted to Allstate.

259.     On information and belief, as a matter of pattern, practice and protocol each Claimant that was "treated" at the Richmond Hill Clinic was assigned a unique patient identifier number so that one or more of the Controllers, or others acting at their direction,

could track the amount of No-fault billing, submitted, and types of services performed in connection with any individual Claimant.

260.    On information and belief, the Paper Owners that operated out of the Richmond Hill Clinic ceded all substantive billing functions of the Richmond Hill Clinic Providers to one or more of the Controllers and maintained no control over how those functions were conducted.

**B.   The Fraudulent Billing Protocol at the Richmond Hill Clinic**

261.    In furtherance of the scheme to defraud, individuals who were purportedly involved in automobile accidents in New York and purportedly sustained soft-tissue injuries would present at the Richmond Hill Clinic, which would automatically trigger a treatment protocol designed to fraudulently bill insurance companies, in general, and Allstate, in particular, for *inter alia,* medical evaluations, diagnostic tests, chiropractic treatment, acupuncture treatment, and physical therapy, irrespective of medical necessity.

262.    On information and belief, as a matter of pattern, practice and protocol, on the date of a Claimant's initial visit to Richmond Hill Clinic, such Claimant was instructed to execute Assignment of Benefit ("AOB") forms for each practice operating out of the clinic, including but not limited to JAGA Medical Services, Logic Chiropractic, VSL Acupuncture, and High Level Care Physical Therapy, irrespective of whether or not such Claimant required treatment at such practices.

263.    On information and belief, to the extent any Claimant was examined at all at the providers operating out of the Richmond Hill Clinic, they were each diagnosed with conditions that varied little from Claimant to Claimant, allowing for the same predetermined protocol of treatment for each Claimant. By way of example and not limitation, (i) JAGA Medical Services routinely diagnosed Claimants with non-specific neck and/or back pain, (ii) Logic Chiropractic routinely diagnosed Claimants with muscle spasms and disfunction in the cervical, thoracic,

and lumbar regions of the back, and (iii) VSL Acupuncture regularly diagnosed Claimants with non-specific neck pain, lower back pain, and joint pain in the shoulder region.

264.     On information and belief, Claimants purportedly treated at the Richmond Hill Clinic were routinely assessed the same general diagnoses and subjected to the same pre-determined treatment protocol irrespective of medical necessity, including but not limited to physical therapy purportedly provided by High Level Care Physical Therapy, chiropractic services purportedly provided by Logic Chiropractic, and acupuncture services purportedly provided by VSL Acupuncture.

265.     On information and belief, the protocol of treatment by each of the providers operating out of the Richmond Hill Clinic involved virtually the same services purportedly performed for every Claimant on nearly every visit and continued irrespective of any documented changes in the Claimant's condition.

266.     On information and belief, consistent with the fact that Claimants that treated at the Richmond Hill Clinic were subjected to the same pre-determined treatment protocol irrespective of medical necessity, approximately 97.5% of such Claimants were purportedly treated by more than one Richmond Hill Clinic Provider, and approximately 73% were purportedly treated by every Richmond Hill Clinic Provider.  A spreadsheet identifying a representative sample of Claimants that were treated by more than one Richmond Hill Clinic Provider is annexed hereto as Exhibit "14."

    i.    **JAGA Medical Services' Fraudulent Examinations, Diagnoses, and Treatment**

267.     On information and belief, at all times relevant herein and in order to justify fraudulent billing, Defendant Avellini, through JAGA Medical Services, diagnosed virtually all, if not all, Claimants that were purportedly treated at the Richmond Hill Clinic with pre-

determined diagnoses of non-specific neck and back pain, referred each Claimant for physical therapy and various diagnostic tests including cervical and lumbar spine MRIs and Range of Motion tests, and prescribed each Claimant Diclofenac Gel 3%.

268.    On information and belief, notwithstanding that JAGA Medical Services virtually always diagnosed Claimants at their initial evaluations with non-specific neck and back pain in order to justify unnecessary further testing and treatment at the Richmond Hill Clinic, JAGA Medical Services, as a matter of pattern, practice and protocol, fraudulently billed Allstate for initial evaluations pursuant to CPT Codes which contained the highest reimbursement rates, notwithstanding that the services reflected in such codes were never provided.

269.    By way of example and not limitation, at the Richmond Hill Clinic, JAGA Medical Services routinely, if not always, billed Allstate for initial evaluations pursuant to: CPT Code 99204, which requires an approximate 45-minute face-to-face examination that involves a comprehensive history, a comprehensive exam, and moderate complexity medical decision-making.

270.    On information and belief, notwithstanding that the length and complexity of an initial examination should vary depending on the unique circumstances of each Claimant at the Richmond Hill Clinic, JAGA Medical Services routinely selected the foregoing new patient evaluation CPT Code in accordance with JAGA Medical Services' pre-determined billing protocol.

271.    On information and belief, JAGA Medical Services' initial evaluation reports routinely failed to reflect a level of examination which would substantiate the expensive CPT Code that were billed; instead such reports were merely form documents with check boxes or circled fields, containing limited extemporaneous comments and a pattern of similar purported

68

patient complaints and medical histories that were documented for no other reason than to justify further unnecessary treatment and/or testing at the Richmond Hill Clinic. By way of example and not limitation:

- Unlike what would be expected from a representative sample of legitimate initial examinations of individuals involved in automobile accidents, in a review of initial examination reports of Claimants purportedly treated by JAGA Medical Services at the Richmond Hill Clinic, the descriptions of the Claimant's complaints in each Initial Report submitted by JAGA Medical Services virtually always included non-specific neck and back pain;

- Unlike what would be expected from a representative sample of legitimate initial examinations of individuals involved in automobile accidents, in a review of initial examination reports of Claimants purportedly treated by JAGA Medical Services at the Richmond Hill Clinic, the section of the initial reports submitted containing a check list of activities Claimants should avoid to prevent aggravation of the patient's condition was nearly always left blank; and

- Unlike what would be expected from a representative sample of legitimate initial examinations of individuals involved in automobile accidents, in a review of initial examination reports of Claimants purportedly treated at JAGA Medical Services, each Claimant was purportedly provided identical responses concerning their ability to perform each of a set list of activities of daily living, "limited 2ry [*sic*] to pain", indicated with a single pen-stroke down that response column, or the section was left blank.

A representative sample of initial examinations are annexed hereto as Exhibit "15."

272.    Nearly every Claimant was referred for MRIs of the lumbar region of the spine, the cervical region of the spine or both in the initial examination.

273.    Nearly every Claimant was referred for Range of Motion testing of the lumbar region, the cervical region, or both in the initial examination.

274.    JAGA Medical Services billed for the performance of outcome assessment testing on nearly every Claimant at the Richmond Hill Clinic on the same date of service as the initial examination.

275.    In addition to the fraudulent initial evaluations, JAGA Medical Services routinely billed Allstate for periodic re-evaluations, which like JAGA Medical Services' initial examinations, involved, at most, cursory exams of Claimants at the Richmond Hill Clinic to support the continuation of billing for medically unnecessary services purportedly provided to Claimants at the Richmond Hill Clinic.

276.    In that regard, irrespective of whether a particular Claimant's condition was documented to have improved, remained the same, or worsened, nearly every Re-Evaluation Report identified one or more conditions—neck pain, back pain, shoulder pain, or knee pain—requiring further treatment, and scheduled Claimants to return to JAGA Medical Services for another re-evaluation.  A representative sample of re-evaluation reports are annexed hereto as Exhibit "16."

277.    On information and belief, as with JAGA Medical Services' fraudulent initial examinations, JAGA Medical Services similarly failed to tailor its re-evaluations to the unique circumstances of each patient in order to justify the billing it submitted to Allstate.

278.    By way of example and not limitation, JAGA Medical Services billed Allstate for nearly every re-evaluation under CPT code 99214, a level 4 office visit, the second most expensive code for an evaluation of an existing patient, in which the provider typically spends 25 minutes of face-to-face time with the patient, and which involves two out of three of the following: detailed history, detailed examination, and medical decision making of moderate complexity. A representative sample of claims is annexed hereto as Exhibit "17."

279.    On information and belief, based on the wide range of demographics of Claimants that were purportedly treated by JAGA Medical Services at the Richmond Hill Clinic, and the variation in the types of accidents, it is unlikely, if not impossible, that nearly every Claimant re-evaluation met the same criteria for the re-evaluation.

280.     In addition, JAGA Medical Services billed Allstate separately for an additional round of Outcome Assessment testing on the same dates of service as nearly every Claimant's first re-evaluation, and in nearly two thirds of all Claimant re-evaluations.  A representative sample of claims is annexed hereto as Exhibit "18."

**ii.   High Level Care Physical Therapy's Fraudulent Treatment**

281.     On information and belief, as part of the scheme to defraud alleged herein, Ahmed, through High Level Care Physical Therapy, as a matter of pattern, practice and protocol, routinely billed Allstate for services purportedly provided to Claimants based on a pre-determined treatment protocol regardless of medical necessity, and irrespective of whether each Claimant presented with a prescription for such  services as required by the No-fault Law.

282.     High Level Care Physical Therapy is owned on paper by Defendant Ahmed, who is also the paper owner of the physical therapy practice at the Corona Clinic, and initially purported to treat Claimants at the Brooklyn Clinic as an employee of Standard Care PT, before he became the owner of the physical therapy practice at the Brooklyn Clinic once Standard Care PT yielded its place at the Brooklyn Clinic to Ahmed PT.

283.     On information and belief, as part of the scheme to defraud alleged herein, Ahmed, through High Care Physical Therapy, as a matter of pattern, practice and protocol, routinely billed Allstate for services purportedly provided to Claimants based on a pre-determined treatment protocol regardless of medical necessity, and irrespective of whether each Claimant presented with a prescription for such  services as required by the No-fault Law.

284.     By way of example and not limitation, High Level Care Physical Therapy submitted numerous initial examination reports to Allstate in connection with claims for reimbursement documenting physical therapy evaluations purportedly performed on Claimants that would also visit JAGA Medical Services, notwithstanding that Defendant Avellini/JAGA

Medical Services had not yet examined such Claimants in connection with their purported injuries for which they were receiving physical therapy services. A representative sample of claims is annexed hereto as Exhibit "19."

285.    On information and belief, High Level Care Physical Therapy purportedly performed initial evaluations on Claimants at the Richmond Hill Clinic prior to their being examined by Avellini/JAGA Medical Services, because it knew that as part of the fraudulent protocol of treatment established at the Richmond Hill Clinic, Defendant Avellini/JAGA Medical Services would be referring virtually all Claimants for physical therapy services irrespective of medical necessity.

286.    Moreover, High Level Care Physical Therapy's billing submissions virtually always lacked a written referral from Defendant Avellini or JAGA Medical Services, regardless of whether JAGA Medical Services' initial evaluation or re-evaluation reports identified physical therapy in a Claimant's treatment plan

287.    Rather, on information and belief, High Level Care Physical Therapy followed a pre-determined treatment plan for each Claimant who was purportedly treated at the Richmond Hill Clinic, with nearly every Claimant being recommended physical therapy treatments three to four times a week, with treatment plans spanning six to twelve weeks, but ultimately billing for durations of twenty or more weeks for most Claimants.

288.    Demonstrative of the fact that High Level Care Physical Therapy billed Allstate pursuant to a pre-determined treatment protocol irrespective of medical necessity, High Level Care Physical Therapy routinely failed to execute its own recommended treatments, and instead billed for the same three to four modalities purportedly performed on each Claimant. For example, while High Level Care Physical Therapy's initial examination reports frequently recorded numerous recommended services, including but not limited to ADL training, gait

training, neuromuscular reeducation, and ultrasound treatments, High Level Care Physical Therapy rarely, if ever, provided those services.

289. On information and belief, High Level Care Physical Therapy billed Allstate for almost identical treatment purportedly provided to virtually every Claimant irrespective of any change in the Claimant's condition. By way of example and not limitation, in connection with a Claimant's initial physical therapy evaluation purportedly performed prior to June 2019, High Level Care Physical Therapy billed Allstate for a physical therapy evaluation using CPT Code 97001 based on a conclusion that each Claimant suffered from injuries as a result of an automobile accident and should begin a treatment plan. From June 2019, to the present, High Level Care Physical Therapy billed Allstate for the same evaluations using CPT code 97161, a new code created to replace 97001, and included in the most recent New York Workers Compensation Fee Schedule, which would not become effective for No-Fault claims until October 2020. A representative sample of claims is annexed hereto as Exhibit "20."

290. On information and belief, in connection with every subsequent visit following an initial evaluation, High Level Care Physical Therapy billed Allstate for the same protocol of treatments, irrespective of necessity, consisting of hot packs billed under CPT Code 97010, and electrical stimulation, billed under CPT Code 97014, alone or in combination with therapeutic massage billed under CPT Code 97124 and/or therapeutic exercises billed under CPT Code 97110. A representative sample of claims is annexed hereto as Exhibit "21."

291. Physical therapy progress notes which purported to document the physical therapy services provided to each Claimant on each date of service and record the physical therapist's assessment of each Claimant's condition, virtually always documented the predetermined treatment protocol followed by High Level Care Physical Therapy—hot packs and electrical stimulation either alone or in conjunction with therapeutic exercises and/or

therapeutic massage—while documenting, at best, cursory descriptions of each Claimant's condition—either not assessing the Claimant's response to treatment or claiming that the Claimant was tolerating the treatments well, but continued to report suffering pain, and that the Claimant's treatment plan should continue—regardless of whether the Claimant's condition was improving as a result of the services performed.

292.    In addition, despite recording each Claimant's response to health care services they are currently receiving in High Level Care Physical Therapy's initial examination report, High Level Care Physical Therapy's reports failed to document any attempt to coordinate care across the multiple disciplines that were purportedly provided to each Claimant, often on the same day.

### iii. Logic Chiropractic's Fraudulent Examinations, Diagnoses, and Treatment

#### a. The Fraudulent Initial Exams and Diagnoses

293.    In addition to the Richmond Hill Clinic's services billed for by JAGA Medical Services and High Level Care Physical Therapy, Defendant Abakin, through Logic Chiropractic, billed Allstate for chiropractic services purportedly performed on Claimants, pursuant to a fraudulent pre-determined treatment protocol irrespective of medical necessity.

294.    In furtherance of the scheme to defraud alleged herein, Logic Chiropractic diagnosed virtually every Claimant with muscle spasms, and Cervical, Thoracic, and Lumbar disfunction, and based on these diagnoses, recommended that each Claimant undergo chiropractic spinal manipulation three days a week, starting immediately with a re-evaluation performed every four to six weeks.

295.    In connection with Logic Chiropractic's fraudulent protocol of treatment, Logic Chiropractic completed, for each Claimant, a "Chiropractic Initial Evaluation Report" ("Initial

Chiro Report") which seldom varied from patient to patient; for example, on information and belief, virtually every Initial Chiro Report reflected that Claimants reported:  (a) complaints of pain in three regions of the spine in most cases; (b) spasm, tenderness, and pain in multiple regions of the spine; (c) limited cervical, thoracic, and lumbar ranges of motion accompanied by pain and (d) purported positive responses to multiple orthopedic tests including the Cervical Foraminal Compression, Cervical Distraction, Shoulder Depression, Straight Leg Raise, Kemp's test, and Soto Hall. A representative sample of initial examinations are annexed hereto as Exhibit "22."

296.    On information and belief, in order to justify a fraudulent protocol of treatment, ABA Chiropractic diagnosed nearly all Claimants with muscle spasms and Cervical, Thoracic, and Lumbar disfunction.  *Id.* at Exhibit "22."

297.    Moreover, the treatment plans set forth in the Initial Chiro Reports, rather than demonstrating a credible exercise of professional judgment tailored to individual Claimants, consisted of pre-printed paragraphs on reports for evaluations conducted through May 2018, contained the following language:

> The patient has begun chiropractic care consisting of adjustments, trigger point and various stretching techniques as per individual patient need.
>
> The patient will receive care 3 times/week and will be re-evaluated monthly as the care progresses.

*Id.* at Exhibit "22," pp. 1-19.

298.    Subsequent reports contained the following boilerplate language, which provided limited options for the chiropractor to circle recommended treatments and frequency of treatment, severely limiting the practitioner's exercise of independent professional judgment:

75

> This patient has begun Chiropractic treatment consisting of Chiropractic spinal manipulation and manual traction to decrease spinal fixations and increase segmental function. Adjunctive physical modalities consisting of ice and ischemic compression/ manual trigger point therapy and various stretching techniques as per individual symptoms may be used. Patient will be seen as needed and/or One/Two/Three times per week. In the event there is no noted improvement after four weeks, MUA will be considered on an individual basis. The patient was instructed about certain limitations in his/her activities.

*Id.* at Exhibit "22," pp. 20-31

299.    Initial Chiro Reports submitted by Logic Chiropractic with this paragraph invariably had "Chiropractic spinal manipulation" as the only treatment modality selected, and "Three" for the frequency of treatments per week.  *See* Exhibit "22."

300.    Regardless of the template used, Logic Chiropractic's Initial Chiro Report always stated the prognosis of the Claimant as "guarded," requiring further treatment to evaluate the Claimant's condition.  *Id.* at Exhibit "22."

### b.  The Fraudulent Chiropractic Treatment Billing Protocol

301.    Based upon the Initial Chiro Reports by Logic Chiropractic, Logic Chiropractic billed Allstate for services purportedly provided to each Claimant, several times a week, that were nearly identical for each Claimant on every date of service, irrespective of any improvement or worsening of the Claimant's condition.

302.    In that regard, while Logic Chiropractic recommended the same service for each Claimant on each Initial Chiro Report—chiropractic spinal manipulation—and while the boilerplate language on the forms also included manual traction, ice, ischemic compression, and manual trigger point therapy, Logic Chiropractic always billed Allstate just for Chiropractic Manipulative Treatment for each Claimant date of service, and never billed for

manual traction, ice, ischemic compression, or manual trigger point therapy. A representative sample of claims is annexed hereto as Exhibit "23."

303.    On information and belief, Abakin, through Logic Chiropractic, submitted bills and supposedly supporting documentation for chiropractic services purportedly performed on each Claimant to conceal that Abakin, through Logic Chiropractic, systematically billed Allstate for identical or near identical combinations of services purportedly performed on each Claimant according to a pre-determined treatment protocol irrespective of medical necessity.

### iv.  VSL Acupuncture's Fraudulent Examinations, Diagnoses, and Treatment

304.    On information and belief, in furtherance of the scheme to defraud alleged herein, Avshalumova, through VSL Acupuncture, billed Allstate for acupuncture services pursuant to a fraudulent pre-determined treatment protocol irrespective of medical necessity, on virtually all, if not all, Claimants who was purportedly treated at the Richmond Hill Clinic during all times relevant to the Complaint.

305.    On information and belief, Avshalumova, through VSL Acupuncture, reportedly performed acupuncture on the same days that Claimants purportedly received medical services from one or more additional providers at the Richmond Hill Clinic.

306.    On information and belief, because VSL Acupuncture's purported services were provided pursuant to an illegal protocol of treatment irrespective of medical necessity, VSL Acupuncture's evaluation and treatment of Claimants did not bear any of the hallmarks of a legitimate acupuncture regimen

307.    On information and belief, rather than providing acupuncture services within the prevailing standard of care, and in furtherance of their scheme to defraud, to the extent any Claimant received purported acupuncture treatment at all at VSL Acupuncture, such treatment was performed on every Claimant the same way, without taking into account any particular

Claimant's medical history, physical examination, diagnosis, treatment plan or progress throughout the course of treatment.

308.    On information and belief, consistent with providing purported acupuncture treatments pursuant to a pre-determined treatment protocol, Avshalumova, through VSL Acupuncture, submitted initial examination reports and treatment notes to Allstate, which, with few exceptions, revealed the following pattern in VSL Acupuncture's purported evaluation and treatment of each Claimant:

- Initial evaluations invariably report "Qi stagnation and Blood stasis" from a pre-set checklist of Qi pattern discriminations, and "Regulate the Qi and quicken and transform stasis, stop pain," from a pre-set checklist of Treatment Principals, while never utilizing the space provided for an individualized assessment of the Claimant's pattern discrimination or appropriate treatment principal.

- The treatment goals for each Claimant are limited to the boilerplate text "Decrease of pain improved range of motion, strength and flexibility will continue to be the main objective of this treatment," while never utilizing the space reserved for individualized goals

- Every Claimant "displays active symptomology and suffers from recurrent exacerbation of symptoms."

- Every Claimant's "lymphatic and blood circulation are impaired due to the extreme physical and mental stress of the [automobile] accident."

- Every Claimant "presents a sensation of generalized pain."

- For every Claimant, it was the "clinical opinion" of VSL Acupuncture that the Claimant required acupuncture treatment.

- For every Claimant evaluated since July 2018, it was the "clinical opinion" of VSL Acupuncture that the Claimant required cupping treatment.

A representative sample of initial examinations are annexed hereto as Exhibit "24."

309.     On information and belief, VSL Acupuncture initially recommended that every Claimant receive acupuncture treatments 3-4 times per week without recommending a duration of the treatment plan.

310.     Thereafter, on information and belief, VSL Acupuncture failed to perform re-evaluations of Claimants on any regular or reasoned timetable, allowing anywhere between three to twenty-three weeks to elapse between evaluations.

311.     However, on information and belief, regardless of when, or how frequently VSL Acupuncture actually re-evaluated Claimants, VSL Acupuncture recommended additional treatments 3-4 times per week for an additional 4 weeks when evaluated within the first seven weeks of treatment, and 2-3 times per week for an additional 4 weeks when evaluated thereafter.

312.     While Claimants at the Richmond Hill Clinic received chiropractic, acupuncture, and physical therapy treatments from multiple professionals on the same dates of service over the same periods of time, on information and belief, neither Avshalumova nor any other employee of VSL Acupuncture communicated with the other providers rendering services on each Claimant in an attempt to coordinate their treatment.

313.     On information and belief, in furtherance of their scheme to defraud, Avshalumova, through VSL Acupuncture, systematically submitted bills and reports for identical or nearly identical combinations of acupuncture services purportedly performed on each Claimant who was purportedly treated at the Richmond Hill Clinic to Allstate, according to a pre-determined billing protocol irrespective of medical necessity.

## 4.   THE BROOKLYN CLINIC SCHEME TO DEFRAUD

314.     At the examination under oath on November 18, 2019 and December 9, 2019 in *In the Matter JAGA Medical Services, P.C. and Allstate Insurance Compan*y, Defendant

Avellini testified that  Defendant Lacroix asked him if he would open another location of JAGA Medical Services at 1900 B Ralph Avenue, Brooklyn, NY.

315.     On information and belief, the opening of the JAGA Medical Services location at 1900 B Ralph Avenue, Brooklyn, NY was part of a scheme to defraud orchestrated by one or more of the Controllers through which they would own, operate and control the JAGA Medical Services location at 1900 B Ralph Avenue, Brooklyn, NY, as well as ancillary providers which would operate out of the same location and fraudulently bill Allstate for chiropractic, physical therapy, acupuncture and diagnostic testing services.

316.     On information and belief, in furtherance of the scheme to defraud, in addition to recruiting Defendant Avellini to sell his name and license so that they could illegally own and control JAGA Medical Services at location at 1900 B Ralph Avenue, Brooklyn, NY, one or more of the Controllers also recruited Defendants Lacroix, Elbegrmi, Ahmed and Avshalumova a to sell their names and licenses to one or more of the Controllers so that they could illegally own and operate Mindful Chiropractic, Standard Care PT, Ahmed PT and Milas Acupuncture (the "Brooklyn Clinic Providers"), respectively, out of the location at 1900 B Ralph Avenue, Brooklyn, NY (the "Brooklyn Clinic").

### A.  Fraudulent Ownership of the Brooklyn Clinic Providers

317.     On information and belief, one or more of the Controllers managed the day-to-day operations of the Brooklyn Clinic Providers, including but not limited to hiring staff to work in the physical locations and purchasing the equipment that was used at the Brooklyn Clinic.

318.     On information and belief, the Paper Owners operating out of the Brooklyn Clinic ceded operation and/or control of their respective professional corporations to one or more of the Controllers.

319.    By way of example and not limitation, consistent *w*ith the fact that he was not the true owner of JAGA Medical Services at Brooklyn Clinic, at an examination under oath on November 18, 2019 and December 9, 2019, Defendant Avellini testified that: (i) in exchange for "lease" payments, he was provided with fully equipped office space; (ii)  he did not purchase any of the equipment which JAGA Medical Services utilized; (iii)  there is no signage or other designation outside of the Brooklyn Clinic indicating that JAGA Medical Services operates out of that location; (iv) he does not have keys to the location, nor does he know who has the keys; (v) he does not know the telephone number; (vi) he has no knowledge regarding the equipment used to purportedly perform diagnostic testing ; (vii) he has no knowledge of the names of technicians who purportedly performed Manual Muscle Testing or Outcome Assessment Testing; (viii) he has no knowledge regarding the medical necessity for Electrodiagnostic Testing; and (viii) he has no knowledge regarding the CPT codes used for billing Manual Muscle Testing, Computerized Range of Motion Testing, or Electrodiagnostic Testing.

320.    On information and belief, once the Brooklyn Clinic Providers were established, one or more of the Controllers, with the acquiescence of the Paper Owners that operated from the Brooklyn Clinic, caused the Brooklyn Clinic Providers to make unnecessary referrals of Claimants who were being treated by a different Brooklyn Clinic Provider that one or more of the Controllers also owned, operated and/or controlled.

321.    On information and belief, at all times relevant herein, the Paper Owners that operated from the Brooklyn Clinic knew or should have known that the fee and/or other compensation that they received from one or more of the Controllers for the use of their names and licenses was dependent, in part, on their referral of Claimants to other Brooklyn Clinic Providers, irrespective of medical necessity.

322.   On information and belief, once the Brooklyn Clinic Providers were established, one or more of the Controllers caused the Brooklyn Clinic Providers to make unnecessary referrals of Claimants who were being treated by a different Brooklyn Clinic Provider that one or more of the Controllers also owned, operated and/or controlled.

323.   On information and belief, the majority, if not all, of the Claimants who were purportedly treated at a Brooklyn Clinic Provider was referred to it by another Brooklyn Clinic Provider.

324.   On information and belief, the scheme to defraud devised by one or more of the Controllers ensured that each Brooklyn Clinic Provider had a constant stream of Claimants which could be used to submit fraudulent billing to Allstate.

325.   By way of example and not limitation, in a representative sample of 52 Claimants that purportedly treated at the Brooklyn Clinic, 47 Claimants (90%) were purportedly treated by more than one Brooklyn Clinic Provider, and 38 Claimants (73%) were purportedly treated by every Brooklyn Clinic Provider.

326.   On information and belief, because the scheme to defraud alleged herein ensured that the Brooklyn Clinic Providers had a constant stream of Claimants which could be used to submit fraudulent billing to Allstate, the Brooklyn Clinic Providers did not engage in any marketing activities or have any substantive patient base other than those patients referred from other Brooklyn Clinic Providers.

327.   On information and belief, in order to facilitate the billing fraud alleged herein, one or more of the Controllers established a common billing apparatus designed to ensure that they maintained complete control over the coordination of billing submitted to Allstate in connection with claims for reimbursement submitted by the Brooklyn Clinic Providers.

328.   By way of example and not limitation, despite purportedly being separate and

independent professional corporations, one or more of the Brooklyn Clinic Providers routinely has the same five (5) digit unique patient identifier number printed on the bottom left corner of bills submitted to Allstate.

329.   On information and belief, as a matter of pattern, practice and protocol each Claimant that was "treated" at the Brooklyn Clinic was assigned a unique patient identifier number so that one or more of the Controllers, or others acting at their direction, could track the amount of No-fault billing submitted in connection with any individual Claimant.

330.   On information and belief, the Paper Owners that operated out of the Brooklyn Clinic ceded all substantive billing functions of the Brooklyn Clinic Providers to one or more of the Controllers and maintained no control over how those functions were conducted.

**B.   Fraudulent Billing Protocol at the Brooklyn Clinic**

331.   In furtherance of the scheme to defraud, individuals who were purportedly involved in automobile accidents in New York and purportedly sustained soft-tissue injuries would present at the Brooklyn Clinic, which would automatically trigger a treatment protocol designed to fraudulently bill insurance companies, in general, and Allstate, in particular, for *inter alia,* medical evaluations, diagnostic tests, chiropractic treatment, acupuncture treatment, and physical therapy, irrespective of medical necessity.

332.   On information and belief, as a matter of pattern, practice and protocol, on the date of a Claimant's initial visit to Brooklyn Clinic, such Claimant was instructed to execute Assignment of Benefit ("AOB") forms for each practice operating out of the clinic, including but not limited to JAGA Medical Services, Mindful Chiropractic, Milas Acupuncture, and either Standard Care PT or Ahmed PT, irrespective of whether or not such Claimant required treatment at such practices.

333.    On information and belief, to the extent any Claimant was examined at all at the providers operating out of the Brooklyn Clinic, they were each diagnosed with conditions that varied little from Claimant to Claimant, allowing for the same predetermined protocol of treatment for each Claimant. By way of example and not limitation, (i) JAGA Medical Services routinely diagnosed Claimants with non-specific neck and/or back pain, (ii) Mindful Chiropractic routinely diagnosed Claimants with muscle spasms and sprains/strains in the cervical, thoracic, and lumbar regions of the back, and (iii) Milas Acupuncture regularly diagnosed Claimants with non-specific neck pain, lower back pain, and joint pain in the shoulder region.

334.    On information and belief, legitimate, Claimants purportedly treated at the Brooklyn Clinic were routinely assessed the same general diagnoses and subjected to the same pre-determined treatment protocol irrespective of medical necessity, including but not limited to physical therapy purportedly provided by Standard Care PT and/or Ahmed PT, chiropractic services purportedly provided by Mindful Chiropractic, and acupuncture services purportedly provided by Milas Acupuncture.

335.    On information and belief, the protocol of treatment by each of the providers operating out of the Brooklyn Clinic involved virtually the same services purportedly performed for every Claimant on nearly every visit and continued irrespective of any documented changes in the Claimant's condition.

336.    On information and belief, consistent with the fact that Claimants that treated at the Brooklyn Clinic were subjected to the same pre-determined treatment protocol irrespective of medical necessity, approximately 90% of such Claimants were purportedly treated by more than one Brooklyn Clinic Provider, and approximately 73% were purportedly treated by every Brooklyn Clinic Provider. A spreadsheet identifying a representative sample

of Claimants that were treated by more than one Brooklyn Clinic Provider is annexed hereto as Exhibit "25."

### i. JAGA Medical Services' Fraudulent Examinations, Diagnoses, and Treatment

337.    On information and belief, at all times relevant herein and in order to justify fraudulent billing, Defendant Avellini, through JAGA Medical Services, diagnosed virtually all, if not all, Claimants that were purportedly treated at the Brooklyn Clinic with pre-determined diagnoses of non-specific neck and back pain, referred each Claimant for physical therapy and various diagnostic tests including cervical and lumbar spine MRIs, and prescribed each Claimant Diclofenac Gel 3% or Lidocaine 5% ointment, along with either 7.5 mg or 15 mg of Mobic.

338.    On information and belief, notwithstanding that JAGA Medical Services virtually always diagnosed Claimants at their initial evaluations with non-specific neck and back pain in order to justify unnecessary further testing and treatment at the Brooklyn Clinic, JAGA Medical Services, as a matter of pattern, practice and protocol, fraudulently billed Allstate for initial evaluations pursuant to CPT Codes which contained the highest reimbursement rates, notwithstanding that the services reflected in such codes were never provided.

339.    By way of example and not limitation, at the Brooklyn Clinic, JAGA Medical Services routinely, if not always, billed Allstate for initial evaluations pursuant to: CPT Code 99204, which requires an approximate 45-minute face-to-face examination that involves a comprehensive history, a comprehensive exam, and moderate complexity medical decision-making.

340.    On information and belief, notwithstanding that the length and complexity of an initial examination should vary depending on the unique circumstances of each Claimant at the Brooklyn Clinic, JAGA Medical Services routinely selected the foregoing new patient evaluation CPT Code in accordance with JAGA Medical Services' pre-determined billing protocol.

341.    On information and belief, JAGA Medical Services' initial evaluation reports routinely failed to reflect a level of examination which would substantiate the expensive CPT Code that was billed; instead such reports were merely form documents with check boxes or circled fields, containing limited extemporaneous comments and a pattern of similar purported patient complaints and medical histories that were documented for no other reason than to justify further unnecessary treatment and/or testing at the Brooklyn Clinic. By way of example and not limitation:

- Unlike what would be expected from a representative sample of legitimate initial examinations of individuals involved in automobile accidents, in a review of initial examination reports of Claimants purportedly treated by JAGA Medical Services at the Brooklyn Clinic, the descriptions of the Claimant's complaints in each Initial Report submitted by JAGA Medical Services virtually always included  non-specific neck and/or back pain;

- Unlike what would be expected from a representative sample of legitimate initial examinations of individuals involved in automobile accidents, in a review of initial examination reports of Claimants purportedly treated by JAGA Medical Services at the Brooklyn Clinic, the section of the initial reports submitted containing a check list of activities Claimants should avoid to prevent aggravation of the patient's condition was nearly always left blank; and

- Unlike what would be expected from a representative sample of legitimate initial examinations of individuals involved in automobile accidents, in a review of initial examination reports of Claimants purportedly treated at JAGA Medical Services, each Claimant was purportedly provided identical responses concerning their ability to perform each of a set list of activities of daily living, "limited 2ry [*sic*]

to pain", indicated with a single pen-stroke down that response column, or the section was left blank.

A representative sample of initial examinations is annexed hereto as Exhibit "26."

342.    Nearly every Claimant was referred for MRIs of the lumbar region of the spine, the cervical region of the spine or both in the initial examination.

343.    JAGA Medical Services billed for the performance of outcome assessment testing on nearly every Claimant at the Brooklyn Clinic on the same date of service as the initial examination.

344.    Avellini, through JAGA Medical Services, submitted fraudulent bills to Allstate, for the initial examinations, supported by template initial report forms which, on information and belief, recorded incomplete and/or fabricated Claimant complaints and medical histories to support pre-determined diagnoses, to justify the billing for initial examinations, and outcome assessment testing at the Brooklyn Clinic irrespective of medical necessity, and to justify referrals for diagnostic tests and physical therapy services  with the intent to defraud Allstate.

345.    In addition to the fraudulent initial evaluations, JAGA Medical Services routinely billed Allstate for periodic re-evaluations, which like JAGA Medical Services' initial examinations, involved, at most, cursory exams of Claimants at the Brooklyn Clinic to support the continuation of billing for medically unnecessary services purportedly provided to Claimants at the Brooklyn Clinic.

346.    In that regard, irrespective of whether a particular Claimant's condition was documented to have improved, remained the same, or worsened, nearly every Re-Evaluation Report identified one or more conditions—neck pain, back pain, shoulder pain, or knee pain—requiring further treatment, and scheduled Claimants to return to JAGA Medical Services for

another re-evaluation.  A representative sample of re-evaluation reports is annexed hereto as Exhibit "27."

347.    On information and belief, as with JAGA Medical Services' fraudulent initial examinations, JAGA Medical Services similarly failed to tailor its re-evaluations to the unique circumstances of each Claimant in order to justify the billing it submitted to Allstate.

348.    By way of example and not limitation, JAGA Medical Services billed Allstate for nearly every reevaluation under CPT code 99214, a level 4 office visit, the second most expensive code for an evaluation of an existing patient, in which the provider typically spends 25 minutes of face-to-face time with the patient, and which involves two out of three of the following: detailed history, detailed examination, and medical decision making of moderate complexity. A representative sample of claims is annexed hereto as Exhibit "28."

349.    On information and belief, based on the wide range of demographics of Claimants that were purportedly treated by JAGA Medical Services at the Brooklyn Clinic, and the variation in the types of accidents, it is unlikely, if not impossible, that nearly every Claimant re-evaluation met the same criteria for the re-evaluation.

350.    JAGA Medical Services billed Allstate separately for an additional round of Outcome Assessment testing on the same dates of service as nearly every Claimant's first re-evaluation, and in nearly two thirds of all Claimant re-evaluations.  A representative sample of claims is annexed hereto as Exhibit "29."

## ii. Fraudulent Billing for Physical Therapy Services at the Brooklyn Clinic

### a. Standard Care PT's Fraudulent Treatment

351.    On information and belief, as part of the scheme to defraud alleged herein, Elbegrmi, through Standard Care PT as a matter of pattern, practice and protocol, routinely billed Allstate for services purportedly provided to Claimants based on a pre-determined

treatment protocol regardless of medical necessity, and irrespective of whether each Claimant presented with a prescription for such  services as required by the No-fault Law.

352.    By way of example and not limitation, Standard Care PT routinely submitted initial examination reports to Allstate in connection with claims for reimbursement documenting physical therapy evaluations purportedly performed on Claimants notwithstanding that Defendant Avellini/JAGA Medical Services had not yet examined such Claimants in connection with their purported injuries for which they were receiving physical therapy services, nor had any other referral for physical therapy services been made.

353.    On information and belief, Standard Care PT purportedly performed initial evaluations on Claimants at the Brooklyn Clinic prior to their being examined by Avellini/JAGA Medical Services, because it knew that as part of the fraudulent protocol of treatment established at the Brooklyn Clinic, Defendant Avellini/JAGA Medical Services would be referring virtually all Claimants for physical therapy services irrespective of medical necessity. A representative sample of claims is annexed hereto as Exhibit "30."

354.    On information and belief, Standard Care PT followed a pre-determined treatment plan for each Claimant who was purportedly treated at the Brooklyn Clinic, with each Claimant being prescribed physical therapy treatments three to four times a week, initially for four to six weeks, but ultimately billing for durations, on average, over twenty weeks.

355.    On information and belief, Standard Care PT billed Allstate for almost identical treatment purportedly provided to virtually every Claimant irrespective of any change in the Claimant's condition. By way of example and not limitation, in connection with a Claimant's initial physical therapy evaluation, Standard Care PT billed Allstate for a physical therapy evaluation using CPT Code 97001 based on a conclusion that each Claimant suffered from

injuries as a result of an automobile accident and should begin a treatment plan. A representative sample of claims is annexed hereto as Exhibit "31."

356.    On information and belief, in connection with every subsequent visit following an initial evaluation, Standard Care PT billed Allstate for the same protocol of treatments, irrespective of necessity, consisting of hot packs billed under CPT Code 97010, and electrical stimulation, billed under CPT Code 97014, alone or in combination with therapeutic massage billed under CPT Code 97124 and/or therapeutic exercises billed under CPT Code 97110. A representative sample of claims is annexed hereto as Exhibit "32."

357.    Demonstrative of the fact that Standard Care PT billed Allstate pursuant to a pre-determined protocol irrespective of medical necessity, Standard Care PT used a one-page form to document each purported initial evaluation with check boxes in its treatment plan section for no more than eight different treatment modalities.

358.    Moreover, even within this limited treatment framework, Standard Care PT routinely failed to execute its own recommended treatments, and instead billed for the same three to four modalities purportedly performed on each Claimant. For example, while Standard Care PT's initial examination reports frequently recorded numerous recommended services, including but not limited to ADL re-training and ultrasound treatments, Standard Care PT rarely, if ever, provided those services.

359.    Instead, physical therapy progress notes which purported to document the physical therapy services provided to each Claimant on each date of service and record the physical therapist's assessment of each Claimant's condition, virtually always documented the predetermined treatment protocol followed by Standard Care PT—hot packs and electrical stimulation either alone or in conjunction with therapeutic exercises and/or therapeutic massage—while documenting, at best, cursory descriptions of each Claimant's condition—

either not assessing the Claimant's response to treatment or checking a box on the form for "patient tolerated treatment well," but continued to report suffering pain, and that the Claimant's treatment plan should continue—regardless of whether the Claimant's condition was improving as a result of the services performed.

360.    In addition, Standard Care PT's reports failed to document any attempt to coordinate care across the multiple disciplines that were purportedly provided to each Claimant, often on the same day.

### b.  Ahmed PT's Fraudulent Treatment

361.    On information and belief, in December 2018, Ahmed PT replaced Standard Care PT as the physical therapy provider for the Brooklyn Clinic, yet the Predetermined Treatment Protocol at the Brooklyn Clinic went unchanged.

362.    Ahmed PT is owned on paper by Defendant Ahmed, who was also the paper owner of the physical therapy practices at the Corona Clinic and Richmond Hill Clinic, and who was also purportedly treating Claimants at the Brooklyn Clinic as an employee of Standard Care PT.

363.    On information and belief, as part of the scheme to defraud alleged herein, Ahmed, through Ahmed PT, as a matter of pattern, practice and protocol, continued to routinely bill Allstate for services purportedly provided to Claimants based on a pre-determined treatment protocol regardless of medical necessity, and irrespective of whether each Claimant presented with a prescription for such  services as required by the No-fault Law.

364.    By way of example and not limitation, Ahmed PT submitted numerous initial examination reports to Allstate in connection with claims for reimbursement documenting physical therapy evaluations purportedly performed on Claimants that would also visit JAGA Medical Services notwithstanding that Defendant Avellini/JAGA Medical Services had not yet

examined such Claimants in connection with their purported injuries for which they were receiving physical therapy services.

365.    On information and belief, Ahmed PT purportedly performed initial evaluations on Claimants at the Brooklyn Clinic prior to their being examined by Avellini/JAGA Medical Services, because it knew that as part of the fraudulent protocol of treatment established at the Brooklyn Clinic, Defendant Avellini/JAGA Medical Services would be referring virtually all Claimants for physical therapy services irrespective of medical necessity.

366.    Moreover, Ahmed PT's billing submissions frequently lacked a written referral from Defendant Avellini or JAGA Medical Services, regardless of whether JAGA Medical Services' initial evaluation or re-evaluation reports identified physical therapy in a Claimant's treatment plan.

367.    Rather, on information and belief, Ahmed PT continued to follow a pre-determined treatment plan for each Claimant who was purportedly treated at the Brooklyn Clinic, with each Claimant being recommended physical therapy treatments three to four times a week, initially for four to six weeks, but ultimately billing for durations, on average, over twenty weeks.

368.    On information and belief, for virtually every Claimant, the treatment plans found in the intervention section of Ahmed PT initial examination reports identified the same four treatment modalities: Hot/Cold Packs, Electrical Stimulation, Therapeutic Massage/Manual Massage, and Therapeutic Exercises/Active Assisted Exercises.    On occasion, Ahmed PT would also list Myofascial Release and/or ultrasounds, services Ahmed PT, rarely, if ever billed for.

369.    On information and belief, Ahmed PT billed Allstate for almost identical treatment purportedly provided to virtually every Claimant irrespective of any change in the

Claimant's condition. By way of example and not limitation, in connection with a Claimant's initial physical therapy evaluation, Ahmed PT billed Allstate for a physical therapy evaluation using CPT Code 97001 or 97002 based on a conclusion that each Claimant suffered from injuries as a result of an automobile accident and should begin a treatment plan.   A representative sample of claims is annexed hereto as Exhibit "33."

370.    On information and belief, in connection with every subsequent visit following an initial evaluation, Ahmed PT billed Allstate for the same protocol of treatments, irrespective of necessity, consisting of hot packs billed under CPT Code 97010, and electrical stimulation, billed under CPT Code 97014, alone or in combination with therapeutic massage billed under CPT Code 97124 and/or therapeutic exercises billed under CPT Code 97110. A representative sample of claims is annexed hereto as Exhibit "34."

371.    Instead, physical therapy progress notes which purported to document the physical therapy services provided to each Claimant on each date of service and record the physical therapist's assessment of each Claimant's condition, virtually always documented the predetermined treatment protocol followed by Ahmed PT—hot packs and electrical stimulation either alone or in conjunction with therapeutic exercises and/or therapeutic massage—while documenting, at best, cursory descriptions of each Claimant's condition—either not assessing the Claimant's response to treatment or checking the pre-set option on the form "Pt tolerated tx," but continued to report suffering pain, and that the Claimant's treatment plan should continue—regardless of whether the Claimant's condition was improving as a result of the services performed.

372.    In addition, despite recording each Claimant's response to health care services they are currently receiving in Ahmed PT's initial examination report, Ahmed PT's reports

failed to document any attempt to coordinate care across the multiple disciplines that were purportedly provided to each Claimant, often on the same day.

### iii. Mindful Chiropractic's Fraudulent Examinations, Diagnoses, and Treatment

#### a. The Fraudulent Initial Exams and Diagnoses

373.    In addition to services billed for by JAGA Medical Services, Standard Care PT, and Ahmed PT, Defendant Lacroix, through Mindful Chiropractic, billed Allstate for chiropractic services purportedly performed on Claimants, pursuant to a fraudulent pre-determined treatment protocol irrespective of medical necessity.

374.    In furtherance of the scheme to defraud alleged herein, Mindful Chiropractic diagnosed virtually every Claimant with muscle spasms, and sprains/strains in the cervical, thoracic, and lumbar regions of the back, and based on these diagnoses, recommended that each Claimant undergo the same treatments, including adjustments to the vertebral motion segments, trigger point therapy/myofascial release, neuromuscular reeducation exercise, and mechanical traction, three to four days per week for the first four to six weeks starting immediately with a re-evaluation performed every four to six weeks.

375.    In connection with Mindful Chiropractic's fraudulent protocol of treatment, Mindful Chiropractic completed, for each Claimant, a "Chiropractic Initial Evaluation Report" ("Initial Chiro Report") which seldom varied from patient to patient; for example, on information and belief, virtually every Initial Chiro Report reflected that Claimants reported: (a) complaints of pain in three regions of the spine in most cases; (b) spasm, tenderness, and pain in multiple regions of the spine; and (c) limited cervical and lumbar ranges of motion accompanied by pain.  A representative sample of initial examinations are annexed hereto as Exhibit "35."

376.    On information and belief, in order to justify a fraudulent protocol of treatment, Mindful Chiropractic diagnosed nearly all Claimants with muscle spasms and sprains/strains of the cervical, thoracic, and lumbar regions of the back. *Id.* at Exhibit "35."

377.    Moreover, the treatment plans set forth in the Initial Chiro Reports, rather than demonstrating a credible exercise of professional judgment tailored to individual Claimants, consisted of a pre-printed paragraphs on all forms with the following language:

> The patient will be seen _____ times /week for the first 4-6 weeks starting immediately. Re-evaluation will be performed every 4-6 weeks and proper treatment plan modifications will be made. The short term goals of this plan are to decrease pain and increase range of motion through chiropractic treatment and home exercise program.
>
> Chiropractic Treatment will include Diversified/Activator adjustments to:
> ☐Occipito-Cervical    ☐Cervical    ☐Cervico-Thoracic    ☐Thoracic
> ☐Thoraco-Lumbar        ☐Lumbar             ☐Lumbo-Sacral
> ☐Sacrococcygea/Sacroiliac
>
> The patient will also receive Trigger Point Therapy/Myofascial Release, Neuromuscular Reeducation exercise, and Mechanical Traction as needed.

*Id.* at Exhibit "35."

378.    For each Claimant, Mindful Chiropractic invariably recommends treatment three-four  times a week; routinely checked off the boxes for Cervical, Cervico-Thoracic, Thoracic, Thoraco-Lumbar, and Lumbar adjustments, and did not circle or cross off any of the listed treatments, such that Mindful Chiropractic's treatment plans were uniform, and not individualized to the needs of each Claimant.  *Id.* at Exhibit "35."

379.    Mindful Chiropractic's Initial Chiro Reports also contained the following pre-printed boilerplate opinion and long-term prognosis, irrespective of each Claimant's physical condition:

It is my opinion that as a result of the traumatic injuries sustained by _____ on __/__/__ there were extreme stretching and likely tearing of the supporting joint structures (discs, tendons, joint capsules, and ligaments of the spine) thus Vertebral Subluxation Complex.

The Vertebral Subluxation Complex and myofascial compensatory hypertonicity changes will affect normal joint mechanics, produce adverse reaction of related structures(nerves), cause pain and result in loss of range of motion which can persist for month or even years. Chiropractic is the most efficient treatment of the Vertebral Subluxation Complex and will allow the patient to regain/retain the normal functional motion of the spine.

It is my professional opinion that this patient starts and complies with the treatment program described above to achieve both symptomatic and optimal functional improvement of their overall condition.

*Id.* at Exhibit "35."

### b.  The Fraudulent Chiropractic Treatment Billing Protocol

380.    Based upon the Initial Chiro Reports by Mindful Chiropractic, Mindful Chiropractic billed Allstate for services purportedly provided to each Claimant, several times a week, that were nearly identical for each Claimant on every date of service, irrespective of any improvement or worsening of the Claimant's condition.

381.    In that regard, while Mindful Chiropractic recommended the same services for each Claimant on each Initial Chiro Report—"Trigger Point Therapy/Myofascial Release, Neuromuscular Reeducation exercise, and Mechanical Traction" in addition to chiropractic adjustments upwards of five regions of the spine—Mindful Chiropractic almost always billed Allstate just for Chiropractic manipulative treatment for each Claimant date of service, but rarely if ever, billed for Mechanical Traction, Trigger Point Therapy/Myofascial Release, or Neuromuscular Reeducation.  A representative sample of claims is annexed hereto as Exhibit "36."

382.     On information and belief, Lacroix, through Mindful Chiropractic, submitted bills and supposedly supporting documentation for chiropractic services purportedly performed on each Claimant to conceal that Lacroix, through Mindful Chiropractic, systematically billed Allstate for identical or near identical combinations of services purportedly performed on each Claimant according to a pre-determined treatment protocol irrespective of medical necessity.

### iv.   Milas Acupuncture's Fraudulent Examinations, Diagnoses, and Treatment

383.     On information and belief, in furtherance of the scheme to defraud alleged herein, Avshalumova, through Milas Acupuncture, billed Allstate for acupuncture services pursuant to a fraudulent pre-determined treatment protocol irrespective of medical necessity, on virtually all, if not all, Claimants who were purportedly treated at the Brooklyn Clinic during all times relevant to the Complaint.

384.     On information and belief, Avshalumova, through Milas Acupuncture, reportedly performed acupuncture on the same days that Claimants purportedly received medical services from one or more additional providers at the Brooklyn Clinic.

385.     On information and belief, because Milas Acupuncture's purported services were provided pursuant to an illegal protocol of treatment irrespective of medical necessity, Milas Acupuncture's evaluation and treatment of Claimants did not bear any of the hallmarks of a legitimate acupuncture regimen.

386.     On information and belief, rather than providing acupuncture services within the prevailing standard of care, and in furtherance of their scheme to defraud, to the extent any Claimant received purported acupuncture treatment at all at Milas Acupuncture, such treatment was performed on every Claimant the same way, without taking into account any particular

Claimant's medical history, physical examination, diagnosis, treatment plan or progress throughout the course of treatment.

387.    On information and belief, consistent with providing purported acupuncture treatments pursuant to a pre-determined treatment protocol, Avshalumova, through Milas Acupuncture, submitted initial examination reports and treatment notes to Allstate, which, with few exceptions, revealed the following pattern in Milas Acupuncture's purported evaluation and treatment of each Claimant:

- Initial evaluations invariably report "Qi stagnation and Blood stasis" from a pre-set checklist of Qi pattern discriminations, and "Regulate the Qi and quicken and transform stasis, stop pain," from a pre-set checklist of Treatment Principals, while never utilizing the space provided for an individualized assessment of the Claimant's pattern discrimination or appropriate treatment principal.

- The treatment goals for each Claimant are limited to the boilerplate text "Decrease of pain improved range of motion, strength and flexibility will continue to be the main objective of this treatment," while never utilizing the space reserved for individualized goal.

- Every Claimant "displays active symptomology and suffers from recurrent exacerbation of symptoms"

- Every Claimant's "lymphatic and blood circulation are impaired due to the extreme physical and mental stress of the [automobile] accident."

- Every Claimant "presents a sensation of generalized pain."

- For every Claimant, it is the "clinical opinion" of Milas Acupuncture that the Claimant requires acupuncture treatment.

- For every Claimant evaluated on or after June 2018, it was also the "clinical opinion" of Milas Acupuncture that the Claimant requires cupping treatment.

A representative sample of initial examinations are annexed hereto as Exhibit "37."

388.    On information and belief, Milas Acupuncture initially recommended that every Claimant receive acupuncture treatments 3-4 times per week, and purportedly re-evaluated

each Claimant every 4-8 weeks, at which time Milas Acupuncture recommended treatments to continue, on average, 3 times per week for an additional 4 weeks irrespective of any change in the Claimant's condition—ultimately billing Allstate for durations of service, on average, over 20 weeks per Claimant.

389.    While Claimants at the Brooklyn Clinic received chiropractic, acupuncture, and physical therapy treatments from multiple professionals on the same dates of service over the same periods of time, on information and belief, neither Avshalumova nor any other employee of Milas Acupuncture, communicated with the other providers rendering services on each Claimant in an attempt to coordinate their treatment.

390.    On information and belief, in furtherance of their scheme to defraud, Avshalumova, through Milas Acupuncture, systematically submitted bills and reports for identical or nearly identical combinations of acupuncture services purportedly performed on each Claimant who was purportedly treated at the Brooklyn Clinic to Allstate according to a pre-determined billing protocol irrespective of medical necessity.

5.    **THE FRAUDULENT DIAGNOSTIC TESTING**

A.    **Fraudulent Computerized Range of Motion, Muscle Testing and Outcome Assessment Testing**

391.    On information and belief, in furtherance of the scheme to defraud alleged herein, and as a matter of practice, procedure and protocol, Defendants, Corona Medical Plaza and/or JAGA Medical Services, routinely referred Claimants for a predetermined protocol of Computerized Range of Motion, Muscle Testing and/or Outcome Assessment Testing that they knew, or should have known, was medically unnecessary and/or of no clinical or diagnostic value (the "Fraudulent Diagnostic Testing Protocol"), regardless of the clinic at which such services were purportedly performed.

392.     On information, and belief, in furtherance of the scheme to defraud alleged herein, virtually all Claimants who were purportedly examined by Corona Medical Plaza and/or JAGA Medical Services were prescribed the Fraudulent Diagnostic Testing Protocol irrespective of need.

393.     On information and belief, the Fraudulent Diagnostic Testing Protocol was not designed in order to provide medically necessary services to Claimants; but rather, to increase Corona Medical Plaza's and/or JAGA Medical Services' billings and enrich the Defendants.

394.     Defendants' decision to perform the Fraudulent Diagnostic Testing Protocol typically did not vary from Claimant to Claimant based on their age, weight, sex, physical limitations, injury, symptoms or medical history.

395.     Demonstrative that a Fraudulent Diagnostic Testing Protocol existed at JAGA Medical Services and that services were provide irrespective of medical need, at an examination under oath in *In the Matter JAGA Medical Services, P.C. and Allstate Insurance Compan*y on December 8, 2019, Defendant Avellini admitted that (i) every person that he purportedly treated at JAGA Medical Services purportedly received Computerized Range of Motion, Muscle Testing and Outcome Assessment Testing, (ii) he could not state the medical necessity for such testing, and that (iii) it "may be" duplicative of his examination findings.

396.     By way of further example and not limitation that a Fraudulent Diagnostic Testing Protocol existed at Corona Medical Plaza and that services were provide irrespective of medical necessity, at an examination under oath in *In the Matter Corona Medical* on January 13, 2020, Defendant Avellini admitted that every person that he purportedly treated at Corona Medical Plaza received Computerized Range of Motion, Muscle Testing and Outcome Assessment Testing in order to "confirm" that they were not malingering.

397.    On information and belief, the test results and supporting documentation submitted in connection with Defendants' claims for reimbursement for Computerized Range of Motion, Muscle Testing and/or Outcome Assessment Testing reflected services that, if performed at all, were medically unnecessary and performed pursuant to the Fraudulent Diagnostic Testing Protocol.

**B.  Incomplete Range of Motion Measurements**

398.    By way of example and not limitation, on information and belief, as a matter of practice and procedure, Defendants submitted bills to Allstate for reimbursement of computerized range of motion tests purportedly performed that were fabricated and materially misrepresented in that they contained incomplete range of motion measurements, highly indicative of invalid impairment evaluations that were based on the incomplete measurements, that failed to meet the requirements of use of CPT codes 95851 and the AMA Guidelines, and thus are not eligible for reimbursement as billed.

399.    On information and belief, according to the Fee Schedule and the AMA Guidelines, reimbursement for range of motion billed under CPT Codes 95851 includes measurements of the degree of movement in multiple planes of motion, assessment of the capsular end feel of the joint, observation of muscle substitution patterns due to weakness of surrounding muscles, and notation of pain, tonus, and crepitus at specific places in the arc of motion.

400.    On information and belief, as a matter of procedure, practice and protocol and in furtherance of the scheme to defraud alleged herein, Defendants, through Corona Medical Plaza and/or JAGA Medical Services, routinely performed incomplete range of motion tests which they used to calculate motion impairment.

401.    By way of example, on information and belief, according to the AMA Guides as it relates to determining impairments of the spine, spinal range of motion should be measured in three principal planes: sagittal (extension-flexion), frontal or coronal (movements toward-away from the midline) and transverse or axial (rotation).   The ratings for each impaired spinal motion are added to determine impairment.

402.    On information and belief, notwithstanding this requirement, while purportedly performing cervical and/or lumbar range of motion tests, in some instances, Defendants, through Corona Medical Plaza and/or JAGA Medical Services, failed to measure all required planes of motion, including cervical lateral flexion and/or lumbar rotation.   By failing to perform these measurements, the cervical and/or lumbar range of motion evaluations purportedly performed by Defendants were incomplete.

403.    By way of example and not limitation, representative examples of claims wherein Defendants failed to test all planes of motion in the cervical and/or lumbar spine include Claimants: A.L., claim number 0519735103; S.L., claim number 0522780311; S.R., claim number 0524344215; C. M., claim number 0557587714; M.C., claim number 0553306317; G.R., claim number 0553306317; G.C., claim number 0538943630; D.J., claim number 0556584696, and A.G., claim number 0558317459.

404.    On information and belief, to the extent that Defendants' range of motion testing was based on incomplete range of motion measurements and impairment evaluations that do not take into consideration all range of motion measurements required to calculate motion impairment, it is of no diagnostic value.

405.    On information and belief, Defendants, through Corona Medical Plaza and/or JAGA Medical Services, failed to test all required planes of motion because they knew that the computerized range of motion reports were fictitious and not intended to actually diagnose

Claimants' medical condition and direct future treatment, but instead, intended solely to generate payments from insurance companies in general, and Allstate, in particular.

406.    On information and belief, because Defendants' range of motion testing failed to meet the requirements of CPT 95851, the Defendants were not entitled to reimbursement.

## C.  Fraudulent Electrodiagnostic Testing

407.    In furtherance of the scheme to defraud alleged herein, as a matter of practice, procedure and protocol, Defendants JAGA Medical Services and Corona Medical Plaza billed Allstate for nerve conduction velocity tests ("NCV") and electromyograms ("EMG") (the foregoing tests are generically and collectively referred to as "Electrodiagnostic Testing") when in fact such services were medically unnecessary and/or of no diagnostic or treatment value.

408.    On information and belief, the Electrodiagnostic Testing was purportedly performed, if at all, in a manner that Defendants JAGA Medical Services and Corona Medical Plaza knew or should have known was contrary to the prevailing standard of care and would produce invalid data, findings and diagnoses that endangered the welfare of the Claimants, putting them at risk of having undiagnosed medical conditions and diseases and/or the wrong diagnosis and wrong treatment. By submitting fictitious bills and reports for NCV and EMG testing to Allstate, Defendants JAGA Medical Services and Corona Medical Plaza misrepresented the actual medical status of the Claimants and the services purportedly rendered, which were not provided as billed, if provided at all.

409.    The American Medical Association (AMA) is the publisher of the CPT Code Book, which is the definitive medical source used by licensed medical professionals to accurately describe, among other things, medical and diagnostic services performed and billed to third-party payors, such as insurance companies.

410.     Pursuant to Section 5108 of the Insurance Law, the Department of Insurance has adopted the Fee Schedule published by the Workers' Compensation Board, which sets forth the charges for professional health services that are reimbursable under the No-fault Law. The Fee Schedule incorporates the CPT codes published by the AMA, and the coding rules and regulations set forth by the AMA.

411.     At all relevant times mentioned herein, Defendants JAGA Medical Services and Corona Medical Plaza submitted bills to Allstate for Electrodiagnostic Tests, wherein using CPT codes that intentionally and materially misrepresented the services, if any, performed and for which they sought reimbursement and were paid.

412.     On information and belief, in furtherance of the scheme to defraud and as a matter of practice, procedure and protocol, Defendants JAGA Medical Services and Corona Medical Plaza routinely referred Claimants treated at one or more of the Fraudulently Owned PCs for physiatry evaluations billed through the Fraudulently Owned PCs that Defendants JAGA Medical Services and Corona Medical Plaza knew or should have known were medically unnecessary and/or would produce medically invalid recommendations for Electrodiagnostic Testing, also billed through the Fraudulently Owned PCs, that were of no clinical or diagnostic value.

413.     On information and belief, in furtherance of the scheme to defraud and as a matter of practice, procedure and protocol, Defendants JAGA Medical Services and Corona Medical Plaza submitted boilerplate reports of purported physiatric evaluations to falsely justify Electrodiagnostic Testing which was not indicated by the Claimants' examination findings.

414.     The nervous system is divided into two major anatomical divisions: the central nervous system and the peripheral nervous system. The central nervous system includes the

brain and the spinal cord, while the peripheral nervous system includes the peripheral nerves. The purpose of a neurological examination is to identify the presence of any abnormality in the nervous system. The standard neurological examination checks the function and integrity of each component of the nervous system, including examination for the presence of generalized diseases of the peripheral nerves, known as neuropathy. Neuropathy can result from many diseases such as diabetes, kidney failure, cancer, AIDs and from systemic inflammatory disease of the small arteries of the body. In accordance with accepted medical practice, when a physician conducts an examination of a patient where the complained of symptoms may affect the nervous system or where the examination shows findings suggestive of nervous system disease or injury, it is essential that the physician rule out the existence of neuropathy, which may be done by performing an NCV.

415.    Radiculopathy is defined as injury or dysfunction of spinal nerve roots, which may affect the nerve root of a sensory nerve, motor nerve or both. With respect to trauma cases, such as those suffered as a result of automobile accidents, for the few cases in which radiculopathy occurs, the usual cause of radiculopathy is direct pressure on the nerve root by a herniated intervertebral disc causing inflammation of the nerve root. In the context of Electrodiagnostic Testing, the presence or absence of radiculopathy is determined by performing an EMG.

416.  On information and belief, to confirm or rule out a diagnosis through an NCV and EMG, the data and results produced from the testing must be performed and interpreted in a medically valid manner according to the standard of practice. Similarly, it is impossible to correctly interpret an EMG unless the NCV is properly performed and interpreted in accordance with the prevailing standard of practice.

417.    On information and belief, in numerous instances, the reported results associated with the Electrodiagnostic Testing were fictitious, meaning that Defendants JAGA Medical Services and Corona Medical Plaza routinely and as an integral element of their scheme to defraud, submitted bogus reports, findings and data to insurance companies, in general, and Plaintiffs, in particular, to substantiate their fraudulent claims and induce payment.

### 1.  Protocol Approach to NCV and EMG Testing

418.    By way of example and not limitation, as a matter of practice and procedure, Defendants JAGA Medical Services and Corona Medical Plaza used what is known as the "protocol approach" to perform NCVs and EMGs, when in fact accepted medical practice and the AMA requirement is that such tests be performed using what is known as a "dynamic" examination or approach as a prerequisite for billing under EMG and NCV CPT codes.

419.    Unlike the protocol approach utilized by Defendants JAGA Medical Services and Corona Medical Plaza that resulted in the same set of nerves and muscles purportedly being tested regardless of the Claimants' symptoms and findings, the dynamic approach (also known as a "progressive" examination) actually takes into account the individual symptoms and the results and findings of each nerve and muscle tested resulting in a logical, coherent and constantly evolving electrodiagnostic evaluation, evidenced by variation of the nerves and muscles tested on a case-by-case basis.

420.    On information and belief, even though NCVs and EMGs must be performed dynamically, Defendants JAGA Medical Services and Corona Medical Plaza used the protocol approach, which fails to recognize that the nerves and muscles studied should change from case to case and evolve within a case as the study proceeds.

421.    On information and belief, use of the dynamic approach is a prerequisite for the use of the electrodiagnostic CPT codes and, in using the protocol approach as a matter of

practice, procedure and protocol, Defendants JAGA Medical Services and Corona Medical Plaza submitted bills to Allstate for reimbursement of NCVs and EMGs wherein they represented the services were validly performed and reimbursable under the No-fault Law, when in fact they were not.

422.   Even though Defendants JAGA Medical Services' and Corona Medical Plaza's utilization of a protocol approach to the selection of NCVs and EMGs was violative of the requirements of the applicable CPT codes, Defendants JAGA Medical Services and Corona Medical Plaza sought reimbursement, and were paid by Allstate, for such services that they knew or should have known were not validly performed, were of no diagnostic value and were fraudulent and not reimbursable under the No-fault Law. By way of example and not limitation:

- Representative examples of claims wherein the Defendants purportedly sampled the same 10 nerves (Bilateral Motor Median and Ulnar, Bilateral Sensory Median and Ulnar and Bilateral Median and Ulnar F-waves) in the upper limb nerve conduction tests include Claimants: A.L., claim number 0519735103;   S.R., claim number 0524344215, W.B., claim number 0532355996;   D.G., claim number 0534267505;    J.B., claim number 0545005043;    D.C., claim number 0548558212; M.N., claim number 0551543432;   G.R., claim number 0553306317; M.C. claim number 0553306317;   G.C., claim number 0538943630; D.J., claim number 0556584696; and A.G., claim number 0558317459;

- Representative examples of claims wherein the Defendants purportedly sampled the same 16 nerves (Bilateral Motor Peroneal and tibial, Bilateral Sensory Superficial Peroneal and Sural, Bilateral Peroneal and Tibial F-waves, and Bilateral tibial H reflexes) in the lower limb nerve conduction tests include Claimants:  A.L., claim number 0519735103; S.L, claim number 0522780311; W.B., claim number 0532355996;  D.G., claim number 0534267505;  S.S., claim number 0541876876; P.P.,   claim number 0543435697; J.B., claim number 0545005043;  H.B., claim number 0547602870; M.N., claim number 0551543432;  G.R., claim number 0553306317;    M.C., claim number 0553306317;  G.C., claim number 0538943630; D.J., claim number 0556584696;  and A.G., claim number 0558317459;

- Representative examples of claims wherein the Defendants purportedly sampled the same 10 muscles (Bilateral Deltoid, Bicep, Flexor Carpi Radialis,

Triceps, Brachioradialis) in the upper limb EMG tests include Claimants: A.L., claim number 0519735103; S.R., claim number 0524344215; W.B., claim number 0532355996; D.G., claim number 0534267505; D.C., claim number 0548558212; M.N., claim number 0551543432; G.R.,0553306317; M.C., claim number 0553306317; G.C., claim number 0538943630; claimant D.J., claim number 0556584696; and A.G.; claim number 0558317459; and

- Representative examples of claims wherein the Defendants purportedly sampled the same 10 muscles (Bilateral Vastus Lateralis, Anterior Tibialis, Medial Gastrocnemius, Posterior Tibialis, Extensor Hallucis Longus) in the lower limb EMG tests include Claimants: A.L., claim number 0519735103; S.L., claim number 0522780311; W.B., claim number 0532355996; D.G., claim number 0534267505; S.S., claim number 0541876876; P.P., claim number 0543435697; H.B., claim number 0547602870; M.N., claim number 0551543432; G.R., claim number 0553306317; M.C., claim number 0553306317; claimant G.C., claim number 0538943630; D.J., claim number 0556584696; and A.G., claim number 0558317459.

423. On information and belief, the use of the "protocol approach," which, if administered at all, was uniformly employed by Defendants JAGA Medical Services and Corona Medical Plaza, increases the likelihood of invalid diagnoses and unreasonable and unnecessary testing.

424. On information and belief, the use of the "protocol approach," by Defendants JAGA Medical Services and Corona Medical Plaza virtually assured the likelihood of medically unreasonable and unnecessary Electrodiagnostic Testing.

425. Defendants JAGA Medical Services' and Corona Medical Plaza's purported use of the "protocol approach" (as opposed to utilizing the "progressive" or "dynamic" examination approach) in performing NCVs and EMGs is contrary to the well accepted practices of the medical community.

426. Defendants JAGA Medical Services' and Corona Medical Plaza's use of the "protocol approach" is contrary to the requirements for billing for electrodiagnostic services under the CPT codes used by the Defendants in seeking reimbursement from Allstate, and

reflects a pattern and practice of billing for services that were bogus, medically necessary and/or of no diagnostic value.

427.    On information and belief, since the NCV and EMG testing was substantially or routinely performed in a manner that could not possibly produce medically valid results, none of the medically accepted electrodiagnostic procedures were followed, rendering the purported services billed by Defendants JAGA Medical Services and Corona Medical Plaza to Allstate of no diagnostic value and fraudulent.

428.    By submitting to Allstate fictitious bills and documentation for NCV and EMG testing, Defendants JAGA Medical Services and Corona Medical Plaza misrepresented the services purportedly rendered and billed for services which were not rendered, or services performed in an invalid manner, rendering the results of no diagnostic value.

429.    A protocol approach to electrodiagnostic studies is clinically unacceptable and does not meet the standard required for billing for services under the applicable CPT code, and therefore bills submitted by Defendants JAGA Medical Services and Corona Medical Plaza to Allstate in connection therewith were fraudulent and potentially exposed the Claimants to an incorrect diagnosis and treatment plan.

## 2.    Overutilization of F-wave Tests

430.    On information and belief, the F-wave is a late combined motor action potential resulting from the backfiring of antidromically activated motor neurons by a supramaximal stimulus.

431.    On information and belief, Defendants JAGA Medical Services and Corona Medical Plaza, as a matter of pattern and practice, routinely over-utilized F-wave tests to fraudulently bill Allstate for services that were performed, if at all, solely to maximize reimbursement to Defendants JAGA Medical Services and Corona Medical Plaza.

432.     On information and belief, in numerous instances, Defendants JAGA Medical Services and Corona Medical Plaza submitted Electrodiagnostic Testing reports to Allstate in support of claims for reimbursement, which demonstrated that Defendants JAGA Medical Services and Corona Medical Plaza purportedly performed four (4) F-wave tests in each upper and lower limb NCV of the Claimants.

433.     On information and belief, performing four (4) F-waves tests in all NCV studies of Claimants who have been involved in automobile accidents, or even Claimants with suspected radiculopathy, is contrary to accepted medical practice, which dictates the use of an EMG to diagnose radiculopathy, as opposed to the F-wave tests that were purportedly performed by Defendants JAGA Medical Services and Corona Medical Plaza.

434.     On information and belief, the over-utilization of F-wave tests by Defendants JAGA Medical Services and Corona Medical Plaza was intentionally designed to fraudulently increase reimbursement from Allstate through Defendants JAGA Medical Services' and Corona Medical Plaza's purported routine performance of unnecessary, excessive testing. Assuming that Defendants JAGA Medical Services and Corona Medical Plaza actually performed the billed for tests, the over utilization of F-wave tests served no purpose other than to enrich Defendants JAGA Medical Services and Corona Medical Plaza through higher reimbursement, while needlessly exposing Claimants to increased pain associated with a minimum of forty uncomfortable electrical stimulations required by the testing.

435.     Billing for the F-wave tests was a misrepresentation by Defendants JAGA Medical Services and Corona Medical Plaza that the tests were medically indicated or within the standard of care for proper treatment, when in fact they were not, and knowingly administering this unnecessary testing to Claimants evidenced a wanton disregard by Defendants JAGA Medical Services and Corona Medical Plaza for their welfare.

110

3.  **Improper Performance of F-wave Tests and Misrepresented Findings**

436.    In addition to the intentional and fraudulent over utilization of F-wave tests, on information and belief, in numerous instances, Defendants JAGA Medical Services and Corona Medical Plaza knowingly failed to administer F-wave testing in accordance with the prevailing standard of care and the requirements of the applicable CPT code, rendering the F-wave test results invalid and unusable for clinical purposes.

437.    In that regard, Defendants JAGA Medical Services and Corona Medical Plaza through the Fraudulently Owned PCs, routinely, intentionally and fraudulently billed Allstate for F-wave tests that were not medically necessary to diagnose radiculopathy (the ostensible justification for the test in the first place) and then, in performing this wholly unnecessary test, failed to conduct a sufficient number of stimulations per each nerve tested in order to observe the required number of ten (10) F-wave responses per test.

438.    According to the AMA, who owns and defines the meaning of the CPT codes under which Defendants JAGA Medical Services and Corona Medical Plaza billed for nerve conduction studies, at least ten (10) F-waves should be assessed to arrive at a reasonably accurate F-wave latency. Performing enough stimulations to observe a minimum of ten (10) F-waves is also a requirement of the CPT code.

439.    On information and belief, many of the F-wave waveforms submitted by Defendants JAGA Medical Services and Corona Medical Plaza to Allstate in support of claims for reimbursement fail to reflect the performance of a sufficient number of stimulations to produce the required ten (10) F-waves and fail to identify ten (10) visible F-waves in each nerve tested.

440.    By way of example and not limitation, representative claims submitted by Defendants JAGA Medical Services and Corona Medical Plaza to Allstate for reimbursement

which fail to identify ten (10) visible F-waves in each nerve tested include Claimants: A.L., claim number 0519735103; S.L., claim number 0522780311; S.R., claim number 0524344215; W.B. claim number 0532355996; D.G., claim number 0534267505; J.B., claim number 0545005043; S.S., claim number 0541876876; P.P., claim number 0543435697; H.B., claim number 0547602870; D.C., claim number 0548558212; M.N., claim number 0551543432; G.R., claim number 0553306317; M.C., claim number 0553306317; G.C., claim number 0538943630; D.J., claim number 0556584696; and A.G., claim number 0558317459.

441.    By failing to perform the F-wave testing within the requirements of the CPT code and the prevailing standard of care, Defendants JAGA Medical Services and Corona Medical Plaza failed to provide the fundamental professional medical services for which they fraudulently submitted and/or conspired to submit bills related thereto, to Allstate for reimbursement under the No-fault Law.

442.    Additionally, notwithstanding that Defendants JAGA Medical Services and Corona Medical Plaza knew or should have known that the F-wave tests were invalid, on information and belief, Defendants JAGA Medical Services and Corona Medical Plaza knowingly submitted NCV studies to Allstate in which the data and findings related to the F-wave tests were, in part or wholly, fictitious and contrived, meaning that Defendants JAGA Medical Services and Corona Medical Plaza routinely submitted to Allstate F-wave findings that contained material misrepresentations to substantiate their fraudulent claims and induce payment.

443.    By way of example and not limitation, in numerous instances, Defendants JAGA Medical Services and Corona Medical Plaza submitted Electrodiagnostic Testing reports to Allstate which contained findings falsely representing that there were "normal F-wave latencies of all nerves tested," when in fact the number of F-wave responses was

insufficient to measure latency. Representative examples of these claims include Claimants: A.L., claim number 0519735103; S.L., claim number 0522780311; S.R., claim number 0524344215; W.B., claim number 0532355996; D.G., claim number 0534267505; J.B., claim number 0545005043; H.B., claim number 0547602870; D.C.,  claim number 0548558212; M.N., claim number 0551543432, G.R., claim number 0553306317; M.C., claim number 0553306317; C.M., claim number 0557587714; G.C., claim number 0538943630; D.J., claim number 0556584696; and  A.G., claim number 0558317459.

444.    In other instances, Defendants JAGA Medical Services and Corona Medical Plaza submitted electrodiagnostic test reports to Allstate which contained findings falsely representing that there were "prolonged F-wave latencies of all nerves tested," when in fact the number of F-wave responses was insufficient to measure latency. Representative examples of these claims include Claimant: W.B., claim number 0532355996, S.S., claim number 0541876876; and claimant P.P., claim number 0543435697.

445.    By misrepresenting the F-wave findings, Defendants JAGA Medical Services and Corona Medical Plaza knowingly endangered the welfare of the Claimants, putting them at risk of having undiagnosed medical conditions and diseases, and/or the wrong diagnosis and wrong treatment, as well as billed Allstate for services that were not rendered as billed and were of no diagnostic value.

### 4.   Overutilization of H-Reflex Testing Not Provided as Billed

446.    On information and belief, in furtherance of their fraudulent protocol of nerve testing, Defendants JAGA Medical Services and Corona Medical Plaza routinely submitted medical reports reflecting the performance of H-reflex tests in many of the lower limb electrodiagnostic study.

113

447.    The systematic and intentional billing for unnecessary H-reflex testing by Defendants JAGA Medical Services and Corona Medical Plaza was, and is, contrary to widely accepted medical practices and intentionally designed to fraudulently maximize reimbursement from Allstate.

448.    In addition to the intentional and fraudulent over utilization of H-reflex tests, on information and belief, in numerous instances, Defendants JAGA Medical Services and Corona Medical Plaza knowingly submitted NCV studies to Allstate in which the data and findings related to the H-reflex tests were, in part or wholly, fictitious and contrived, meaning that Defendants JAGA Medical Services and Corona Medical Plaza routinely submitted to Allstate H-reflex test results containing material misrepresentations to substantiate their fraudulent claims and induce payment.

449.    By way of example and not limitation, Defendants JAGA Medical Services and Corona Medical Plaza routinely misrepresented that peroneal H-reflex testing in the gastroc was administered to various patients, when Defendants JAGA Medical Services and Corona Medical Plaza knew or should have known that: 1) the peroneal nerve does not elicit an H-reflex, and that 2) the gastroc muscle is not innervated by the peroneal nerve, making it impossible to perform such a test, and indicating that the services were not provided by Defendants JAGA Medical Services and Corona Medical Plaza as billed.

450.    Representative examples of claims where Defendants JAGA Medical Services and Corona Medical Plaza billed for H-reflex testing that was not provided as billed include Claimants: S.L., claim number 0522780311; J.B., claim number 0545005043; H.B., claim number 0547602870; G.R., claim number 0553306317; M.C., claim number 0553306317; C.M., claim number 0557587714; A.G., claim number 0558317459; and G.C., claim number 0538943630.

**5.  Unreported Conduction Block Falsely Interpreted as Normal**

451.    By way of further example of Defendants JAGA Medical Services and Corona Medical Plaza's NCV fraud, on information and belief, in numerous instances Defendants JAGA Medical Services and Corona Medical Plaza submitted electrodiagnostic testing reports in support of claims for reimbursement that included NCV data and waveforms which demonstrated a significant drop in proximally evoked motor nerve amplitude responses as compared to distal, indicative of conduction block, an electrodiagnostic finding suggestive of a serious medical problem, which Defendants JAGA Medical Services and Corona Medical Plaza failed to report was present, and failed to incorporate in the diagnosis of each NCV study in which the conduction block occurred.

452.    According to the AMA, conduction block is an important pathologic finding. NCV studies are performed to assess the integrity of and diagnose diseases of the peripheral nervous system and an NCV report should document the nerves evaluated, the distance between the stimulation and recording sites, conduction velocity, latency values, and amplitude, and include a final diagnosis.

453.    On information and belief, by failing to indicate that a conduction block was present in the studies in which it occurred, Defendants JAGA Medical Services' and Corona Medical Plaza's reports failed to meet the basic criteria of the CPT code, and thereby such services were not rendered as billed and in accordance with the applicable CPT code.

454.    On information and belief, in addition to failing to report and/or diagnose the presence of conduction block, in numerous instances, the NCV studies submitted by Defendants JAGA Medical Services and Corona Medical Plaza were falsely interpreted by them to be within normal limits, when in fact, the data they submitted, upon which these interpretations were purportedly based, contained data values and abnormal electrodiagnostic

findings indicative of conduction block, that if taken at face value are suggestive or diagnostic of an underlying neuropathy that were entirely ignored. By ignoring these obvious abnormalities, Defendants JAGA Medical Services and Corona Medical Plaza failed to provide the fundamental professional medical services for which they fraudulently submitted and/or conspired to submit bills to Allstate for reimbursement under the No-fault Law.

455.    Representative examples of claims in which conduction block was present but failed to be noted and properly interpreted include Claimants: S.L., claim number 0522780311; D.G.., claim number 0534267505; D.J., claim number 0556584696; and A.G., claim number 0558317459.

456.    On information and belief, were the reported abnormal data values submitted by Defendants JAGA Medical Services and Corona Medical Plaza to Allstate true and the cause of the apparent neuropathy not diagnosed and treated, the patients would be placed at risk for progressive neurological disorders and/or underlying disease.

457.    On information and belief, were the reported abnormal data values submitted by Defendants JAGA Medical Services and Corona Medical Plaza to Allstate true, emergent diagnostic workups were required to identify the cause of said neuropathy or other nerve injury. In each instance, Defendants JAGA Medical Services and Corona Medical Plaza failed to perform the required follow-up or diagnostic testing consistent with the abnormal findings. Rather, the abnormal findings were often reported as being within "normal" variance or were otherwise ignored.

458.    On information and belief, the abnormal data values were ignored because they were known to be fictitious and therefore not indicative of any underlying condition warranting additional examination or diagnostic testing.

459.    On information and belief, if the abnormal data values reported by Defendants JAGA Medical Services and Corona Medical Plaza were true and went untreated, the "Claimants" would have been left to suffer from various neuropathies, including potentially grave neuropathies and undiagnosed systemic diseases, such as Guillaume-Barre syndrome (GBS), chronic inflammatory demyelinating polyneuropathy (CIDP) and multifocal motor neuropathy with persistent conduction block (MMN).

460.    On information and belief, Defendants JAGA Medical Services and Corona Medical Plaza did not either rule out conduction blocks or diagnose the potentially serious conditions that cause conduction blocks in the aforementioned studies because they knew that the studies were bogus, fictitious, and therefore not indicative of any underlying condition warranting additional examination or diagnostic testing.

461.    In addition to committing many acts of mail fraud by the submission of fraudulent NCV data to Allstate in connection with claims for reimbursement, Defendants JAGA Medical Services and Corona Medical Plaza, as a matter of procedure, practice and protocol, routinely submitted, through the Fraudulently Owned PCs, bills for reimbursement to Allstate for EMG tests that reflected services that were invalid, materially misrepresented, fabricated, of no diagnostic value, and/or never performed as billed.

**6.   False EMG Interpretations Relating to Failure to Sample Paraspinal Muscles**

462.    On information and belief, Defendants JAGA Medical Services and Corona Medical Plaza knowingly submitted electrodiagnostic testing reports to Allstate in which their interpretations relating to the EMG data were, in part or wholly, fictitious and contrived, meaning that Defendants JAGA Medical Services and Corona Medical Plaza routinely submitted to Allstate EMG interpretations containing material misrepresentations to substantiate their fraudulent claims and induce payment.

463.   By way of example and not limitation, in numerous instances, Defendants JAGA Medical Services and Corona Medical Plaza submitted Electrodiagnostic Testing reports to Allstate falsely representing that "needle EMG in the **bilateral cervical paraspinals** and selected muscles in both upper extremities did not show abnormal spontaneous activities, insertional activity and recruitment were within normal limits," when in fact the Defendants JAGA Medical Services and Corona Medical Plaza failed to sample any cervical paraspinal muscles as part of their EMG testing. Representative examples of these claims include Claimants: S.R., claim number 0524344215; W.B., claim number 0532355996; D.G., claim number 0534267505; D.C., claim number 0548558212; G.R., claim number 0553306317; C.M., claim number 0557587714; D.J. claim number 0556584696; and A.G., claim number 0558317459.

464.   By way of further example and not limitation, in numerous instances, Defendants JAGA Medical Services and Corona Medical Plaza submitted Electrodiagnostic Testing reports to Allstate falsely representing that "needle EMG in the **bilateral lumbosacral paraspinals** and selected muscles in both lower extremities did not show abnormal spontaneous activities," when in fact the Defendants JAGA Medical Services and Corona Medical Plaza failed to sample any lumbosacral paraspinal muscles as part of their EMG testing. Representative examples of these claims include claimants: S.L., claim number 0522780311; D.G., claim number 0534267505;  S.S., claim number 0541876876, H.B., claim number 0547602870; G.R., claim number 0553306317; M.C., claim number 0553306317; C.M., claim number 0557587714;  A.G., claim number 0558317459; and G.C., claim number 0538943630.

465.   By misrepresenting the EMG interpretations, Defendants JAGA Medical Services and Corona Medical Plaza knowingly endangered the welfare of the Claimants,

putting them at risk of having undiagnosed medical conditions and diseases, and/or the wrong diagnosis and wrong treatment, as well as billed Allstate for services that were not rendered as billed and were of no diagnostic value.

466.    On information and belief, Defendants JAGA Medical Services' and Corona Medical Plaza's failure to sample cervical and lumbar paraspinal muscles as part of their EMG testing was below the standard of care and reduced the chances that radiculopathy (Defendants' professed reason for EMG) could be identified.

467.    It is commonly accepted in the medical community that approximately one-third (33.3%) of radiculopathy cases will have EMG findings only in the paraspinal muscles, one-third (33.3%) will have findings only in limb muscles, and one third (33.3%) will have abnormal findings in both the paraspinals and the limb muscles. Although the exact level of radiculopathy cannot be determined from findings in the paraspinals alone, since approximately 33% of radiculopathies will be missed if the paraspinal muscles are not sampled, the standard of practice is to sample the associated paraspinals in the majority of Claimants who have suspected radiculopathy.

468.    Defendants JAGA Medical Services' and Corona Medical Plaza's false EMG interpretations and failure to sample cervical and/or lumbar paraspinal muscles rendered the EMG test results invalid and unusable for clinical purposes. By failing to perform and interpret the EMG testing within the prevailing standard of care, Defendants JAGA Medical Services and Corona Medical Plaza failed to provide the fundamental professional medical services for which they fraudulently submitted and/or conspired to submit bills to Allstate for reimbursement and materially misrepresented the services provided.

7.   **Failure to Extend EMG from a Screening to Diagnostic Study**

469.    By way of further example of Defendants JAGA Medical Services' and Corona Medical Plaza's EMG fraud, on information and belief, in numerous instances Defendants JAGA Medical Services and Corona Medical Plaza submitted electrodiagnostic testing reports in support of claims for reimbursement which demonstrated that Defendants JAGA Medical Services and Corona Medical Plaza failed to extend the EMG studies from screening to diagnostic EMGs when radiculopathy was detected.

470.    The standard practice in electromyography is to sample a minimum of five muscles per limb to diagnose the presence or absence of radiculopathy. If abnormalities suggestive of radiculopathy are found, the EMG study is extended, and additional muscles are tested in order to establish an accurate diagnosis by defining the radiculopathy to the correct root level.

471.    Contrary to the accepted practice, on information and belief, Defendants JAGA Medical Services and Corona Medical Plaza, as a matter of practice, procedure and protocol, sampled only the same five limb muscles in virtually every upper and lower EMG study, including cases where radiculopathy was present, when they should have sampled additional muscles that would have reliably determined which root was involved.

472.    On information and belief, Defendants JAGA Medical Services' and Corona Medical Plaza's failure to extend the EMGs from screening to diagnostic studies renders the EMG studies invalid and of no diagnostic value and was a material misrepresentation of the services provided.

473.    By way of example and not limitation, representative examples of claims where Defendants JAGA Medical Services and Corona Medical Plaza failed to extend the EMGs from screening to diagnostic studies include Claimants:  A.L., claim number 0519735103;

W.B.,  claim number 0532355996; P.P.; claim number 0543435697; M.N., claim number 0551543432; M.C. claim number 0553306317; G.C., claim number 0538943630; and D.J., claim number 0556584696

## DISCOVERY OF THE FRAUD

474.    Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud, described above, Plaintiffs did not discover and should not have reasonably discovered that their damages were attributable to fraud until shortly before they filed their complaint.

## FIRST CLAIM FOR RELIEF

## AGAINST DEFENDANTS AVELLINI, JOHN DOES 1 THROUGH 20 AND ABC CORPORATIONS 1 THROUGH 20

### [RICO, pursuant to 18 U.S.C. § 1962(c)]

475.    The allegations of paragraphs 1 through 474 are hereby repeated and realleged as though fully set forth herein.

## THE RICO ENTERPRISE

476.    At all times relevant herein, JAGA Medical Services was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

477.    From in or about 2014 through the present, Defendants Avellini, John Doe Defendants 1 through 20 and ABC Corporations 1 through 20 knowingly conducted and participated in the affairs of the JAGA Medical Services Enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein, in the representative list of predicate acts set forth in the accompanying Appendix, which are incorporated by reference.  Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

478.    At all relevant times mentioned herein, John Doe Defendants 1 through 20 were the Controllers of, exerted control over, and directed the operations of the JAGA Medical Services Enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs seeking payments that Jaga Medical Services was ineligible to receive because it (a) is fraudulently incorporated and/or owned and controlled by unlicensed laypersons; (b) submitted claims for medically unnecessary medical services performed pursuant to a predetermined course of treatment, designed solely to maximize reimbursement; (c) submitted claims for reimbursement pursuant to unlawful referral and/or financial arrangement(s) between the Defendants without regard to medical necessity; and (d) submitted claims for reimbursement under billing codes that misrepresent and exaggerate the services purportedly provided Claimants.

479.    At all relevant times mentioned herein, Defendant Avellini was employed by or associated with the JAGA Medical Services Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.  In addition, Defendant Avellini furnished his name and professional license to the JAGA Medical Services Enterprise and provided the essential means for the Enterprise to fraudulently incorporate and/or operate a bogus professional service corporation and fraudulently bill insurance companies.

480.    On information and belief, one or more of John Does 1 through 20 were associated with the JAGA Medical Services Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

481.    On information and belief, one or more of the ABC Corporations 1 through 20 were associated with the JAGA Medical Services Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

122

## THE PATTERN OF RACKETEERING ACTIVITY
## (RACKETEERING ACTS)

482.    The racketeering acts set forth herein were carried out over a six-year period, were related and similar, and were committed as part of Defendants' scheme to use their control of JAGA Medical Services to defraud insurers.

483.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as JAGA Medical Services continues to pursue collection on the fraudulent bills to the present day.

484.    As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the JAGA Medical Services Enterprise based upon materially false and misleading information.

485.    Through the JAGA Medical Services Enterprise, Defendants submitted or caused to be submitted fraudulent claim forms seeking payment for healthcare services provided to No-fault Claimants. The bills and supporting documents that were sent by Defendants, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service.  By virtue of those activities, Defendants engaged in a continuous series of predicate acts of mail fraud.

486.    A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

487.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

488.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## DAMAGES

489.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have been injured in their business and property and have been damaged in the aggregate amount presently in excess of $129,500.00, the exact amount to be determined at trial.

490.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Avellini, John Does 1 through 20 and ABC Corporations 1 through 20, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

## SECOND CLAIM FOR RELIEF

## AGAINST DEFENDANTS AVELLINI, JOHN DOES 1 THROUGH 20 AND ABC CORPORATIONS 1 THROUGH 20

### [RICO, pursuant to 18 U.S.C. § 1962(c)]

491.    The allegations of paragraphs 1 through 474 are hereby repeated and realleged as though fully set forth herein.

## THE RICO ENTERPRISE

492.    At all times relevant herein, Corona Medical Plaza was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

493.    From in or about 2013 through the present, Defendants Avellini, John Doe Defendants 1 through 20 and ABC Corporations 1 through 20 knowingly conducted and participated in the affairs of the Corona Medical Plaza Enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein, in the representative list of predicate acts set forth in the accompanying Appendix, which are incorporated by reference.  Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

494.    At all relevant times mentioned herein, John Doe Defendants 1 through 20, were the Controllers of, exerted control over, and directed the operations of the Corona Medical Plaza Enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs seeking payments that Corona Medical Plaza was ineligible to receive because it (a) is fraudulently incorporated and/or owned and controlled by unlicensed laypersons; (b) submitted claims for medically unnecessary medical services performed pursuant to a predetermined course of treatment, designed solely to maximize reimbursement; (c) submitted claims for reimbursement pursuant to unlawful referral and/or financial arrangement(s) between the Defendants without regard to medical necessity; and (d) submitted claims for reimbursement under billing codes that misrepresent and exaggerate the services purportedly provided Claimants.

495.    At all relevant times mentioned herein, Defendant Avellini was employed by or associated with the Corona Medical Plaza Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.  In addition, Defendant Avellini furnished his name and professional license to the Corona Medical Plaza Enterprise and provided the essential means for the Enterprise to fraudulently incorporate and/or operate a bogus professional service corporation and fraudulently bill insurance companies.

496.     On information and belief, one or more of John Does 1 through 20 were associated with the Corona Medical Plaza Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

497.     On information and belief, one or more of the ABC Corporations 1 through 20 were associated with the Corona Medical Plaza s Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

## THE PATTERN OF RACKETEERING ACTIVITY
## (RACKETEERING ACTS)

498.     The racketeering acts set forth herein were carried out over a seven-year period, were related and similar, and were committed as part of Defendants' scheme to use their control of Corona Medical Plaza to defraud insurers.

499.     On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Corona Medical Plaza continues to pursue collection on the fraudulent bills to the present day.

500.     As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Corona Medical Plaza Enterprise based upon materially false and misleading information.

501.     Through the Corona Medical Plaza, Defendants submitted or caused to be submitted fraudulent claim forms seeking payment for healthcare services provided to No-fault Claimants. The bills and supporting documents that were sent by Defendants, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States

Postal Service.  By virtue of those activities, Defendants engaged in a continuous series of predicate acts of mail fraud.

502.    A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

503.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

504.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## DAMAGES

505.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have been injured in their business and property and have been damaged in the aggregate amount presently in excess of $193,500.00, the exact amount to be determined at trial.

506.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Avellini John Does 1 through 20 and ABC Corporations 1 through 20, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

## THIRD CLAIM FOR RELIEF

## AGAINST DEFENDANTS ABAKIN, JOHN DOES 1 THROUGH 20 AND ABC CORPORATIONS 1 THROUGH 20

### [RICO, pursuant to 18 U.S.C. § 1962(c)]

507.    The allegations of paragraphs 1 through 474 are hereby repeated and realleged as though fully set forth herein.

## THE RICO ENTERPRISE

508.    At all times relevant herein, ABA Chiropractic was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

509.    From in or about 2013 through the present, Defendants Abakin, John Doe Defendants 1 through 20 and ABC Corporations 1 through 20 knowingly conducted and participated in the affairs of the ABA Chiropractic Enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein, in the representative list of predicate acts set forth in the accompanying Appendix, which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

510.    At all relevant times mentioned herein, Defendants John Doe Defendants 1 through 20, were the Controllers of, exerted control over, and directed the operations of the ABA Chiropractic Enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs seeking payments that ABA Chiropractic was ineligible to receive because it (a) is fraudulently incorporated and/or owned and controlled by unlicensed laypersons; (b)  submitted claims for medically unnecessary medical services performed pursuant to a predetermined course of treatment, designed solely to maximize

reimbursement; (c) submitted claims for reimbursement pursuant to unlawful referral and/or financial arrangement(s) between the Defendants without regard to medical necessity; and (d) submitted claims for reimbursement under billing codes that misrepresent and exaggerate the services purportedly provided Claimants.

511.    At all relevant times mentioned herein, Defendant Abakin was employed by or associated with the ABA Chiropractic Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.  In addition, Defendant Abakin furnished his name and professional license to the ABA Chiropractic Enterprise and provided the essential means for the Enterprise to fraudulently incorporate and/or operate a bogus professional service corporation and fraudulently bill insurance companies.

512.    On information and belief, one or more of John Does 1 through 20 were associated with the ABA Chiropractic Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

513.    On information and belief, one or more of the ABC Corporations 1 through 20 were associated with the ABA Chiropractic s Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

### THE PATTERN OF RACKETEERING ACTIVITY
### (RACKETEERING ACTS)

514.    The racketeering acts set forth herein were carried out over a seven-year period, were related and similar, and were committed as part of Defendants' scheme to use their control of ABA Chiropractic to defraud insurers.

515.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as ABA Chiropractic continues to pursue collection on the fraudulent bills to the present day.

516.     As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the ABA Chiropractic Enterprise based upon materially false and misleading information.

517.     Through the ABA Chiropractic Enterprise, Defendants submitted or caused to be submitted fraudulent claim forms seeking payment for healthcare services provided to No-fault Claimants. The bills and supporting documents that were sent by Defendants, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service.  By virtue of those activities, Defendants engaged in a continuous series of predicate acts of mail fraud.

518.     A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

519.     Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

520.     Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## DAMAGES

521.     By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have been injured in their

business and property and have been damaged in the aggregate amount presently in excess of

$93,600.00, the exact amount to be determined at trial.

522.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from

Defendants Avellini, John Does 1 through 20 and ABC Corporations 1 through 20, jointly and

severally, three-fold damages sustained by them, together with the costs of this lawsuit and

reasonable attorneys' fees.

<div align="center">

**FOURTH CLAIM FOR RELIEF**

**<u>AGAINST DEFENDANTS AHMED, JOHN DOES 1 THROUGH 20 AND ABC
CORPORATIONS 1 THROUGH 20</u>**

**[RICO, pursuant to 18 U.S.C. § 1962(c)]**

</div>

523.    The allegations of paragraphs 1 through 474 are hereby repeated and realleged

as though fully set forth herein.

<div align="center">

**<u>THE RICO ENTERPRISE</u>**

</div>

524.    At all times relevant herein, Ahmed PT was an "enterprise" engaged in, or the

activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4),

and within the meaning of 18 U.S.C. § 1962(c).

525.    From in or about 2018 through the present, Defendants Ahmed, John Doe

Defendants 1 through 20 and ABC Corporations 1 through 20 knowingly conducted and

participated in the affairs of the Ahmed PT Enterprise through a pattern of racketeering activity,

including the numerous acts of mail fraud described herein, in the representative list of

predicate acts set forth in the accompanying Appendix, which are incorporated by reference.

Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

526.    At all relevant times mentioned herein, John Doe Defendants 1 through 20 were

the Controllers of, exerted control over, and directed the operations of the Ahmed PT Enterprise

<div align="center">131</div>

and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs seeking payments that Ahmed PT was ineligible to receive because it (a) is fraudulently incorporated and/or owned and controlled by unlicensed laypersons; (b) submitted claims for medically unnecessary medical services performed pursuant to a predetermined course of treatment, designed solely to maximize reimbursement; (c) submitted claims for reimbursement pursuant to unlawful referral and/or financial arrangement(s) between the Defendants without regard to medical necessity; and (d) submitted claims for reimbursement under billing codes that misrepresent and exaggerate the services purportedly provided Claimants.

527.    At all relevant times mentioned herein, Defendant Ahmed was employed by or associated with the Ahmed PT Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.  In addition, Defendant Ahmed furnished his name and professional license to the Ahmed PT Enterprise and provided the essential means for the Enterprise to fraudulently incorporate and/or operate a bogus professional service corporation and fraudulently bill insurance companies.

528.    On information and belief, one or more of John Does 1 through 20 were associated with the Ahmed PT Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

529.    On information and belief, one or more of the ABC Corporations 1 through 20 were associated with the Ahmed PT Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

## THE PATTERN OF RACKETEERING ACTIVITY
## (RACKETEERING ACTS)

530.    The racketeering acts set forth herein were carried out over a three-year period,

were related and similar, and were committed as part of Defendants' scheme to use their control

of Ahmed PT to defraud insurers.

531.    On information and belief, this pattern of racketeering activity poses a specific

threat of repetition extending indefinitely into the future, inasmuch as Ahmed PT continues to

pursue collection on the fraudulent bills to the present day.

532.    As a part of the pattern of racketeering activity, and for the purpose of executing

the scheme and artifice to defraud as described above, Defendants caused mailings to be made

through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were

made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue

checks to the Ahmed PT Enterprise based upon materially false and misleading information.

533.    Through the Ahmed PT Enterprise, Defendants submitted or caused to be

submitted fraudulent claim forms seeking payment for healthcare services provided to No-fault

Claimants. The bills and supporting documents that were sent by Defendants, as well as the

payments that Plaintiffs made in response to those bills, were sent through the United States

Postal Service.  By virtue of those activities, Defendants engaged in a continuous series of

predicate acts of mail fraud.

534.    A sample list of predicate acts is set forth in the accompanying Appendix, which

identifies the nature and date of mailings that were made by Defendants in furtherance of the

scheme as well as the specific misrepresentations identified for each of the mailings.

535.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C.

§ 1961(1)(b).

536.     Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## DAMAGES

537.     By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Fire and Casualty Insurance Company and Allstate Property and Casualty Insurance Company have been injured in their business and property and have been damaged in the aggregate amount presently in excess of $54,600.00, the exact amount to be determined at trial.

538.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Ahmed, John Does 1 through 20 and ABC Corporations 1 through 20, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

## FIFTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS AHMED, JOHN DOES 1 THROUGH 20 AND ABC CORPORATIONS 1 THROUGH 20

### [RICO, pursuant to 18 U.S.C. § 1962(c)]

539.     The allegations of paragraphs 1 through 474 are hereby repeated and realleged as though fully set forth herein.

## THE RICO ENTERPRISE

540.     At all times relevant herein, Elmont Rehab PT was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

541.     From in or about 2013 through the present, Defendants Ahmed, John Doe Defendants 1 through 20 and ABC Corporations 1 through 20 knowingly conducted and participated in the affairs of the Elmont Rehab PT Enterprise through a pattern of racketeering

activity, including the numerous acts of mail fraud described herein, in the representative list of predicate acts set forth in the accompanying Appendix, which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

542.    At all relevant times mentioned herein, John Doe Defendants 1 through 20 were the Controllers of, exerted control over, and directed the operations of the Elmont Rehab PT Enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs seeking payments that Elmont Rehab PT was ineligible to receive because it (a) is fraudulently incorporated and/or owned and controlled by unlicensed laypersons; (b) submitted claims for medically unnecessary medical services performed pursuant to a predetermined course of treatment, designed solely to maximize reimbursement; (c) submitted claims for reimbursement pursuant to unlawful referral and/or financial arrangement(s) between the Defendants without regard to medical necessity; and (d) submitted claims for reimbursement under billing codes that misrepresent and exaggerate the services purportedly provided Claimants.

543.    At all relevant times mentioned herein, Defendant Ahmed was employed by or associated with the Elmont Rehab PT Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.  In addition, Defendant Ahmed furnished his name and professional license to the Elmont Rehab PT Enterprise and provided the essential means for the Enterprise to fraudulently incorporate and/or operate a bogus professional service corporation and fraudulently bill insurance companies.

544.    On information and belief, one or more of John Does 1 through 20 were associated with the Elmont Rehab PT Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

545.    On information and belief, one or more of the ABC Corporations 1 through 20 were associated with the Elmont Rehab PT Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

## THE PATTERN OF RACKETEERING ACTIVITY
## (RACKETEERING ACTS)

546.    The racketeering acts set forth herein were carried out over a seven-year period, were related and similar, and were committed as part of Defendants' scheme to use their control of Elmont Rehab PT to defraud insurers.

547.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Elmont Rehab PT continues to pursue collection on the fraudulent bills to the present day.

548.    As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Elmont Rehab PT Enterprise based upon materially false and misleading information.

549.    Through the Elmont Rehab PT Enterprise, Defendants submitted or caused to be submitted fraudulent claim forms seeking payment for healthcare services provided to No-fault Claimants. The bills and supporting documents that were sent by Defendants, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service.  By virtue of those activities, Defendants engaged in a continuous series of predicate acts of mail fraud.

550.     A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

551.     Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

552.     Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

### DAMAGES

553.     By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have been injured in their business and property and have been damaged in the aggregate amount presently in excess of $163,900.00, the exact amount to be determined at trial.

554.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Ahmed, John Does 1 through 20 and ABC Corporations 1 through 20, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

### SIXTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS AHMED, JOHN DOES 1 THROUGH 20 AND ABC CORPORATIONS 1 THROUGH 20

### [RICO, pursuant to 18 U.S.C. § 1962(c)]

555.     The allegations of paragraphs 1 through 474 are hereby repeated and realleged as though fully set forth herein.

## THE RICO ENTERPRISE

556.   At all times relevant herein, High Level Care Physical Therapy was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

557.   From in or about 2017 through the present, Defendants Ahmed, John Doe Defendants 1 through 20 and ABC Corporations 1 through 20 knowingly conducted and participated in the affairs of the High Level Care Physical Therapy Enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein, in the representative list of predicate acts set forth in the accompanying Appendix, which are incorporated by reference.  Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

558.   At all relevant times mentioned herein, John Doe Defendants 1 through 20 were the Controllers of, exerted control over, and directed the operations of the High Level Care Physical Therapy Enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs seeking payments that High Level Care Physical Therapy was ineligible to receive because it (a) is fraudulently incorporated and/or owned and controlled by unlicensed laypersons; (b) submitted claims for medically unnecessary medical services performed pursuant to a predetermined course of treatment, designed solely to maximize reimbursement; (c) submitted claims for reimbursement pursuant to unlawful referral and/or financial arrangement(s) between the Defendants without regard to medical necessity; and (d) submitted claims for reimbursement under billing codes that misrepresent and exaggerate the services purportedly provided Claimants.

559.   At all relevant times mentioned herein, Defendant Ahmed was employed by or associated with the High Level Care Physical Therapy Enterprise and participated in the

conduct of its affairs through a pattern of racketeering activity.  In addition, Defendant Ahmed furnished his name and professional license to the High Level Care Physical Therapy Enterprise and provided the essential means for the Enterprise to fraudulently incorporate and/or operate a bogus professional service corporation and fraudulently bill insurance companies.

560.    On information and belief, one or more of John Does 1 through 20 were associated with the High Level Care Physical Therapy Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

561.    On information and belief, one or more of the ABC Corporations 1 through 20 were associated with the High Level Care Physical Therapy Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

## THE PATTERN OF RACKETEERING ACTIVITY
## (RACKETEERING ACTS)

562.    The racketeering acts set forth herein were carried out over a four-year period, were related and similar, and were committed as part of Defendants' scheme to use their control of High Level Care Physical Therapy to defraud insurers.

563.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as High Level Care Physical Therapy continues to pursue collection on the fraudulent bills to the present day.

564.    As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue

checks to the High Level Care Physical Therapy Enterprise based upon materially false and misleading information.

565.    Through the High Level Care Physical Therapy Enterprise, Defendants submitted or caused to be submitted fraudulent claim forms seeking payment for healthcare services provided to No-fault Claimants. The bills and supporting documents that were sent by Defendants, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service.  By virtue of those activities, Defendants engaged in a continuous series of predicate acts of mail fraud.

566.    A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

567.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

568.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## DAMAGES

569.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company have been injured in their business and property and have been damaged in the aggregate amount presently in excess of $61,500.00, the exact amount to be determined at trial.

570.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Ahmed, John Does 1 through 20 and ABC Corporations 1 through 20, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

## SEVENTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS ABAKIN, JOHN DOES 1 THROUGH 20 AND ABC CORPORATIONS 1 THROUGH 20

### [RICO, pursuant to 18 U.S.C. § 1962(c)]

571.    The allegations of paragraphs 1 through 474 are hereby repeated and realleged as though fully set forth herein.

### THE RICO ENTERPRISE

572.    At all times relevant herein, Logic Chiropractic was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

573.    From in or about 2017 through the present, Defendants Abakin, John Doe Defendants 1 through 20 and ABC Corporations 1 through 20 knowingly conducted and participated in the affairs of the Logic Chiropractic Enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein, in the representative list of predicate acts set forth in the accompanying Appendix, which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

574.    At all relevant times mentioned herein, John Doe Defendants 1 through 20 were the Controllers of, exerted control over, and directed the operations of the Logic Chiropractic Enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs seeking payments that Logic Chiropractic was ineligible to receive because it (a) is fraudulently incorporated and/or owned and controlled by unlicensed laypersons; (b) submitted claims for medically unnecessary medical services performed pursuant to a predetermined course of treatment, designed solely to maximize reimbursement;

(c) submitted claims for reimbursement pursuant to unlawful referral and/or financial arrangement(s) between the Defendants without regard to medical necessity; and (d) submitted claims for reimbursement under billing codes that misrepresent and exaggerate the services purportedly provided Claimants.

575.    At all relevant times mentioned herein, Defendant Abakin was employed by or associated with the Logic Chiropractic Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.  In addition, Defendant Abakin furnished his name and professional license to the Logic Chiropractic Enterprise and provided the essential means for the Enterprise to fraudulently incorporate and/or operate a bogus professional service corporation and fraudulently bill insurance companies.

576.    On information and belief, one or more of John Does 1 through 20 were associated with the Logic Chiropractic Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

577.    On information and belief, one or more of the ABC Corporations 1 through 20 were associated with the Logic Chiropractic Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

### THE PATTERN OF RACKETEERING ACTIVITY
### (RACKETEERING ACTS)

578.    The racketeering acts set forth herein were carried out over a four-year period, were related and similar, and were committed as part of Defendants' scheme to use their control of Logic Chiropractic to defraud insurers.

579.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Logic Chiropractic continues to pursue collection on the fraudulent bills to the present day.

580.     As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Logic Chiropractic Enterprise based upon materially false and misleading information.

581.     Through the Logic Chiropractic Enterprise, Defendants submitted or caused to be submitted fraudulent claim forms seeking payment for healthcare services provided to No-fault Claimants. The bills and supporting documents that were sent by Defendants, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service.  By virtue of those activities, Defendants engaged in a continuous series of predicate acts of mail fraud.

582.     A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

583.     Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

584.     Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## DAMAGES

585.     By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company have been injured in their business and property and have been damaged in the aggregate amount presently in excess of $36,700.00, the exact amount to be determined at trial.

586.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Abakin, John Does 1 through 20 and ABC Corporations 1 through 20, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

## EIGHTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS AVSHALUMOVA, JOHN DOES 1 THROUGH 20 AND ABC CORPORATIONS 1 THROUGH 20

### [RICO, pursuant to 18 U.S.C. § 1962(c)]

587.    The allegations of paragraphs 1 through 474 are hereby repeated and realleged as though fully set forth herein.

## THE RICO ENTERPRISE

588.    At all times relevant herein, Milas Acupuncture was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

589.    From in or about 2017 through the present, Defendants Avshalumova, John Doe Defendants 1 through 20 and ABC Corporations 1 through 20 knowingly conducted and participated in the affairs of the Milas Acupuncture Enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein, in the representative list of predicate acts set forth in the accompanying Appendix, which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

590.    At all relevant times mentioned herein, John Doe Defendants 1 through 20 were the Controllers of, exerted control over, and directed the operations of the Milas Acupuncture Enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and

supporting documents to Plaintiffs seeking payments that Milas Acupuncture was ineligible to receive because it (a) is fraudulently incorporated and/or owned and controlled by unlicensed laypersons; (b) submitted claims for medically unnecessary medical services performed pursuant to a predetermined course of treatment, designed solely to maximize reimbursement; (c) submitted claims for reimbursement pursuant to unlawful referral and/or financial arrangement(s) between the Defendants without regard to medical necessity; and (d) submitted claims for reimbursement under billing codes that misrepresent and exaggerate the services purportedly provided Claimants.

591.    At all relevant times mentioned herein, Defendant Avshalumova was employed by or associated with the Milas Acupuncture Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.   In addition, Defendant Avshalumova furnished his name and professional license to the Milas Acupuncture Enterprise and provided the essential means for the Enterprise to fraudulently incorporate and/or operate a bogus professional service corporation and fraudulently bill insurance companies.

592.    On information and belief, one or more of John Does 1 through 20 were associated with the Milas Acupuncture Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

593.    On information and belief, one or more of the ABC Corporations 1 through 20 were associated with the Milas Acupuncture Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

## THE PATTERN OF RACKETEERING ACTIVITY
## (RACKETEERING ACTS)

594.    The racketeering acts set forth herein were carried out over a four-year period, were related and similar, and were committed as part of Defendants' scheme to use their control of Milas Acupuncture to defraud insurers.

595.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Milas Acupuncture continues to pursue collection on the fraudulent bills to the present day.

596.    As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Milas Acupuncture Enterprise based upon materially false and misleading information.

597.    Through the Milas Acupuncture Enterprise, Defendants submitted or caused to be submitted fraudulent claim forms seeking payment for healthcare services provided to No-fault Claimants. The bills and supporting documents that were sent by Defendants, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service.  By virtue of those activities, Defendants engaged in a continuous series of predicate acts of mail fraud.

598.    A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

599.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

600.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## DAMAGES

601.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have been injured in their business and property and have been damaged in the aggregate amount presently in excess of $139,600.00, the exact amount to be determined at trial.

602.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Avshalumova, John Does 1 through 20 and ABC Corporations 1 through 20, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

## NINTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS LACROIX, JOHN DOES 1 THROUGH 20 AND ABC CORPORATIONS 1 THROUGH 20

### [RICO, pursuant to 18 U.S.C. § 1962(c)]

603.    The allegations of paragraphs 1 through 474 are hereby repeated and realleged as though fully set forth herein.

## THE RICO ENTERPRISE

604.    At all times relevant herein, Mindful Chiropractic was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

147

605.    From in or about 2017 through the present, Defendants Lacroix, John Doe Defendants 1 through 20 and ABC Corporations 1 through 20 knowingly conducted and participated in the affairs of the Mindful Chiropractic Enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein, in the representative list of predicate acts set forth in the accompanying Appendix, which are incorporated by reference.  Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

606.    At all relevant times mentioned herein, John Doe Defendants 1 through 20 were the Controllers of, exerted control over, and directed the operations of the Mindful Chiropractic Enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs seeking payments that Mindful Chiropractic was ineligible to receive because it (a) is fraudulently incorporated and/or owned and controlled by unlicensed laypersons; (b) submitted claims for medically unnecessary medical services performed pursuant to a predetermined course of treatment, designed solely to maximize reimbursement; (c) submitted claims for reimbursement pursuant to unlawful referral and/or financial arrangement(s) between the Defendants without regard to medical necessity; and (d) submitted claims for reimbursement under billing codes that misrepresent and exaggerate the services purportedly provided Claimants.

607.    At all relevant times mentioned herein, Defendant Lacroix was employed by or associated with the Mindful Chiropractic Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.  In addition, Defendant Lacroix furnished his name and professional license to the Mindful Chiropractic Enterprise and provided the essential means for the Enterprise to fraudulently incorporate and/or operate a bogus professional service corporation and fraudulently bill insurance companies.

608.    On information and belief, one or more of John Does 1 through 20 were associated with the Mindful Chiropractic Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

609.    On information and belief, one or more of the ABC Corporations 1 through 20 were associated with the Mindful Chiropractic Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

## THE PATTERN OF RACKETEERING ACTIVITY (RACKETEERING ACTS)

610.    The racketeering acts set forth herein were carried out over a four-year period, were related and similar, and were committed as part of Defendants' scheme to use their control of Mindful Chiropractic to defraud insurers.

611.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Mindful Chiropractic continues to pursue collection on the fraudulent bills to the present day.

612.    As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Mindful Chiropractic Enterprise based upon materially false and misleading information.

613.    Through the Mindful Chiropractic Enterprise, Defendants submitted or caused to be submitted fraudulent claim forms seeking payment for healthcare services provided to No-fault Claimants. The bills and supporting documents that were sent by Defendants, as well as the payments that Plaintiffs made in response to those bills, were sent through the United

States Postal Service.  By virtue of those activities, Defendants engaged in a continuous series of predicate acts of mail fraud.

614.     A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

615.     Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

616.     Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## DAMAGES

617.     By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have been injured in their business and property and have been damaged in the aggregate amount presently in excess of $64,900.00, the exact amount to be determined at trial.

618.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Lacroix, John Does 1 through 20 and ABC Corporations 1 through 20, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

## TENTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS ELBEGRMI, JOHN DOES 1 THROUGH 20 AND ABC CORPORATIONS 1 THROUGH 20

### [RICO, pursuant to 18 U.S.C. § 1962(c)]

619.    The allegations of paragraphs 1 through 474 are hereby repeated and realleged as though fully set forth herein.

### THE RICO ENTERPRISE

620.    At all times relevant herein, Standard Care PT was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

621.    From in or about 2017 through the present, Defendants Elbegrmi, John Doe Defendants 1 through 20 and ABC Corporations 1 through 20 knowingly conducted and participated in the affairs of the Standard Care PT Enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein, in the representative list of predicate acts set forth in the accompanying Appendix, which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

622.    At all relevant times mentioned herein, John Doe Defendants 1 through 20 were the Controllers of, exerted control over, and directed the operations of the Standard Care PT Enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs seeking payments that Standard Care PT was ineligible to receive because it (a) is fraudulently incorporated and/or owned and controlled by unlicensed laypersons; (b) submitted claims for medically unnecessary medical services performed pursuant to a predetermined course of treatment, designed solely to maximize reimbursement;

(c) submitted claims for reimbursement pursuant to unlawful referral and/or financial arrangement(s) between the Defendants without regard to medical necessity; and (d) submitted claims for reimbursement under billing codes that misrepresent and exaggerate the services purportedly provided Claimants.

623.    At all relevant times mentioned herein, Defendant Elbegrmi was employed by or associated with the Standard Care PT Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.  In addition, Defendant Elbegrmi furnished his name and professional license to the Standard Care PT Enterprise and provided the essential means for the Enterprise to fraudulently incorporate and/or operate a bogus professional service corporation and fraudulently bill insurance companies.

624.    On information and belief, one or more of John Does 1 through 20 were associated with the Standard Care PT Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

625.    On information and belief, one or more of the ABC Corporations 1 through 20 were associated with the Standard Care PT Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

## THE PATTERN OF RACKETEERING ACTIVITY
## (RACKETEERING ACTS)

626.    The racketeering acts set forth herein were carried out over a four-year period, were related and similar, and were committed as part of Defendants' scheme to use their control of Standard Care PT to defraud insurers.

627.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Standard Care PT continues to pursue collection on the fraudulent bills to the present day.

628. As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Standard Care PT Enterprise based upon materially false and misleading information.

629. Through the Standard Care PT Enterprise, Defendants submitted or caused to be submitted fraudulent claim forms seeking payment for healthcare services provided to No-fault Claimants. The bills and supporting documents that were sent by Defendants, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service.  By virtue of those activities, Defendants engaged in a continuous series of predicate acts of mail fraud.

630. A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

631. Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

632. Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**DAMAGES**

633. By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have been injured in their business and property and have been

damaged in the aggregate amount presently in excess of $80,900.00, the exact amount to be determined at trial.

634.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Elbegrmi, John Does 1 through 20 and ABC Corporations 1 through 20, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

## ELEVENTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS AVSHALUMOVA, JOHN DOES 1 THROUGH 20 AND ABC CORPORATIONS 1 THROUGH 20

### [RICO, pursuant to 18 U.S.C. § 1962(c)]

635.     The allegations of paragraphs 1 through 474 are hereby repeated and realleged as though fully set forth herein.

## THE RICO ENTERPRISE

636.     At all times relevant herein, UGP Acupuncture was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

637.     From in or about 2013 through the present, Defendants Avshalumova, John Doe Defendants 1 through 20 and ABC Corporations 1 through 20 knowingly conducted and participated in the affairs of the UGP Acupuncture Enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein, in the representative list of predicate acts set forth in the accompanying Appendix, which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

638.     At all relevant times mentioned herein, John Doe Defendants 1 through 20 were the Controllers of, exerted control over, and directed the operations of the UGP Acupuncture

Enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs seeking payments that UGP Acupuncture was ineligible to receive because it (a) is fraudulently incorporated and/or owned and controlled by unlicensed laypersons; (b) submitted claims for medically unnecessary medical services performed pursuant to a predetermined course of treatment, designed solely to maximize reimbursement; (c) submitted claims for reimbursement pursuant to unlawful referral and/or financial arrangement(s) between the Defendants without regard to medical necessity; and (d) submitted claims for reimbursement under billing codes that misrepresent and exaggerate the services purportedly provided Claimants.

639.    At all relevant times mentioned herein, Defendant Avshalumova was employed by or associated with the UGP Acupuncture Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.   In addition, Defendant Avshalumova furnished his name and professional license to the UGP Acupuncture Enterprise and provided the essential means for the Enterprise to fraudulently incorporate and/or operate a bogus professional service corporation and fraudulently bill insurance companies.

640.    On information and belief, one or more of John Does 1 through 20 were associated with the UGP Acupuncture Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

641.    On information and belief, one or more of the ABC Corporations 1 through 20 were associated with the UGP Acupuncture Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

## THE PATTERN OF RACKETEERING ACTIVITY
## (RACKETEERING ACTS)

642.     The racketeering acts set forth herein were carried out over a seven-year period, were related and similar, and were committed as part of Defendants' scheme to use their control of UGP Acupuncture to defraud insurers.

643.     On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as UGP Acupuncture continues to pursue collection on the fraudulent bills to the present day.

644.     As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the UGP Acupuncture Enterprise based upon materially false and misleading information.

645.     Through the UGP Acupuncture Enterprise, Defendants submitted or caused to be submitted fraudulent claim forms seeking payment for healthcare services provided to No-fault Claimants. The bills and supporting documents that were sent by Defendants, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service.  By virtue of those activities, Defendants engaged in a continuous series of predicate acts of mail fraud.

646.     A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

647.     Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

648.     Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## DAMAGES

649.     By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have been injured in their business and property and have been damaged in the aggregate amount presently in excess of $140,000.00, the exact amount to be determined at trial.

650.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Avshalumova, John Does 1 through 20 and ABC Corporations 1 through 20, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

### TWELFTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS AVSHALUMOVA, JOHN DOES 1 THROUGH 20 AND ABC CORPORATIONS 1 THROUGH 20

### [RICO, pursuant to 18 U.S.C. § 1962(c)]

651.     The allegations of paragraphs 1 through 474 are hereby repeated and realleged as though fully set forth herein.

### THE RICO ENTERPRISE

652.     At all times relevant herein, VSL Acupuncture was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

653.    From in or about 2017 through the present, Defendants Avshalumova, John Doe Defendants 1 through 20 and ABC Corporations 1 through 20 knowingly conducted and participated in the affairs of the VSL Acupuncture Enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein, in the representative list of predicate acts set forth in the accompanying Appendix, which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

654.    At all relevant times mentioned herein, John Doe Defendants 1 through 20 were the Controllers of, exerted control over, and directed the operations of the VSL Acupuncture Enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs seeking payments that VSL Acupuncture was ineligible to receive because it (a) is fraudulently incorporated and/or owned and controlled by unlicensed laypersons; (b) submitted claims for medically unnecessary medical services performed pursuant to a predetermined course of treatment, designed solely to maximize reimbursement; (c) submitted claims for reimbursement pursuant to unlawful referral and/or financial arrangement(s) between the Defendants without regard to medical necessity; and (d) submitted claims for reimbursement under billing codes that misrepresent and exaggerate the services purportedly provided Claimants.

655.    At all relevant times mentioned herein, Defendant Avshalumova was employed by or associated with the VSL Acupuncture Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.  In addition, Defendant Avshalumova furnished his name and professional license to the VSL Acupuncture Enterprise and provided the essential means for the Enterprise to fraudulently incorporate and/or operate a bogus professional service corporation and fraudulently bill insurance companies.

656.   On information and belief, one or more of John Does 1 through 20 were associated with the VSL Acupuncture Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

657.   On information and belief, one or more of the ABC Corporations 1 through 20 were associated with the VSL Acupuncture Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

## THE PATTERN OF RACKETEERING ACTIVITY
## (RACKETEERING ACTS)

658.   The racketeering acts set forth herein were carried out over a four-year period, were related and similar, and were committed as part of Defendants' scheme to use their control of VSL Acupuncture to defraud insurers.

659.   On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as VSL Acupuncture continues to pursue collection on the fraudulent bills to the present day.

660.   As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the VSL Acupuncture Enterprise based upon materially false and misleading information.

661.   Through the VSL Acupuncture Enterprise, Defendants submitted or caused to be submitted fraudulent claim forms seeking payment for healthcare services provided to No-fault Claimants. The bills and supporting documents that were sent by Defendants, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States

Postal Service.  By virtue of those activities, Defendants engaged in a continuous series of predicate acts of mail fraud.

662.    A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

663.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

664.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## **DAMAGES**

665.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company have been injured in their business and property and have been damaged in the aggregate amount presently in excess of $98,400.00, the exact amount to be determined at trial.

666.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Avshalumova, John Does 1 through 20 and ABC Corporations 1 through 20, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

### **THIRTEENTH CLAIM FOR RELIEF**

### **AGAINST ALL DEFENDANTS**

**(Common Law Fraud)**
**(Fraudulent Incorporation)**

667.    The allegations of paragraphs 1 through 474 are hereby repeated and realleged as though fully set forth herein.

668.    Defendants Avellini, Abakin, Ahmed, Avshalumova, Elbegrmi, Lacroix, Jaga Medical Services, Corona Medical Plaza, ABA Chiropractic, Ahmed PT, Elmont Rehab PT, High Level Physical Therapy, Logic Chiropractic, Milas Acupuncture, Mindful Chiropractic, Standard Care PT, UGP Acupuncture, VSL Acupuncture, John Does 1 through 20 and ABC Corporations 1 through 20 intentionally, knowingly, fraudulently and with an intent to deceive Plaintiffs, made various misleading statements intended to hold out the Fraudulently Owned PCs as legal professional service corporations in compliance with core licensing requirements when, in fact, they were not, thereby inducing Plaintiffs to make payments that Defendants were not entitled to because of their fraudulent incorporation and/or illegal corporate structure that rendered the Fraudulently Owned PCs not licensed in accordance with applicable New York state law.  As part of the fraudulent scheme implemented by Defendants, the Fraudulently Owned PCs, with the assistance and knowledge of Defendants the Avellini, Abakin, Ahmed, Avshalumova, Elbegrmi, and Lacroix, and one or more of the John Doe Defendants 1 through 20, made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs for payment.

669.    Defendants Avellini, Abakin, Ahmed, Avshalumova, Elbegrmi, Lacroix, Jaga Medical Services, Corona Medical Plaza, ABA Chiropractic, Ahmed PT, Elmont Rehab PT, High Level Physical Therapy, Logic Chiropractic, Milas Acupuncture, Mindful Chiropractic, Standard Care PT, UGP Acupuncture, VSL Acupuncture, John Does 1 through 20 and ABC Corporations 1 through 20 intentionally, knowingly, fraudulently and with an intent to deceive Plaintiffs, concealed the fact that one or more of the John Doe Defendants 1 through 20, not Defendants Avellini, Abakin, Ahmed, Avshalumova, Elbegrmi, and Lacroix, were the true owners of the Fraudulently Owned PCs, by making false representations of material facts, including but not limited to the following fraudulent misrepresentations:

a.      Each and every bill and report set forth the name of the Fraudulently Owned PCs as professional corporations owned by Defendants Avellini, Abakin, Ahmed, Avshalumova, Elbegrmi, and Lacroix, licensed healthcare providers, when, in fact, they were not. The submission of bills and reports containing the signatures of Defendants Avellini, Abakin, Ahmed, Avshalumova, Elbegrmi, and Lacroix, was a fraudulent misrepresentation, intended to deceive and mislead the Plaintiffs into believing that the Fraudulently Owned PCs were legal professional corporations when, in fact, they were not;

b.      False and misleading statements and information regarding who owned, controlled and operated the Fraudulently Owned PCs;

c.      False and misleading statements and information intended to mislead Plaintiffs into believing that the Fraudulently Owned PCs were being operated by Defendants Avellini, Abakin, Ahmed, Avshalumova, Elbegrmi, and Lacroix, as indicated in their respective certificates of incorporation when, in fact, they were not;

d.      False and misleading statements intended to mislead Plaintiffs into believing that the Fraudulently Owned PCs were licensed in accordance with applicable New York state law when, in fact, they were not;

e.      False and misleading statements that the Fraudulently Owned PCs were properly licensed and therefore eligible to recover No-fault benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR 65-3.16(a)(12) when, in fact, they were not;

f.      False and misleading statements and information intended to circumvent Article 15 of the B.C.L., which prohibits ownership by individuals not licensed to practice the profession for which a professional corporation was incorporated;

g.      False and misleading statements and information, as contained in the signed medical reports and NF-3s, that were intended to deceive and conceal the facts that the Fraudulently Owned PCs were engaged in the illegal corporate practice of medicine, in contravention of New York state law and that the Controllers, and/or others unknown to Plaintiffs, were billing for medical and/or other healthcare services through Fraudulently Owned PCs;

h.      False and misleading statements and information set forth in NF-3 forms and medical reports indicating that Defendants Avellini, Abakin, Ahmed, Avshalumova, Elbegrmi, and Lacroix were actively involved in the operations of the Fraudulently Owned PCs when, in fact, they were not; and

i.      False and misleading statements contained in each separate bill, medical

record and report submitted by Defendants to Plaintiffs regarding the relationships between Defendants Avellini, Abakin, Ahmed, Avshalumova, Elbegrmi, and Lacroix and the Controllers, and the Fraudulently Owned PCs and Defendants Avellini, Abakin, Ahmed, Avshalumova, Elbegrmi, and Lacroix, which concealed or failed to disclose the actual relationships between said parties and the existence of fraudulent corporate structures.

670.   Defendants knew the foregoing material misrepresentations to be false when made, particularly that the Fraudulently Owned PCs were properly licensed in accordance with New York state law and eligible to recover No-fault benefits, and made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

671.   Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and/or omissions and upon a state of facts that Plaintiffs were led to believe existed as a result of Defendants' acts of fraud and deception, and which led to Plaintiffs making substantial payments to the Fraudulently Owned PCs.

672.   Had Plaintiffs known of the Fraudulently Owned PCs' illegal corporate structure, which were contrary to all indications reflected in the medical reports, treatment verifications, bills for medical and/or other healthcare services and other documents they submitted in support of payment, Plaintiffs would not have paid the Fraudulently Owned PCs' claims for No-fault insurance benefits submitted in connection therewith.

673.   Plaintiffs were thus injured as a proximate result and are entitled to recover and recoup from the Defendants payments they made to the Fraudulently Owned PCs, in accordance with the Court of Appeals' decision in *State Farm v. Mallela*.  *See* 4 N.Y.3d 313, 827 N.E.2d 758 (2005).

674.   Furthermore, Defendants' far-reaching pattern of fraudulent conduct evinces a high degree of moral turpitude and wanton dishonesty which, as alleged above, has harmed, and will continue to harm, the public at large, thus entitling Plaintiffs to recovery of exemplary

and punitive damages.

675.    By reason of the foregoing, Plaintiffs have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $1,277,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

### FOURTEENTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS CORONA MEDICAL PLAZA, ABA CHIROPRACTIC, ELMONT REHAB PT, UGP ACUPUNCTURE, AVELLINI, ABAKIN, AHMED AND AVSHALUMOVA

### (Common Law Fraud-Billing Fraud)

676.    The allegations of paragraphs 1 through 474 are hereby repeated and realleged as though fully set forth herein.

677.    Defendants Corona Medical Plaza, ABA Chiropractic, Elmont Rehab PT, UGP Acupuncture, Avellini, Abakin, Ahmed, Avshalumova, John Does 1 through 20 and ABC Corporations 1 through 20, intentionally, knowingly, fraudulently, and with an intent to deceive Plaintiffs, made numerous false and misleading statements of material fact as to the necessity of the medical services purportedly rendered and that the medical services were provided when in fact they were not provided as billed and exaggerated the level of service, if any, purportedly provided, thereby inducing Plaintiffs to make payments to Defendants that Defendants were not entitled to because of their fraudulent nature.  As part of the fraudulent scheme, Corona Medical Plaza, ABA Chiropractic, Elmont Rehab Physical Therapy, UGP Acupuncture, Abakin, Ahmed, Avshalumova, John Does 1 through 20 and ABC Corporations 1 through 20 made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs for payment.

678.     Defendants Corona Medical Plaza, ABA Chiropractic, Elmont Rehab Physical Therapy, UGP Acupuncture, Avellini, Abakin, Ahmed, Avshalumova, John Does 1 through 20 and ABC Corporations 1 through 20 intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiffs, concealed the fact that the bills submitted to Plaintiffs for reimbursement of No-fault benefits the Fraudulent Services were materially misrepresented.

679.     Defendants Corona Medical Plaza, ABA Chiropractic, Elmont Rehab Physical Therapy, UGP Acupuncture, Avellini, Abakin, Ahmed, Avshalumova, John Does 1 through 20 and ABC Corporations 1 through 20 intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiffs, concealed the fact that, in many instances, the services relating to Fraudulent Services were provided pursuant to a pre-determined protocol that was intended to maximize Defendants' profit and reimbursement of payments from the Plaintiffs, as opposed to medical necessity.

680.     Defendants intentionally, knowingly, fraudulently, and with the intent to deceive, submitted patient medical records, reports, treatment verifications and bills for medical treatment which contained false representations of material facts, including but not limited to the following fraudulent material misrepresentations:

a) False and misleading statements and information designed to conceal the fact that Defendants provided services according to a treatment protocol intended to fraudulently bill Plaintiffs for *inter alia,* medical evaluations, diagnostic tests, chiropractic treatment, acupuncture treatment, and physical therapy, irrespective of medical necessity;

b) False and misleading statements and information designed to conceal the fact that the Fraudulent Services were provided pursuant to an illegal referral and/or financial arrangement between and among the Defendants;

c) False and misleading statements made by Corona Medical Plaza in which it recorded incomplete and/or fabricated Claimant complaints and medical histories to support pre-determined diagnose to justify the billing for initial and follow-up

165

examinations and outcome assessment testing irrespective of medical necessity, and to justify referrals for diagnostic tests, acupuncture, physical therapy and chiropractic services with the intent to defraud Allstate;

d)  False and misleading statements made by Corona Medical Plaza in which Corona Medical falsely claimed the initial examinations it purportedly performed on Claimants were reimbursable pursuant to CPT Codes 99205, 99204 or 99243, when they were not;

e)  False and misleading statements made by Corona Medical Plaza in order to justify the billing for Electrodiagnostic Testing when in fact such services were medically unnecessary and/or of no diagnostic or treatment value;

f)  False and misleading statements made by Elmont Rehab PT concerning Claimants conditions in order to justify the billing almost identical physical therapy treatments to virtually every Claimant irrespective of medical necessity;

g)  False and misleading statements made by Elmont Rehab PT regarding the severity of Claimants' conditions in order to justify the provision of physical therapy services which were provided, if at all, pursuant to an illegal treatment protocol irrespective of medical necessity;

h)  False and misleading statements made by ABA Chiropractic through which it fraudulently diagnosed every Claimant with sprains and strains in the cervical, thoracic, and lumbar regions of the back in order to justify fraudulent billing for adjustments to the vertebral motion segments, trigger point therapy, neuromuscular reeducation exercise, mechanical traction, electrical stimulation, and hot packs;

i)  False and misleading statements made by ABA Chiropractic regarding the severity of Claimants' conditions in order to justify the provision of chiropractic services which were provided, if at all, pursuant to an illegal treatment protocol irrespective of medical necessity;

j)  False and misleading statements made by UGP Acupuncture in which it falsely identified identical meridian points for each Claimant irrespective of the Claimants complaints or physical condition;

k)  False and misleading statements made by UGP Acupuncture regarding the severity of Claimants' conditions in order to justify the provision of acupuncture services which were provided, if at all, pursuant to an illegal treatment protocol irrespective of medical necessity;

l)  False and misleading statements contained in the initial and follow-up reports of Corona Medical Plaza, ABA Chiropractic, Elmont Rehab PT and UGP Acupuncture concerning each patient's condition and/or diagnosis to justify the

continued necessity of the Fraudulent Services irrespective of improvements in a Claimant's condition; and

m) Other misrepresentations, including but not limited to those contained in paragraphs a through l above.

681.    On information and belief, in numerous instances, the medical records, reports and bills submitted by Defendants to Plaintiffs in connection with the Fraudulent Services set forth fictional representations of each Claimant's condition and services provided.  The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the Claimants and the consumer public, particularly if the sham and fictional diagnoses were to be relied upon by any subsequent healthcare provider.

682.    The foregoing was intended to deceive and mislead the Plaintiffs into believing that Defendants were providing medically valid services when, in fact, they were not.

683.    Defendants knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

684.    Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations, which Plaintiffs were led to believe existed as a result of Defendants' acts of fraud and deception.

685.    Had Plaintiffs known of the fraudulent content of, and misrepresentations in, the medical records, reports, treatment verifications, and bills for medical treatment, they would not have paid Defendant's claims for No-fault insurance benefits submitted in connection therewith.

686.    Furthermore, Defendants' far reaching pattern of fraudulent conduct evinces a high degree of moral turpitude and wanton dishonesty which, as alleged above, has harmed,

and will continue to harm, the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

687.    By reason of the foregoing, Plaintiffs have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $591,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## FIFTEENTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS JAGA MEDICAL SERVICES, LOGIC CHIROPRACTIC, VSL ACUPUNCTURE, HIGH LEVEL CARE PHYSICAL THERAPY, AVELLINI, ABAKIN, AVSHALUMOVA AND AHMED

### (Common Law Fraud-Billing Fraud)

688.    The allegations of paragraphs 1 through 474 are hereby repeated and realleged as though fully set forth herein.

689.    Defendants JAGA Medical Services, Logic Chiropractic, VSL Acupuncture and High Level Care Physical Therapy, Avellini, Abakin,,, Avshalumova, Ahmed, John Does 1 through 20 and ABC Corporations 1 through 20, intentionally, knowingly, fraudulently, and with an intent to deceive Plaintiffs, made numerous false and misleading statements of material fact as to the necessity of the medical services purportedly rendered and that the medical services were provided when in fact they were not provided as billed and exaggerated the level of service, if any, purportedly provided, thereby inducing Plaintiffs to make payments to Defendants that Defendants were not entitled to because of their fraudulent nature.  As part of the fraudulent scheme, JAGA Medical Services, Logic Chiropractic, VSL Acupuncture and High Level Care Physical Therapy, Avellini, Abakin, Avshalumova, Ahmed,  John Does 1

through 20 and ABC Corporations 1 through 20 made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs for payment.

690.    Defendants JAGA Medical Services, Logic Chiropractic, VSL Acupuncture and High Level Care Physical Therapy, Avellini, Abakin, Avshalumova, Ahmed, John Does 1 through 20 and ABC Corporations 1 through 20 intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiffs, concealed the fact that the bills submitted to Plaintiffs for reimbursement of No-fault benefits the Fraudulent Services were materially misrepresented.

691.    Defendants JAGA Medical Services, Logic Chiropractic, VSL Acupuncture and High Level Care Physical Therapy, Avellini, Abakin, Avshalumova, Ahmed, John Does 1 through 20 and ABC Corporations 1 through 20 intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiffs, concealed the fact that, in many instances, the services relating to Fraudulent Services were provided pursuant to a pre-determined protocol that was intended to maximize Defendants' profit and reimbursement of payments from the Plaintiffs, as opposed to medical necessity.

692.    Defendants intentionally, knowingly, fraudulently, and with the intent to deceive, submitted patient medical records, reports, treatment verifications and bills for medical treatment which contained false representations of material facts, including but not limited to the following fraudulent material misrepresentations:

   a) False and misleading statements and information designed to conceal the fact that Defendants provided services according to a treatment protocol intended to fraudulently bill Plaintiffs for *inter alia*, medical evaluations, diagnostic tests, chiropractic treatment, acupuncture treatment, and physical therapy, irrespective of medical necessity;

   b) False and misleading statements and information designed to conceal the fact that the Fraudulent Services were provided pursuant to an illegal referral and/or financial arrangement between and among the Defendants;

169

c) False and misleading statements made by JAGA Medical Services in which it recorded incomplete and/or fabricated Claimant complaints and medical histories to support pre-determined diagnose to justify the billing for initial and follow-up examinations and outcome assessment testing irrespective of medical necessity, and to justify referrals for diagnostic tests, acupuncture, physical therapy and chiropractic services with the intent to defraud Allstate;

d) False and misleading statements made by Jaga Medical Services in which JAGA Medical Services falsely claimed the initial examinations it purportedly performed on Claimants were reimbursable pursuant to CPT Codes 99205, 99204 or 99243, when they were not;

e) False and misleading statements made by JAGA Medical Services in order to justify the billing for Electrodiagnostic Testing when in fact such services were medically unnecessary and/or of no diagnostic or treatment value;

f) False and misleading statements made by High Level Care Physical Therapy concerning Claimants conditions in order to justify the billing almost identical physical therapy treatments to virtually every Claimant irrespective of medical necessity;

g) False and misleading statements made by High Level Care Physical Therapy regarding the severity of Claimants' conditions in order to justify the provision of physical therapy services which were provided, if at all, pursuant to an illegal treatment protocol irrespective of medical necessity;

h) False and misleading statements made by Logic Chiropractic through which it fraudulently diagnosed every Claimant with sprains and strains in the cervical, thoracic, and lumbar regions of the back in order to justify fraudulent billing for adjustments to the vertebral motion segments, trigger point therapy, neuromuscular reeducation exercise, mechanical traction, electrical stimulation, and hot packs;

i) False and misleading statements made by Logic Chiropractic regarding the severity of Claimants' conditions in order to justify the provision of chiropractic services which were provided, if at all, pursuant to an illegal treatment protocol irrespective of medical necessity;

j) False and misleading statements made by VSL Acupuncture in which it falsely identified identical meridian points for each Claimant irrespective of the Claimants complaints or physical condition;

k) False and misleading statements made by VSL Acupuncture regarding the severity of Claimants' conditions in order to justify the provision of acupuncture services which were provided, if at all, pursuant to an illegal treatment protocol irrespective of medical necessity;

l) False and misleading statements contained in the initial and follow-up reports of JAGA Medical Services, Logic Chiropractic, High Level Care Physical Therapy and VSL Acupuncture concerning each patient's condition and/or diagnosis to justify the continued necessity of the Fraudulent Services irrespective of improvements in a Claimant's condition; and

m) Other misrepresentations, including but not limited to those contained in paragraphs a through l above.

693. On information and belief, in numerous instances, the medical records, reports and bills submitted by Defendants to Plaintiffs in connection with the Fraudulent Services set forth fictional representations of each Claimant's condition and services provided. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the Claimants and the consumer public, particularly if the sham and fictional diagnoses were to be relied upon by any subsequent healthcare provider.

694. The foregoing was intended to deceive and mislead the Plaintiffs into believing that Defendants were providing medically valid services when, in fact, they were not.

695. Defendants knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

696. Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations, which Plaintiffs were led to believe existed as a result of Defendants' acts of fraud and deception.

697. Had Plaintiffs known of the fraudulent content of, and misrepresentations in, the medical records, reports, treatment verifications, and bills for medical treatment, they would not have paid Defendant's claims for No-fault insurance benefits submitted in connection therewith.

698.    Furthermore, Defendants' far reaching pattern of fraudulent conduct evinces a high degree of moral turpitude and wanton dishonesty which, as alleged above, has harmed, and will continue to harm, the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

699.    By reason of the foregoing, Plaintiffs have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $265,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## SIXTEENTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS JAGA MEDICAL SERVICES, MINDFUL CHIROPRACTIC, STANDARD CARE PT, AHMED PT, MILAS ACUPUNCTURE, AVELLINI, LACROIX, ELBEGRMI, AHMED AND AVSHALUMOVA

### (Common Law Fraud-Billing Fraud)

700.    The allegations of paragraphs 1 through 474 are hereby repeated and realleged as though fully set forth herein.

701.    Defendants JAGA Medical Services, Mindful Chiropractic, Standard Care PT, Ahmed PT, Milas Acupuncture, Avellini, Lacroix, Ahmed, Avshalumova, John Does 1 through 20 and ABC Corporations 1 through 20, intentionally, knowingly, fraudulently, and with an intent to deceive Plaintiffs, made numerous false and misleading statements of material fact as to the necessity of the medical services purportedly rendered and that the medical services were provided when in fact they were not provided as billed and exaggerated the level of service, if any, purportedly provided, thereby inducing Plaintiffs to make payments to Defendants that Defendants were not entitled to because of their fraudulent nature.  As part of the fraudulent scheme, JAGA Medical Services, Mindful Chiropractic, Standard Care PT, Ahmed PT, Milas

Acupuncture, Avellini, Lacroix, Ahmed, Avshalumova,  John Does 1 through 20 and ABC Corporations 1 through 20 made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs for payment.

702.    Defendants JAGA Medical Services, Mindful Chiropractic, Standard Care PT, Ahmed PT, Milas Acupuncture, Avellini, Lacroix, Ahmed, Avshalumova, John Does 1 through 20 and ABC Corporations 1 through 20 intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiffs, concealed the fact that the bills submitted to Plaintiffs for reimbursement of No-fault benefits the Fraudulent Services were materially misrepresented.

703.    Defendants JAGA Medical Services, Mindful Chiropractic, Standard Care PT, Ahmed PT, Milas Acupuncture, Avellini, Lacroix, Ahmed, Avshalumova,  John Does 1 through 20 and ABC Corporations 1 through 20 intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiffs, concealed the fact that, in many instances, the services relating to Fraudulent Services were provided pursuant to a pre-determined protocol that was intended to maximize Defendants' profit and reimbursement of payments from the Plaintiffs, as opposed to medical necessity.

704.    Defendants intentionally, knowingly, fraudulently, and with the intent to deceive, submitted patient medical records, reports, treatment verifications and bills for medical treatment which contained false representations of material facts, including but not limited to the following fraudulent material misrepresentations:

a) False and misleading statements and information designed to conceal the fact that Defendants provided services according to a treatment protocol intended to fraudulently bill Plaintiffs for *inter alia,* medical evaluations, diagnostic tests, chiropractic treatment, acupuncture treatment, and physical therapy, irrespective of medical necessity;

b) False and misleading statements and information designed to conceal the fact that the Fraudulent Services were provided pursuant to an illegal referral and/or financial arrangement between and among the Defendants;

c) False and misleading statements made by JAGA Medical Services  in which it recorded incomplete and/or fabricated Claimant complaints and medical histories to support pre-determined diagnose to justify the billing for initial and follow-up examinations and outcome assessment testing irrespective of medical necessity, and to justify referrals for diagnostic tests, acupuncture, physical therapy and chiropractic services with the intent to defraud Allstate;

d) False and misleading statements made by JAGA Medical Services in which JAGA Medical Services falsely claimed the initial examinations it purportedly performed on Claimants were reimbursable pursuant to CPT Codes 99205, 99204 or 99243, when they were not;

e) False and misleading statements made by JAGA Medical Services in order to justify the billing for Electrodiagnostic Testing when in fact such services were medically unnecessary and/or of no diagnostic or treatment value;

f) False and misleading statements made by Standard Care PT and Ahmed PT concerning Claimants conditions in order to justify the billing almost identical physical therapy treatments to virtually every Claimant irrespective of medical necessity;

g) False and misleading statements made by Standard Care PT and Ahmed PT regarding the severity of Claimants' conditions in order to justify the provision of physical therapy services which were provided, if at all, pursuant to an illegal treatment protocol irrespective of medical necessity;

h) False and misleading statements made by Mindful Chiropractic through which it fraudulently diagnosed every Claimant with sprains and strains in the cervical, thoracic, and lumbar regions of the back in order to justify fraudulent billing for adjustments to the vertebral motion segments, trigger point therapy, neuromuscular reeducation exercise, mechanical traction, electrical stimulation, and hot packs;

i) False and misleading statements made by Mindful Chiropractic regarding the severity of Claimants' conditions in order to justify the provision of chiropractic services which were provided, if at all, pursuant to an illegal treatment protocol irrespective of medical necessity;

j) False and misleading statements made by Milas Acupuncture in which it falsely identified identical meridian points for each Claimant irrespective of the Claimants complaints or physical condition;

k) False and misleading statements made by Milas Acupuncture regarding the severity of Claimants' conditions in order to justify the provision of acupuncture services which were provided, if at all, pursuant to an illegal treatment protocol irrespective of medical necessity;

l) False and misleading statements contained in the initial and follow-up reports of JAGA Medical Services, Mindful Chiropractic, Standard Care PT and Ahmed PT and Milas Acupuncture concerning each patient's condition and/or diagnosis to justify the continued necessity of the Fraudulent Services irrespective of improvements in a Claimant's condition; and

m) Other misrepresentations, including but not limited to those contained in paragraphs a through l above.

705.    On information and belief, in numerous instances, the medical records, reports and bills submitted by Defendants to Plaintiffs in connection with the Fraudulent Services set forth fictional representations of each Claimant's condition and services provided.  The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the Claimants and the consumer public, particularly if the sham and fictional diagnoses were to be relied upon by any subsequent healthcare provider.

706.    The foregoing was intended to deceive and mislead the Plaintiffs into believing that Defendants were providing medically valid services when, in fact, they were not.

707.    Defendants knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

708.    Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations, which Plaintiffs were led to believe existed as a result of Defendants' acts of fraud and deception.

709.    Had Plaintiffs known of the fraudulent content of, and misrepresentations in, the medical records, reports, treatment verifications, and bills for medical treatment, they

would not have paid Defendant's claims for No-fault insurance benefits submitted in connection therewith.

710.    Furthermore, Defendants' far reaching pattern of fraudulent conduct evinces a high degree of moral turpitude and wanton dishonesty which, as alleged above, has harmed, and will continue to harm, the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

711.    By reason of the foregoing, Plaintiffs have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $421,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

### SEVENTEENTH CLAIM FOR RELIEF

### AGAINST ALL DEFENDANTS

### (Unjust Enrichment/Restitution)

712.    The allegations of paragraphs 1 through 474 are hereby repeated and realleged as though fully set forth herein.

713.    By reason of their wrongdoing, Defendants have been unjustly enriched, in that they have, directly and/or indirectly, received substantial moneys from Plaintiffs that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

714.    Plaintiffs are entitled to recover restitution for the amount that Defendants were unjustly enriched as a result of payments made by Plaintiffs to said Defendants.

715.    By reason of the foregoing, Plaintiffs have sustained compensatory damages and have been injured in their business and property in an amount as yet to be determined, but

believed to be in excess of $1,277,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## EIGHTEENTH CLAIM FOR RELIEF

## <u>AGAINST ALL DEFENDANTS</u>

**(Declaratory Judgment)**
**(Corporate Practice of Medicine**
**New York State Business Corporation Law §§ 1501, *et seq.*)**

716.     The allegations of paragraphs 1 through 474 are hereby repeated and realleged as though fully set forth herein.

717.     During the relevant time period of  the Complaint, the Controllers have used the names of Defendants Avellini, Abakin, Ahmed, Avshalumova, Elbegrmi, and Lacroix, to circumvent the strict tenets of Article 15 of the Business Corporation Law and incorporate the Fraudulently Owned PCs and submit bills to insurers thereunder.

718.     Under New York law, a professional corporation is not eligible to recover No-fault benefits if it is not licensed in accordance with applicable New York State Law and any such entity does not have standing to seek reimbursement under the No-fault Law.  As a matter of eligibility and standing, the New York Court of Appeals held in *State Farm Mut. Auto. Ins. Co. v. Mallela*, 4 N.Y.3d 313, 827 N.E.2d 758, 794 N.Y.S.2d 700 (2005), that a fraudulently incorporated and/or professional corporation not licensed in accordance with New York State Law, such as the Fraudulently Owned PCs, not formed and/or operated in accordance with Article 15 of the Business Corporation Law, is not entitled to recover No-fault benefits.

719.     As the Fraudulently Owned PCs are fraudulently incorporated and/or are not licensed and/or operated in accordance with applicable New York State Law, with a nominal owner listed on each certificate of incorporation filed with the Department of State, concealing the true owners, it is respectfully requested that this Court issue an order declaring that Allstate

is under no obligation to pay any of Fraudulently Owned PCs' No-fault claims because the Fraudulently Owned PCs are not properly licensed in accordance with New York State Law.

720.    As the Fraudulently Owned PCs are fraudulently incorporated and/or fraudulently licensed and/or operated, with nominal owners listed on the certificates of incorporation filed with the Department of State, concealing the true beneficial owners, it is respectfully requested that this Court issue an order declaring that the Fraudulently Owned PCs are ineligible to recover benefits under the New York State No-fault Law and, therefore, Allstate is under no obligation to pay any of Fraudulently Owned PCs' No-fault claims because of the Fraudulently Owned PCs' illegal corporate structure.

721.    Allstate has no adequate remedy at law.

722.    The Fraudulently Owned PCs will continue to bill Allstate for No-fault services despite their illegal corporate form and fraudulent incorporation absent a declaration by this Court that their activities are unlawful and that Allstate has no obligation to pay the pending, previously-denied and any future No-fault claims submitted by the Fraudulently Owned PCs due to their illegal corporate structure.

## NINETEENTH CLAIM FOR RELIEF

## AGAINST ALL DEFENDANTS

### (Declaratory Judgment under 28 U.S.C. § 2201)
### (Fraudulent Billing Scheme)

723.    The allegations of paragraphs 1 through 474 are hereby repeated and realleged as though fully set forth herein.

724.    At all relevant times mentioned herein, each and every bill mailed by the Defendants, through the Fraudulently Owned PCs, to Plaintiffs sought reimbursement for

services that were never rendered, not of any diagnostic or treatment value and/or reflected a pattern of billing for services that were medically unnecessary.

725.    At all times relevant herein, the Defendants exploited the No-fault Law through the utilization of various deceptive billing tactics engineered to maximize the amount of reimbursement from insurers, in general, and Plaintiffs, in particular, through the submission of fraudulent billing documents pursuant to a fraudulent treatment protocol irrespective of medical necessity.

726.    In view of the Fraudulently Owned PCs submission of fraudulent bills to Plaintiffs, Plaintiffs contend that the Fraudulently Owned PCs have no right to receive payment for any pending bills they have submitted because:

- The Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs to obtain reimbursement for services that were never rendered, not provided as billed, not of any diagnostic or treatment value and/or reflected a pattern of billing for services that were medically unnecessary services;

- The Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs as to the medical necessity of billed-for services, when such services, if performed at all, were performed pursuant to a pre-determined treatment protocol designed solely to maximize reimbursement for the Defendants;

- The Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs seeking reimbursement for services performed pursuant to illegal referral and/or financial arrangement(s) between the Defendants.

727.    As the Defendants have knowingly made the foregoing false and fraudulent misrepresentations about the  services purportedly provided to No-fault Claimants and the amounts they were entitled to be reimbursed, I, it is respectfully requested that this Court issue an order declaring that the Fraudulently Owned PCs are not entitled to receive payment on any

pending, previously-denied and/or submitted unpaid claims and Plaintiffs, therefore, are under no obligation to pay any of Fraudulently Owned PCs' No-fault claims.

728.   Plaintiffs have no adequate remedy at law.

729.   The  Defendants will continue to bill Plaintiffs for false and fraudulent claims for reimbursement absent a declaration by this Court that Plaintiffs have no obligation to pay the pending, previously-denied and/or submitted unpaid claims, regardless of whether such unpaid claims were ever denied, regardless of the purported dates of service.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE,** Plaintiffs demand judgment as follows:

i)   Compensatory damages in an amount in excess of $1,277,000.00, the exact amount to be determined at trial, together with prejudgment interest;

ii)   Punitive damages in such amount as the Court deems just;

iii)   Treble damages, costs and reasonable attorneys' fees on the First through Twelfth Claims for Relief, together with prejudgment interest;

iv)   Compensatory and punitive damages on the Thirteenth through Sixteenth Claims for Relief, together with prejudgment interest;

v)   Compensatory damages on the Seventeenth Claim for Relief, together with prejudgment interest;

vi)   Declaratory Relief on the Eighteenth Claim for Relief declaring that Plaintiffs are under no obligation to pay any of the Fraudulently Owned PCs' No-fault claims because of their illegal corporate structure;

vii)   Declaratory Relief on the Nineteenth Claim for Relief declaring that Plaintiffs are under no obligation to pay any of the Fraudulently Owned PCs' No-fault claims that were for services that were never rendered, not of any diagnostic or treatment value and/or reflected a pattern of billing for services that were medically unnecessary; and

viii)   Costs, reasonable attorneys' fees and such other relief that the Court deems just and proper.

Dated:  New York, New York,
        September 2, 2021

                                  Morrison Mahoney, LLP

                              By__ /s/ Lee Pinzow_____
                                  Robert A. Stern
                                  James A. McKenney
                                  Daniel S. Marvin
                                  Lee Pinzow
                                  Attorneys for Plaintiffs
                                  Wall Street Plaza
                                  88 Pine Street, Suite 1900
                                  New York, New York 10005
                                  (212) 825-1212

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

......................................................................... X

ALLSTATE INSURANCE COMPANY, ALLSTATE FIRE AND CASUALTY )
INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, AND ALLSTATE )
PROPERTY & CASUALTY INSURANCE COMPANY, )

                                PLAINTIFFS, )

               -against- )

JAMES AVELLINI, M.D., ANATOLIY ABAKIN, D.C., AHMED AHMED, P.T. )
A/K/A AHMED ABASS, LUDMILA AVSHALUMOVA, L.AC., AMR SAMY )
ELBEGRMI, P.T., BRAD LACROIX, D.C., JAGA MEDICAL SERVICES, P.C., )
CORONA MEDICAL PLAZA P.C., ABA CHIROPRACTIC P.C., AHMED )
AHMED PT P.C., ELMONT REHAB PT, P.C. D/B/A WAVE CREST )
REHABILITATION PT., HIGH LEVEL CARE PHYSICAL THERAPY P.C., )
LOGIC CHIROPRACTIC, P.C., MILAS ACUPUNCTURE, P.C., MINDFUL )
CHIROPRACTIC P.C., STANDARD CARE P.T. P.C., UGP ACUPUNCTURE )
P.C., VSL ACUPUNCTURE P.C., JOHN DOES 1 THROUGH 20, AND ABC )
CORPORATIONS 1 THROUGH 20, )

                          DEFENDANTS. )

......................................................................... X

CIVIL ACTION

21-CV-4951

JURY TRIAL
DEMANDED

**COMPLAINT**

MORRISON MAHONEY, LLP
ATTORNEYS FOR PLAINTIFFS
WALL STREET PLAZA
88 PINE STREET, SUITE 1900
NEW YORK, NEW YORK 10005
TELEPHONE: (212) 825-1212